**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

CITY OF COLUMBUS,
90 W. Broad St.
Columbus, OH 43215;

MAYOR AND CITY COUNCIL OF
BALTIMORE,
100 N. Holiday St., Suite 101
Baltimore, MD 21202;

CITY OF CHICAGO,
121 N. Lasalle St., Room 600
Chicago, IL 60602;

PIMA COUNTY,
115 N. Church Avenue
2nd Floor, Suite 231
Tucson, AZ 85701;

DOCTORS FOR AMERICA,
2300 18th St NW
Washington, DC 20009; and

MAIN STREET ALLIANCE,
909 Rose Ave, Suite 400
North Bethesda, MD 20852,

   *Plaintiffs*,

  vs.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the United States
Department of Health and Human Services,
200 Independence Ave. SW
Washington, DC 20201;

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
200 Independence Ave. SW
Washington, DC 20201;

Case No. _____

MEHMET OZ, in his official capacity as
Administrator of the Centers for Medicare and
Medicaid Services,
7500 Security Blvd.
Baltimore, MD 21244; and

CENTERS FOR MEDICARE & MEDICAID
SERVICES,
7500 Security Blvd.
Baltimore, MD 21244,

       *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs the City of Columbus, Ohio; the Mayor and City Council of Baltimore; Maryland; the City of Chicago, Illinois; Pima County, Arizona; Doctors for America; and Main Street Alliance hereby sue Defendants Robert F. Kennedy, Jr., in his official capacity as Secretary of the U.S. Department of Health and Human Services; the U.S. Department of Health and Human Services; Mehmet Oz, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services; and the Centers for Medicare & Medicaid Services, and allege the following:

## INTRODUCTION

1. When the Affordable Care Act (ACA) was enacted in 2010, millions of Americans gained access to affordable, comprehensive health care for the first time. Individuals could seek the medical care they needed, when they needed it, and medical providers across the country were better able to provide optimal treatment to their patients. One of the ways the ACA has achieved this result is through the establishment of health insurance Exchanges, where individuals can identify and enroll in affordable insurance policies that meet their health care needs. To ensure lower costs for more comprehensive coverage, the ACA subsidizes the costs of that coverage, which leads younger and healthier individuals to the insurance market, improving the risk pool and lowering premiums for everyone. And the ACA guarantees that individuals are not denied coverage because of a pre-existing health condition or discriminated against based on their history of insurance coverage.

2. The Centers for Medicare & Medicaid Services (CMS), on behalf of the Department of Health and Human Services (HHS), has now published a final rule, purportedly pursuant to the ACA, whose effects will be directly contrary to that landmark legislation. That rule—entitled "Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2027; and Basic Health Program" (2026 Rule), 91 Fed. Reg. 29,526 (May 20,

1

2026)—purports to "improve implementation of the Patient Protection and Affordable Care Act" and "provid[e] quality, more affordable coverage to consumers while minimizing administrative burden and ensuring program integrity." *Id.* at 29,526. But the rule accomplishes the opposite.

3.    Rather than making coverage more affordable or removing barriers to obtaining quality health coverage, the rule will almost certainly cause at least three million Americans to lose coverage on the ACA's health insurance Exchanges in 2026 alone and will result in higher premiums and higher out-of-pocket costs for the remaining enrollees.

4.    The new rule is a continuation of the prior Trump Administration's years-long effort to undermine the ACA. During the first Trump presidency, the Administration vowed to "watch Obamacare go down the tubes."[1] Previously, in a 2019 rule, 83 Fed. Reg. 16,930 (Apr. 17, 2018), CMS and HHS attempted to contravene the ACA with proposals that would have eliminated many of the ACA's guarantees, deterred consumers from enrolling in quality health insurance plans, and increased out-of-pocket costs. This Court responded to those efforts, vacating and remanding portions of the rule as unlawful and arbitrary and capricious. The second Trump administration returned to the same playbook, again seeking to impose provisions that would drive up the cost of coverage and throw people off the insurance rolls. 90 Fed. Reg. 27,074 (June 25, 2025). This Court again rejected that effort.

5.    Now, the Trump-Vance Administration returns yet again with another "death by a thousand paper cuts" approach to the ACA. Cloaked in the pretense of government efficiency and fraud prevention, the 2026 rule creates numerous barriers to affordable insurance coverage, negating the ACA's goal of extending affordable health coverage to all Americans, and instead increasing the population of underinsured and uninsured Americans. Many of this rule's provisions

---

[1] *Excerpts From The Times's Interview with Trump*, N.Y. Times (July 19, 2017), https://perma.cc/XT6Q-LSPA.

are in direct conflict with federal law. And many of its provisions are arbitrary, having been promulgated without observance of proper procedure, reasonable explanation, or meaningful response to public comments, and without consideration of the harm the rule will impose on the millions of consumers whose health and well-being depend on access to affordable coverage. In the absence of judicial intervention, the new rule will go into effect on July 20, 2026.

<b>JURISDICTION AND VENUE</b>

6.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs' challenge to the 2026 rule is reviewable under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

7.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(A) and (C). Defendants are agencies and officers of the United States and Defendant CMS is headquartered in Woodlawn, Maryland. Plaintiffs Main Street Alliance and the Mayor and City Council of Baltimore also reside in Maryland.

<b>PARTIES</b>

8.    Plaintiff the City of Columbus, Ohio, is a municipal corporation organized under Ohio law. *See* Ohio Const. art. XVIII. Columbus has all the powers of local self-government and home rule under the constitution and laws of the state of Ohio, which are exercised in the manner prescribed by the charter of the City of Columbus.[2] Columbus, located in Franklin County, is the capital of Ohio. It is the largest city in the state and the fifteenth largest city in the United States, with a population of around 933,000, according to 2025 census estimates. Columbus provides a wide range of services on behalf of its residents, including health services for families and children, public health, public assistance, and emergency medical care.

---

[2] *See City Code and Charter*, City of Columbus (May 28, 2025), https://perma.cc/B9VK-D6JH; Ohio Rev. Code Ann. § 715.01 (West 1953).

3

9.    Plaintiff the Mayor and City Council of Baltimore represent the largest city in Maryland and thirtieth largest city in the United States, with a population of around 570,000, according to 2025 census estimates. The Baltimore City Health Department is a city agency that has wide-ranging responsibilities for providing health services to residents of the city.[3]

10.    Plaintiff the City of Chicago, Illinois, is a municipal corporation and home-rule unit organized and existing under the constitution and law of the state of Illinois.[4] Located in Cook County, Chicago is the largest city in Illinois and the third-largest city in the United States, with a population of over 2.7 million, according to 2025 census estimates. Chicago provides a wide range of services on behalf of its residents, including health services, public assistance, and emergency medical care.

11.    Plaintiff Pima County is a political subdivision of the State of Arizona, organized and operating under the constitution and laws of Arizona.[5] Geographically, Pima County encompasses approximately 9,200 square miles in south-central Arizona. It is the state's second-most populous county with a population of 1,074,685 according to 2025 census estimates. The city of Tucson is the largest municipality in Pima County. Pima County is legally mandated to administer state laws and manage regional public systems, including public health. Pima County, through the Pima County Health Department, operates four clinic sites and four mobile health units. Pima County is required to provide certain health services, including maternal child health, preschool health screening, family planning, public health nursing, premature and newborn immunizations, nutrition, dental care prevention, preschool health screening, as well as disease

---

[3] *See* Balt. City Charter, art. VII, §§ 54-56, https://perma.cc/9WAJ-BUXZ.
[4] *See* Ill. Const. art. VII.
[5] *See* Ariz. Const. art XII; Arizona Revised Statutes, Title 11.

control programs that address and support diagnosis and treatment of chronic disease, communicable disease, tuberculosis, and venereal disease.[6]

12.     Plaintiff Doctors for America (DFA) is a not-for-profit, § 501(c)(3) organization with over 27,000 member physicians and medical trainees (including medical residents and students) in all 50 states. DFA mobilizes doctors, medical trainees, and other health professionals to be leaders who put patients over politics to improve the health of patients, communities, and the nation. DFA also advocates for comprehensive health system reform, expansion of health insurance coverage, and improvements to health care delivery so that the health system better meets patients' needs.

13.     Plaintiff Main Street Alliance (MSA) is a § 501(c)(3) organization and national network of small businesses, with approximately 30,000 small business members throughout the United States, many of whom rely on the ACA Exchanges for health insurance.

14.     Defendant Robert F. Kennedy, Jr., is sued in his official capacity as Secretary of HHS.

15.     Defendant HHS is a federal agency headquartered at 200 Independence Ave. SW, Washington, D.C. 20201.

16.     Defendant Mehmet Oz is sued in his official capacity as Administrator of CMS.

17.     Defendant CMS is a component of HHS and is headquartered at 7500 Security Boulevard, Baltimore, MD 21244.

---

[6] Ariz. Revised Statutes § 36-104.

## BACKGROUND

### I.    The ACA Aims to Provide Affordable Health Insurance for All Americans

18.    In 2010, Congress enacted the Patient Protection and Affordable Care Act. Pub. L. No. 111-148, 124 Stat. 119 (2010) (as amended by Pub. L. No. 111-152, 124 Stat. 1029 (2010)). "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012); *see also King v. Burwell*, 576 U.S. 473, 479 (2015).

19.    Before the Act's market reforms went into effect in 2014, "individual health insurance markets were dysfunctional." *City of Columbus v. Cochran (City of Columbus II)*, 523 F. Supp. 3d 731, 740 (D. Md. 2021). Insurers were free to deny coverage for people with pre-existing conditions, to refuse to renew such coverage, or even to revoke such coverage after it had been issued. Now, however, the Act's "guaranteed issue" requirement specifies that every "health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every employer and individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), subject to specified exceptions, such as the restriction of enrollments to an annual open enrollment period or special enrollment periods, *id.* § 300gg-1(b); *see Me. Cmty. Health Options v. United States,* 590 U.S. 296, 301 (2020). "In other words, the Act 'ensure[s] that anyone can buy insurance.'" *Me. Cmty. Health Options*, 590 U.S. at 301 (quoting *King*, 576 U.S. at 493).

20.    Health insurance plans must cover a set of "essential health benefits," such as prescription drugs. 42 U.S.C. § 300gg-6(a). And to protect patients from devastating costs when a medical condition exhausts their coverage, the Act limits so-called "cost-sharing"—like deductibles and copayments—for these essential health benefits. *See id.* § 18022(c)(3). The limitation on cost-sharing is adjusted each year by a "premium adjustment percentage," which compares average premiums for "health insurance coverage" in the current year with the same

average for 2013, before the Act's market reforms went into effect. *Id.* § 18022(c)(1), (4). Under the formula that CMS currently uses to calculate this premium adjustment percentage, the maximum out-of-pocket limit (MOOP) that a plan could impose on an enrollee for 2027 would be $12,000 for self-only coverage and $24,000 for family coverage. *See* 91 Fed. Reg. at 29,691.

21.    To help individuals learn about and enroll in health insurance, the Act "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King*, 576 U.S. at 482 (quoting 42 U.S.C. § 18031(b)(1)); *see Me. Cmty. Health Options*, 590 U.S. at 301. These Exchanges, also known as health insurance Marketplaces, enable people not eligible for Medicare or Medicaid to obtain adequate, affordable insurance independent of their jobs. The Exchanges therefore serve as "marketplace[s] that allow[] people to compare and purchase" ACA-compliant plans. *King*, 576 U.S. at 479.

22.    There are several different types of Exchanges. Some states have elected to create Exchanges themselves (state-based Exchanges or SBEs), as is the case in Maryland and Illinois, while others have created Exchanges that operate on the federal Healthcare.gov platform (state-based Exchanges on the federal platform, or SBE-FPs). The Exchange in other states, including Ohio and Wisconsin, is operated by CMS (the federally facilitated Exchange, or FFE). *See* CMS, Consumer Info. & Ins. Oversight, *State-Based Exchanges*, https://perma.cc/L4DF-DQYJ.

23.    Plans that are offered on the Exchanges are known as "qualified health plans." In order to be certified as a qualified health plan, these plans must meet the market reforms described above, as well as additional Exchange requirements applicable to qualified health plans. CMS is responsible for "establish[ing] criteria for the certification of health plans as qualified health plans," including reviewing the plans' "network adequacy" to ensure the plan offers "a sufficient choice of providers," 42 U.S.C. § 18031(c)(1)(B), and includes within its network "essential

community providers" that serve predominately low-income, medically underserved individuals, *id.* § 18031(c)(1)(C). Individuals enroll in qualified health plans for a given benefit year during an annual open enrollment period, or under specified special enrollment periods. *Id.* § 18031(c)(6). To assist with enrollment, the Act requires Exchanges to award grants to healthcare "Navigators" that conduct public education and awareness campaigns, help consumers understand their choices, facilitate their enrollment, and ensure their access to consumer protections. *Id.* § 18031(i)(1), (3).

24.    Plans on the Exchanges offer various levels of generosity: a "bronze" plan is designed to provide benefits that are actuarially equivalent to 60% of the full value of benefits covered by the plan (meaning that premiums are calculated in the expectation that 40% of the cost of coverage would be paid for through enrollee out-of-pocket spending), and "silver," "gold," and "platinum" plans are designed to provide benefits that are actuarially equivalent to 70%, 80%, and 90%, respectively, of the full value of benefits under the plan. *Id.* § 18022(d)(1). Because actuarial predictions may be imprecise, the Act specifies that CMS may "provide for a de minimis variation … to account for differences in actuarial estimates." *Id.* § 18022(d)(3).

25.    The Act also "seeks to make insurance more affordable by giving refundable tax credits to individuals" who are enrolled in these metal levels of coverage. *King*, 576 U.S. at 482 (citing 26 U.S.C. § 36B). These "premium tax credits" (PTCs) vary depending on an individual's income—individuals who earn more must pay more of the cost of their premium—but are generally pegged to the cost of the so-called "benchmark silver plan," or the second-lowest-cost silver plan offered within a market. *See, e.g.*, 26 U.S.C. § 36B(b)(3)(B)-(C). The Act initially made these tax credits available to individuals with incomes between 100% and 400% of the federal poverty level. *Id.* There was no income cap on these tax credits from 2021 to 2025, *see* 26 U.S.C. § 36B(b)(3)(A)(iii), but the 400% income cap was reinstated for 2026. In addition to PTCs, eligible

8

individuals with incomes between 100% and 250% of the federal poverty level benefit from "cost-sharing reductions" that limit their exposure to out-of-pocket costs. 42 U.S.C. § 18071(c).

26.     PTCs are claimed on an individual's tax return after the end of the year and are paid by the IRS. 26 U.S.C. § 36B(h). Rather than waiting to recover their costs later, enrollees may claim "advance premium tax credits" (APTCs) upfront so that the value of the tax credits may be applied directly to the purchase of insurance. 42 U.S.C. §§ 18081, 18082; *City of Columbus II*, 523 F. Supp. 3d at 741. CMS is responsible for determining whether individuals meet the statutory eligibility requirements for APTCs and cost-sharing reductions, as well as for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances." 42 U.S.C. § 18081(f)(1)(B).

27.     In addition to the metal levels of coverage described above, the Act also permits insurers to offer "catastrophic plans" that do not cover any benefits (with the exception of three primary care visits) until the enrollee incurs the statutory out-of-pocket maximum in a given year. *Id*. § 18022(e)(1). Enrollees in catastrophic plans are not eligible for premium tax credits or cost-sharing reductions. 26 U.S.C. § 36B(c)(3)(A). Enrollment in a catastrophic plan in any given "plan year" is limited to individuals under 30 years of age, 42 U.S.C. § 18022(e)(2); individuals without access to affordable health coverage, *id*.; or individuals who, in a given month, are found by CMS "to have suffered a hardship with respect to the capability to obtain coverage under a qualified health plan," 26 U.S.C. § 5000A(e)(5); 42 U.S.C. § 18022(e)(2)(B)(ii).

28.     In sum, the Act requires that insurers generally offer only quality health insurance and aims to lower the cost of coverage to encourage individuals to enroll. This coverage improves access to care and overall health and reduces financial burdens on consumers as well as institutions that pay for uncompensated care. Increasing enrollment in quality health insurance coverage is not only the ACA's immediate goal; it is also key to the Act's long-term success. Insurance market

stability requires robust enrollment, particularly by relatively healthy individuals. Limiting the cost of health insurance is, in turn, essential to promoting enrollment. By driving costs down and insured rates up, the Act ensures that insurance markets function smoothly.

29.     When faithfully implemented, the Act's reforms successfully meet Congress's goal of enabling more individuals to enroll in health insurance coverage. More than 24 million individuals were enrolled in Marketplace coverage in 2025. Press Release, CMS, Over 24 Million Consumers Selected Affordable Health Coverage in ACA Marketplace for 2025 (Jan. 17, 2025), https://perma.cc/N8QF-NKHG. Enrollment has dropped significantly in 2026, however, given the expiration of the enhanced premium tax credits that had been in effect for the previous five years; it is likely that an average of 17.5 million people will be enrolled in Marketplace coverage over the course of 2026. *See* Matt McGough et al., *What We Know So Far About 2026 ACA Marketplace Enrollment, Premiums, and Deductibles*, KFF (May 19, 2026), https://perma.cc/NP62-E5F3.

**II.     CMS Publishes Its 2026 Rule, Flouting the Goals and Purpose of the ACA**

30.     The 2026 rule sets forth a wide range of changes that will render coverage on the Exchanges less affordable, less generous, and harder to obtain. Together, these policies undermine the ACA's purpose by reducing insurance affordability and benefits, creating administrative burdens that make it harder for individuals to enroll in and maintain insurance coverage, and narrowing eligibility for coverage across the board. CMS itself projects that its rule will cause as many as two million additional enrollees to drop coverage in 2027 alone, and that the provisions of its rule that are at issue here will cause premiums to rise by as much as 2.4% next year. 91 Fed. Reg. at 29,854. The agency is almost certainly underestimating the effect of its rule on both scores. The rule accomplishes these results through measures that impose barriers on enrollees attempting to gain coverage, that increase costs for enrollees, and that promote less comprehensive coverage.

31.    *Failure-to-Reconcile Penalty*. The amount of APTCs that an enrollee receives over the course of a year and the amount of PTCs that the enrollee receives on his or her tax return depend on the same statutory formula; APTCs are intended to be a substitute for the tax credit. 26 U.S.C. § 36B; 42 U.S.C. § 18082. But APTCs are calculated based on projected income, so if that projection turns out to be incorrect (because, for example, the enrollee works more hours than expected), he or she might unwittingly owe a tax payment at the end of the year. Under current policy, any such enrollee must be given notice of the tax debt in the first year of enrollment in coverage after the debt is incurred, so that the debt can be repaid; if he or she does not do so, eligibility for APTCs may be revoked in the second year. 45 C.F.R. § 155.305(f)(4)(i), (ii). The final rule revokes that grace period for the FFE and requires that Exchange to determine the enrollee to be ineligible for APTCs in the first year, *id.* § 155.305(f)(4)(iii), even though CMS lacks any authority to alter the statutory formula for eligibility for APTCs, and even though this Court stayed the operation of an identical provision in last year's rule, *City of Columbus v. Kennedy (City of Columbus III)*, 796 F. Supp. 3d 123, 162-63 (D. Md. 2025). Both the one-year and two-year versions of this policy are unlawful.

32.    *Mandatory Verification for Low-Income Enrollees*. The final rule adopts a policy requiring Exchanges to obtain additional documentation from all enrollees who project that their household income for the upcoming year will be greater than 100% of the federal poverty level, if the IRS reports data indicating that the enrollee's current income is below that threshold. CMS has tried to adopt this policy twice before, and this Court has rejected that attempt both times; in each instance, this Court held that, because this policy created "immense administrative burdens" for low-income enrollees, the policy "defie[d] logic" and was arbitrary under the APA. *City of Columbus III*, 796 F. Supp. 3d at 168; *City of Columbus II*, 523 F. Supp. 3d at 763. CMS again

11

acknowledges that this policy would cause tens of thousands of enrollees to lose their coverage. 91 Fed. Reg. at 29,836. The final rule nevertheless attempts to reinstate this policy, on a permanent basis. *Id.* at 29,618.

33.     *Refusal to Accept Attestations from Applicants When Tax Data Is Lacking*. Under current policy, an Exchange must accept an applicant's attestation of his or her projected annual income if the IRS reports that there is no tax return data available. 45 C.F.R. § 155.320(c)(5). The final rule revokes that policy, and the agency will now require Exchanges to verify income with other data sources and to require applicants to submit documentary evidence or otherwise resolve the income inconsistency; if no such evidence is available, the applicant will lose eligibility for APTCs. 91 Fed. Reg. at 29,621. CMS itself projects that these new data-matching policies will cause more than 400,000 people to lose coverage for the upcoming plan year, *id.* at 29,837, and this is almost certainly a vast understatement. CMS sought to adopt an identical policy in last year's rule, but this Court stayed it on the ground that it was arbitrary. *City of Columbus III*, 796 F. Supp. 3d at 169-70.

34.     *Verification Requirements for Special Enrollment Periods*. The final rule also requires the federally facilitated Exchange to expand the scope of pre-enrollment verification for SEP eligibility to additional SEPs and to conduct this verification for at least 75% of new enrollments through SEPs. 91 Fed. Reg. at 29,631. As they did in response to the materially identical provision in last year's rule, commenters noted that the addition of this paperwork burden will depress coverage on the Exchanges, and CMS itself estimated that it would cost consumers more than $7 million in 2026. 91 Fed. Reg. at 29,838. Although CMS had sought last year to impose this policy for one year only, it now intends to make this policy permanent, despite the

agency's failure to grapple with the considerations that caused this Court to stay last year's version of the policy as arbitrary. *See City of Columbus III*, 796 F. Supp. 3d at 159-60.

35.    *Increased Out-of-Pocket Spending Burdens for Certain Enrollees*. For each metal-level plan (bronze, silver, gold, and platinum), the statute sets an annual limitation on cost-sharing—*i.e.*, the maximum amount that an insured consumer may spend on covered medical expenses each year through deductibles, copayments, and coinsurance. *See* 42 U.S.C. § 18022(c)(1), (3). For plan year 2027, the statutory cost-sharing limitations for these plans would be $12,000 for an individual and $24,000 for a family, *see* 91 Fed. Reg. at 29,691, meaning that an insurer must set the maximum out-of-pocket (MOOP) that an enrollee could incur annually under a plan at or below these amounts. The new rule, however, allows insurers to market individual market bronze plans with MOOPs up to 130% of the statutory limitation ($15,600 for an individual or $31,200 for a family), as long as the insurer offers at least one bronze plan that complies with the statutory limitation. 91 Fed. Reg. at 29,699. By increasing the amount that bronze plan enrollees may pay out of pocket, this change exposes consumers to increased costs for medical care, burdening providers with more uncompensated care, and negatively affecting the risk pool. This policy goes into effect in plan year 2027; a similar policy for catastrophic plans will go into effect in 2028.

36.    *Expansion of Eligibility for Less Comprehensive Forms of Coverage*. In addition to metal-level plans, the ACA provides for catastrophic plans, which do not cover most benefits until after an enrollee has reached the statutory limit on out-of-pocket spending. In light of the high out-of-pocket costs associated with catastrophic plans, premiums are generally lower for catastrophic plans relative to metal-level plans, but premium tax credits cannot be used to purchase catastrophic coverage. The ACA limits catastrophic plan enrollment to individuals under 30 years old or those

13

who are certified as exempt from the individual mandate based on a hardship or because they cannot afford to enroll in a qualified health plan. *See* 42 U.S.C. § 18022(e)(2). CMS has long defined a qualifying hardship narrowly, requiring certain unexpected expenses or qualifying circumstances such as homelessness, domestic violence, bankruptcy, or a natural disaster. *See* 45 C.F.R. § 155.605; *see also* 26 U.S.C. § 5000A(e)(5) (granting the agency authority to determine hardship exemptions).

37.    In September 2025, CMS promulgated guidance that drastically expanded the hardship exemption, such that significantly more people would be eligible to enroll in catastrophic coverage. CMS, *Guidance on Hardship Exemptions for Individuals Ineligible for Advance Payment of the Premium Tax Credit or Cost-Sharing Reductions Due to Income* (Sept. 4, 2025), https://perma.cc/9QMD-RJH2 (*Guidance on Hardship Exemptions*). The new rule codifies and expands on this guidance. CMS will now exempt anyone, in any state, who is ineligible for premium tax credits or cost-sharing reductions because their projected annual household income is below 100% of the federal poverty level or above 250% of the federal poverty level. 91 Fed. Reg. at 29,634. This "broad nationwide hardship exemption," *id.*, will allow individuals over the age of 30 to obtain an exemption they do not otherwise qualify for to enroll in catastrophic coverage based solely on income.

38.    *Permission to Market Multi-Year Catastrophic Plans*. The statute requires that eligibility for a catastrophic plan be determined, at the longest, on an annual basis. 42 U.S.C. § 18022(e)(1). The rule will alter that statutory standard to permit an applicant who is found to be eligible to enroll in a catastrophic plan for one year to remain enrolled on such a plan for as many as ten years, even if they no longer meet the statutory eligibility requirements. The rule will further

siphon enrollees away from comprehensive coverage on the Exchanges, raising premiums for those who remain in that coverage.

39.     *Permission to Market Non-Network Qualified Health Plans*. The statute requires an insurer to demonstrate the "network adequacy" of a plan that it offers on the Exchange, in order to ensure the "availability of in-network … providers" so that an enrollee has a "sufficient choice of providers," and that "essential community providers" are "include[d] within health insurance plan networks." 42 U.S.C. § 18031(c)(1)(B)-(C). The statute does so in order to ensure that enrollees are actually able to use the health coverage that they purchase, as consumers who are required to resort to out-of-network providers are more likely to face higher costs and to forgo needed care. The rule, however, permits insurers, beginning in 2028, to market "non-network" plans that will be nominally cheaper than network plans, but that will not provide enrollees with meaningful coverage. These new non-network plans will essentially operate like fixed indemnity contracts, leaving to the insured the responsibility to pay the provider for any balance billing after applying an amount set by the insurer, without the benefit of the ACA's consumer protections.

40.     *Reduced Standards for Network Adequacy*. The agency's current network adequacy standards for qualified health plans ensure enrollees can access care from a sufficient number and type of providers "without unreasonable delay." 45 C.F.R. § 156.230(a)(1)(ii); *see also id*. § 155.1050. These standards include time and distance thresholds to ensure a consumer can reach various in-network specialty providers. *Id.* § 156.230(a)(2)(i). The regulations also ensure access to essential community providers that serve primarily low-income and underserved populations. *Id.* §§ 156.230(a)(1)(i), 156.235. Collectively, these standards set a "federal floor," 89 Fed. Reg. 26,218, 26,333 (Apr. 15, 2024), for network adequacy standards that apply to qualified health plans offered through the FFE, which reviews and determines whether plans meet these minimum

15

federal standards. In addition, state-based Exchanges and SBE-FPs must "establish and impose network adequacy time and distance standards for QHPs that are at least as stringent as standards for QHPs participating on the Federally-facilitated Exchanges," 45 C.F.R. § 155.1050(a)(2)(i)(A), subject to limited exceptions.

41.     The new rule (1) eliminates the quantitative network adequacy requirements in § 155.1050(a)(2)(i) and (ii) for state-based Exchanges and SBE-FPs, 91 Fed. Reg. at 29,645; (2) adds new provisions permitting states, rather than the FFE, to conduct reviews of plans for network adequacy, including the adequacy of essential community provider networks, *id.* at 29,648, 29,650; (3) and modifies regulatory standards to make it harder for regulators to reject an insurer's narrative explanation of the network adequacy of the plans they submit for approval as QHPs, *id.* at 29,729, 29,739. These proposals mirror the network adequacy provisions in the 2018 rule that this Court vacated as arbitrary. *See City of Columbus II*, 523 F. Supp. 3d at 751. As was the case for that rule, these changes will hinder consumers' access to quality care. Many plans already have narrow network offerings, and the elimination of regulatory standards that have provided some measure of protection will jeopardize access to in-network providers and lead individuals to resort more to uncompensated care from safety net providers.

42.     *Elimination of Standardized Plans and Non-standardized Plan Limits*. In an effort "to simplify the consumer shopping experience and to allow consumers to more easily compare plans across issuers," CMS introduced "standardized" plan options in the 2017 Payment Notice. 81 Fed. Reg. 12,204, 12,205 (Mar. 8, 2016); *see* 45 C.F.R. § 155.20. Standardized plans offer a standard cost-sharing structure specified by HHS that makes it easier for consumers to compare plans, including fixed deductibles, fixed annual limitations on cost-sharing, and fixed copayments or coinsurance for certain specified benefits. 81 Fed. Reg. at 12,289-93. Issuers participating on

the federally facilitated Exchange are required to offer "multiple standardized plan options within the same product network type, metal level, and service area," and these options must meaningfully differ from one another. 45 C.F.R. § 156.201(c). Current regulations also impose limits on the number of "non-standardized" plans that issuers may offer on the federally facilitated Exchange. *Id*. § 156.202(b).

43.    CMS attempted to discontinue standardized options in its 2018 rule, 83 Fed. Reg. at 16,974, but this Court vacated that policy as arbitrary because the agency failed to justify its rationale that the rule was needed to promote innovation by insurers. *See City of Columbus II*, 523 F. Supp. 3d at 754-55. CMS once again seeks to discontinue the requirement that insurers offer standardized options. 91 Fed. Reg. at 29,708.  Under the new rule, insurers may continue to offer standardized plans, with modified cost-sharing levels, but will not be required to do so, and any such offerings will not specifically be identified as "standardized" on Exchange websites. CMS also seeks to remove the limitations on the number of non-standardized plans that insurers may offer. *Id*. at 29,720. These policies will make it harder for consumers to meaningfully compare plan options; as a result, confused consumers will be more likely to select plans that do not provide them with adequate coverage, or to drop out of the enrollment process altogether.

44.    *Elimination of Premium Payment Threshold Options*. Under current policy, insurers are permitted to maintain coverage for enrollees who owe unpaid premiums below a fixed-dollar threshold or a specified percentage of the premium that is owed, as if the enrollees had paid their premiums in full. Under these rules, issuers are not required to place such an enrollee in a grace period or terminate the enrollment, consequences that would otherwise occur if an enrollee fails to pay their full premium. This leeway protects the health of the risk pool, as younger and healthier enrollees are more likely to incur small debts in the form of unpaid premiums unwittingly,

so if these enrollees are permitted to remain covered, premiums will remain lower for the rest of the covered population. The new, more restrictive premium payment policy forbids insurers from applying fixed-dollar thresholds or percentage thresholds based on the gross premium. Because the only threshold that an insurer may apply will now be based on the net premium—that is, the portion of the premium for which the enrollee is responsible after accounting for subsidies—enrollees who owe mere dollars or cents will no longer qualify for relief, and more young and healthy enrollees will be thrown off coverage, harming the risk pool and causing these enrollees to resort to uncompensated care from safety net providers.

45.    *Changes to Cost-Sharing Reduction Policies*. As noted above, some enrollees in Exchange plans are entitled both to premium tax credits, and cost-sharing reductions that defray their out-of-pocket expenses. In order to be eligible for these reductions, the consumer must enroll in a particular type of silver plan. Although the premiums for silver plans nominally cover 70% of the cost of the care provided under the plan for a standard population, the true value of the plan to an enrollee who is eligible for these cost-sharing reductions is significantly higher, and, in some cases, higher than gold or platinum plans. Many states direct or permit insurers to price the premiums for these silver plans accordingly, with the result being that the value of these cost-sharing reductions is recovered through tax credits. The new rule restricts states from doing so, requiring insurers to price these silver plans on the basis of the expected health care usage of the enrollees in that particular plan, violating the risk pool requirements of the statute that require all plans on the Exchanges to be priced on the basis of the characteristics of the covered population as a whole. The result will be to lower the tax credits that are available to all enrollees on the Exchanges. CMS did not adequately explain in its proposed rule that it was considering imposing such a requirement, or that it would refuse to certify plans to be offered on the Exchanges that

18

violated such a new requirement, and it thereby deprived the public of a fair opportunity to comment on this rule.

### III.    Defendants Failed to Adequately Consider Public Comments or Provide Adequate Reasoning for the Rule

46.    CMS published a proposed version of the 2026 rule on February 11, 2026. 91 Fed. Reg. 6292. Commenters raised serious concerns with many provisions of the rule, highlighting flaws with the proposed changes to ACA policy.

47.    The agency provided only surface-level responses to many of the public comments that it received. And the agency also failed to reasonably explain the rationale behind the rule's most burdensome provisions. For example:

48.    CMS revoked subsidized coverage for individuals that fail to file and reconcile tax credits without explaining its analysis of how this proposal would address unauthorized enrollments, adequately providing the data the agency relied on, or addressing concerns about coverage loss, impacts on risk pools, and long IRS processing times.

49.    CMS required Exchanges to seek further verification when enrollees project income above the federal poverty level, but other data sources indicate a lower income, without providing any evidence that this paperwork burden addressed any real problem that the Exchanges face, thereby repeating the errors that caused this Court to vacate or stay the same policy twice before.

50.    CMS revoked a policy permitting applicants to attest to their income when IRS data is lacking, again without any evidence that this new burden would solve any real problem, let alone a problem severe enough to justify revoking coverage for the hundreds of thousands of people who will be unable to prove their eligibility given delays and errors in IRS data.

19

51.    CMS imposed prohibitive verification requirements on SEP enrollees without explaining why the policy justified the additional burden and barriers that would be created, or why the effect of deterring some young people from enrolling in coverage would not outweigh any of the policy's supposed benefits.

52.    CMS permitted insurers offering bronze or catastrophic plans to exceed the statutory maximums for out-of-pocket spending under those plans by thousands of dollars, without explaining why it would permit these statutory violations or taking into account the harms that would result for enrollees and providers when enrollees are underinsured.

53.    CMS expanded eligibility for catastrophic plans to the point that the majority of the population would qualify under what was contemplated to be a limited safety valve, without explaining why it chose to draw healthier people away from metal-level coverage and to raise premiums for those who remain in that coverage.

54.    CMS relaxed standards for the review of plans' network adequacy without properly considering the harms that would result for enrollees and for providers when enrollees lack access to in-network treatment options.

55.    CMS revoked a requirement that insurers offer standardized plans and rescinded limits on the number of non-standardized plans insurers may offer, without addressing the harm that falls on enrollees when they enroll in plans that don't meet their needs as a result of the confusion that arises from an overload of plan options to review on the Exchanges.

**IV.    Plaintiffs Have Been, and Will Continue to Be, Harmed by the Rule**

56.    The new rule's challenged provisions, both individually and in combination, will raise premiums for plans on the Exchanges, limit coverage under those plans, and deter millions of individuals from enrolling in coverage, leading to higher uncompensated care costs for

20

providers of last resort. The rule will lead to at least three million fewer people enrolling on the Exchanges. The rule accomplishes these results through measures that impose barriers on enrollees attempting to gain coverage, that increase costs for enrollees, and that promote less comprehensive coverage.

57.     The resulting increase in premiums, erosion of coverage, and decreased enrollment will increase the number of uninsured and underinsured individuals and will cause Plaintiffs irreparable harm.

58.     Columbus, through its Department of Public Health, provides a wide range of services on behalf of its residents, including health services for families and children, public health, public assistance, and emergency medical care. The city also subsidizes a community health center, which serves residents regardless of insurance coverage; a number of specialty clinics that each focus a particular area, such as dental services and family planning; and a collection of eleven neighborhood health centers dedicated to the health care needs of vulnerable, uninsured, and underinsured residents. The increase in the number of uninsured and underinsured individuals resulting from the rule would lead to a greater burden on those city services and lower reimbursement, which will impose additional costs on the city.

59.     In addition, Columbus maintains excellent emergency medical services (EMS) through the Columbus Division of Fire. That system dispatches ambulances to meet urgent health needs, regardless of whether the call comes from an individual who has health insurance or is otherwise able to pay for the call. Although reimbursement is sought from patients' Medicare, Medicaid, or commercial health insurance provider where applicable, Columbus serves uninsured residents equally and recoups only a small fraction of its costs for EMS transport services for uninsured residents. Uninsured residents are also more likely to delay care until conditions become

serious and therefore more likely to require emergency transport services. An increase in the number of uninsured or underinsured individuals will thus result in more EMS transports for which Columbus does not receive reimbursement, and the city must make up for the shortfall in its budget.

60.     Baltimore, through the Baltimore City Health Department, provides a wide range of health services to its residents and operates a number of specialty clinics. Baltimore also provides or subsidizes a number of other services for Baltimore's uninsured and underinsured residents, including a visiting-nurse program and various condition-specific programs. In addition, Baltimore subsidizes several other entities that provide health services to its residents. An increase in the number of uninsured and underinsured individuals will lead to a greater burden on each of those services and programs and create a strain on the city's budget.

61.     The Baltimore City Fire Department (BCFD) also maintains an ambulance system. BCFD's EMS seeks reimbursement for its costs from patients' health insurance, but the EMS answers calls regardless of the individuals' health insurance coverage or ability to pay. Although EMS has in the past been able to recoup approximately 90% of its costs from patients who have insurance, it has been able to recover less than 4% of costs from uninsured patients. An increase in the number of uninsured and underinsured individuals therefore leads to more ambulance calls for which Baltimore does not receive reimbursement, and the city must make up for the shortfall in its budget. An increase in uninsured and underinsured individuals also increases the avoidable use of acute health services, increasing the strain on Baltimore's EMS and other health programs.

62.     Chicago's Department of Public Health operates seven mental health centers, four immunization clinics, and three clinics that provide free testing and treatment for sexually transmitted infections. It also provides at-home and in-field programs and funds and staffs a

22

network of Women, Infants, and Children (WIC) clinics. These clinics and programs serve thousands of uninsured and underinsured city residents, and an increase in those types of patients increases the burden on those city services. By increasing health care costs, barriers to coverage, and the number of uninsured residents, the rule would add to the burden on Chicago's health care safety net and the city's budget.

63.    The Chicago Fire Department provides ambulance transportation services to Chicago residents, including its uninsured and underinsured residents, without regard to income and insurance status. Chicago generally does not receive full reimbursement for ambulance services from uninsured and underinsured residents. Those same residents are more likely to wait until their conditions become more severe and require emergency care, and they disproportionately rely on ambulance services for transport. A higher number of uninsured and underinsured individuals will therefore result in greater emergency services needs and more ambulance transports for which Chicago does not receive reimbursement and thus must make up for the shortfall in its budget.

64.    Pima County, through the Pima County Health Department (PCHD), is the Health Department for the regional jurisdiction, including for the City of Tucson, Arizona. The PCHD serves a large and geographically diverse population that includes urban, rural, tribal, border, and medically underserved communities. The PCHD operates four clinic sites, as well as four mobile health units. Each of these county clinics bill health insurance for those who are insured. The clinics also offer a free or reduced-fee scale for the uninsured and underinsured populations. Thus, when fewer Pima County residents have adequate insurance, PCHD will incur additional costs for providing care to those residents.

23

65.    The Arizona Department of Health Services (ADHS) and state law requires the PCHD to administer certain services. These services include maternal child health, preschool health screening, family planning, public health nursing, premature and newborn immunizations, nutrition, dental care prevention, preschool health screening, as well as disease control programs that address and support diagnosis and treatment of chronic disease, communicable disease, tuberculosis, and venereal disease. If more people become uninsured or underinsured, the county will continue to be required to provide mandatory services such as these, but will no longer receive compensation from health insurance for these services. This will significantly impair the county's ability to provide the legally required health services to its population. A higher number of uninsured and underinsured individuals will increase the demand for healthcare from the PCHD. The PCHD will have no choice but to expand healthcare services to meet community needs. This, combined with the fact that the county would no longer be receiving the same level of compensation from health insurance for these services, would be an enormous financial challenge for the county; the county will be required to provide far more community health services for far less compensation.

66.    In Pima County, a higher number of uninsured and underinsured individuals will therefore result in worsening health outcomes, increased chronic disease burden, delayed treatment, and greater reliance on county-provided healthcare services. This increased reliance will place additional pressure and financial strain on those services. These effects will extend beyond the county's healthcare system itself: workforce participation will be reduced, families will be strained, community systems will be overburdened, and the county's overall stability and economic well-being will be injured.

67.    In addition, the PCHD routinely works closely with ADHS, county healthcare systems, community organizations, and regional partners to improve care coordination, enrollment assistance, and resource navigation for vulnerable populations. A higher number of uninsured and underinsured individuals will strain these collaborative systems and require greater cross-sector coordination to ensure residents can access essential healthcare and supportive services, adding to the burden that would be foisted upon Pima County.

68.    Further, all of the municipal Plaintiffs would be irreparably harmed by the increase in uninsured and underinsured individuals caused by the rule for the additional reason that when individuals do not get the medical care that they need, they are necessarily less healthy, less productive, and less able to participate in city and county life. This has cascading negative effects on city and county programs and communities.

69.    Many of Main Street Alliance's members rely on the Marketplace for health insurance, and those members would be significantly harmed by the rule. The erosion of coverage under the rule will create additional costs for MSA members and negatively affect the health of those who rely on care or medication that they cannot afford without insurance coverage. The increase in costs would even threaten the continued operation of some MSA members. Small businesses often operate on small profit margins, so if health insurance through the Marketplace becomes unaffordable or inadequate, then owners and their employees may be forced to seek alternative employment to have access to employer-sponsored health insurance.

70.    For example, one MSA member operated a small business in Wisconsin, which she recently sold. She needs affordable health insurance that covers expensive medications that she takes to prevent the degradation of her bones due to rheumatoid arthritis. The rule would increase her health insurance costs to levels that she cannot afford. Another MSA member, who also

25

operates a small business in Wisconsin, depends on comprehensive coverage under the ACA for his and his family's health insurance needs. The rule would increase his family's insurance costs as well, making it more difficult for him to maintain his business.

71. DFA's members, including physicians and medical trainees, will likewise be irreparably harmed by the rule's disastrous effects on the costs, administrative burdens, and coverage of health insurance under the ACA. With the increased number of uninsured and underinsured patients, DFA's members would be more likely to see patients who delay care until their needs are acute; they would receive less than full reimbursement for those patients who lose insurance or whose coverage becomes more limited; and they would lose contact with many patients altogether, particularly in low-income communities. The rule will thus force medical providers to direct more time to providing uncompensated care, more administrative time to determining whether insurance coverage is possible, and more time locating patients who are no longer seeking care for serious conditions.

72. Even when DFA's members provide uncompensated patient care—which will occur increasingly if the final rule is implemented—their work does not end with the patient visit. Lack of insurance coverage when a patient needs treatment requires finding a specialist willing to provide care, trying to find an alternative medicine that a patient may be able to afford but is not the optimal treatment, and intervening on behalf of a patient in an attempt to get testing or procedures performed. This will take up greater amounts of clinicians' time as patients lose coverage. The end result is additional time for which DFA members do not get paid that detracts from patient care. Medical providers will expend more time and effort, receive less compensation—threatening the continuation of medical practices, particularly in rural areas—and be unable to provide optimal care to their patients.

73. Some patients will be forced to forgo standard medical care altogether, despite the efforts of their physicians to solve these problems, and some will be forced to go to an emergency room. Not only will this strain community resources, but the care will be limited to what an emergency room can provide. The outcomes will be worse, and the cost will be greater.

## CAUSES OF ACTION

74. Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

## COUNT I
### Violation of the Administrative Procedure Act – Contrary to Law
### (Against All Defendants)

75. The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

76. The rule is a "final agency action for which there is no other adequate remedy in a court" and is "subject to judicial review." *Id.* § 704.

77. Several of the rule's provisions violate the ACA and other federal statutes and regulations and are therefore "not in accordance with the law," including the following:

a. the failure-to-reconcile policy in the rule's amendment of 45 C.F.R. § 155.305(f)(4), along with the previous version of 45 C.F.R. § 155.305(f)(4), is contrary to the requirement in 26 U.S.C. § 36B(a) and (c) that access to premium tax credits is guaranteed so long as an individual qualifies as an "applicable taxpayer";

b. the expansion of the maximum out-of-pocket limits in the rule's revision of 45 C.F.R. § 156.130(a)(2), addition of 45 C.F.R. §§ 156.136, and revision of 156.155(a)(3) is contrary to the statutory provisions setting a statutory maximum for cost-sharing in 42 U.S.C. § 18022(c)(1);

27

c.     the expansion of eligibility for catastrophic plans in the rule's addition of 45 C.F.R. § 155.605(d)(1)(iv), along with the announcement of that expansion of eligibility in the *Guidance on Hardship Exemptions*, is contrary to the limitations on eligibility for such plans described in 42 U.S.C. § 18022(e);

d.     the authorization to insurers to market multi-year catastrophic plans in the rule's addition of 45 C.F.R. § 156.155(a)(6) is contrary to the requirement that eligibility for such plans be determined on an annual basis in 42 U.S.C. § 18022(e);

e.     the authorization to issuers to market non-network plans in the rule's revisions of 45 C.F.R. § 155.1050(a)(1)-(2), addition of 45 C.F.R. § 155.1050(d), addition of 45 C.F.R. § 156.236, and revisions of 45 C.F.R. §§ 156.275(c)(2)(iv) and 156.810(a)(8) is contrary to the statutory requirement that Exchange plans offer network coverage in 42 U.S.C. § 18031(c)(1)(B)-(C); and

f.     the revisions of the agency's cost-sharing reduction policies announced at 91 Fed. Reg. 29,526, 29,566-71 is contrary to the single risk pool provision of 42 U.S.C. § 18032(c)(1).

78.   Accordingly, this Court must hold unlawful and set aside the aforementioned provisions of the rule.

## COUNT II
### Violations of the Administrative Procedure Act – Arbitrary and Capricious and Without Observance of Procedure Required by Law
### (Against All Defendants)

79.   The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

28

80.     The rule is a "final agency action for which there is no other adequate remedy in a court" and is subject to judicial review. *Id.* § 704.

81.     As detailed above, Defendants failed to provide adequate reasons for, and failed to adequately respond to comments about, the following provisions, such that they are arbitrary and capricious under the APA, and Defendants failed to observe required procedure in adopting these provisions, *id.* § 706(2)(A), (D):

a.     the failure-to-reconcile policy in the rule's amendment of 45 C.F.R. § 155.305(f)(4), along with the previous version of 45 C.F.R. § 155.305(f)(4);

b.     the mandatory audit policy for low-income enrollees in the rule's revisions to 45 C.F.R. § 155.320(c)(3)(iii)(A) and (c)(3)(vi)(C)(2);

c.     the revocation of the option for enrollees to attest to their income in the rule's rescission of 45 C.F.R. § 155.320(c)(5);

d.     the imposition of special enrollment period verification in the rule's revisions of 45 C.F.R. § 155.420(g);

e.     the expansion of maximum out-of-pocket limits in the rule's revision of 45 C.F.R. § 156.130(a)(2), addition of 45 C.F.R. § 156.136, and revision of 45 C.F.R. § 156.155(a)(3);

f.     the expansion of eligibility for catastrophic plans in the rule's addition of 45 C.F.R. § 155.605(d)(1)(iv), along with the announcement of that expansion of eligibility in the *Guidance on Hardship Exemptions*;

g.     the authorization to insurers to market multi-year catastrophic plans in the rule's addition of 45 C.F.R. § 156.155(a)(6);

h.     the authorization to issuers to market non-network plans in the rule's

29

revisions of 45 C.F.R. § 155.1050(a)(1)-(2), addition of 45 C.F.R. § 155.1050(d), addition of 45 C.F.R. § 156.236, and revisions of 45 C.F.R. §§ 156.275(c)(2)(iv) and 156.810(a)(8);

i.  the relaxation of network adequacy standards in the rule's revisions of 45 C.F.R. § 155.1050(a)(1)-(2), addition of 45 C.F.R. §§ 155.1050(d) and 155.1051, revisions to 45 C.F.R. §§ 156.230, 156.235, addition of 45 C.F.R. § 156.236, and revisions of 45 C.F.R. §§ 156.275(c)(2)(iv) and 156.810(a)(8);

j.  the elimination of the requirement to offer standardized plans and of the limitations on non-standardized plans in the rule's revisions of 45 C.F.R. §§ 155.20 and 155.205(b)(1) and rescission of 45 C.F.R. §§ 155.220(c)(3)(i)(H), 156.201, 156.202, and 156.265(b)(3)(iv);

k.  the revision of the agency's premium payment threshold policies in the rule's revision of 45 C.F.R. § 155.400(g); and

l.  the revisions of the agency's cost-sharing reduction policies announced at 91 Fed. Reg. 29,526, 29,566-29,571.

82.  These provisions, individually and collectively, also violate section 1554 of the ACA, which bars CMS from issuing any rule that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care." 42 U.S.C. § 18114.

83.  Accordingly, this Court must hold unlawful and set aside the aforementioned provisions of the rule.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

84. declare that the provisions of the 2026 rule identified in Counts I and II are arbitrary, capricious, without observance of proper procedure, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2);

85. vacate and set aside the provisions of the 2026 rule identified in Counts I and II under the APA, *id.*;

86. stay the effective date of the provisions of the 2026 rule identified in Counts I and II under the APA, *id.* § 705;

87. preliminarily and permanently enjoin Defendants from implementing the provisions identified in Counts I and II;

88. award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

89. grant such other and further relief as the Court may deem just and proper.

Dated: June 3, 2026                    Respectfully submitted,

*/s/ Joel McElvain.*
JOEL MCELVAIN (BAR NO. 31673)
CORTNEY ROBINSON HENDERSON (BAR NO. 31968)
CHRISTINE L. COOGLE (BAR NO. 21846)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 935-2082
jmcelvain@democracyforward.org
crhenderson@democracyforward.org
ccoogle@democracyforward.org

*Counsel for Plaintiffs*

31