**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| CITY OF COLUMBUS, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:26-cv-2215 |
| ROBERT F. KENNEDY, JR., *et al.*, | |
| *Defendants*. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR STAY UNDER 5 U.S.C. § 705 OR,
IN THE ALTERNATIVE, FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Introduction ..................................................................................................................1

Background...................................................................................................................2

I.    Statutory Background ....................................................................................2

II.    Prior Litigation ............................................................................................6

III.    The 2026 Final Rule .....................................................................................8

    A.    The Final Rule Imposes Barriers on Obtaining Coverage.......................8

    B.    The Final Rule Increases Costs for Enrollees.........................................10

    C.    The Final Rule Permits Insurers to Offer Less Comprehensive Coverage............12

IV.    The Disastrous Effects of the Final Rule........................................................14

Standard of Review ...................................................................................................15

Argument ..................................................................................................................16

I.    Plaintiffs Are Likely to Succeed on Their Claims Against Provisions That Impose Barriers on Coverage ...................................................................................16

    A.    The Failure-to-Reconcile Policy Is Unlawful and Arbitrary ................................16

    B.    The Verification Policy for Low-Income Enrollees Is Arbitrary .........................20

    C.    The Audit Policy for Enrollees Where Tax Data Is Lacking Is Arbitrary.............22

    D.    The Verification Requirements for SEP Enrollments Are Arbitrary ...................23

II.    Plaintiffs Are Likely to Succeed on Their Claims Against Provisions That Increase Costs for Enrollees ...............................................................................25

    A.    The Cost-Sharing Limitation Policy for Bronze Plans Is Unlawful and Arbitrary .........................................................................................................25

    B.    The Expansion of Catastrophic Plan Eligibility Is Unlawful and Arbitrary..........30

III.    Plaintiffs Are Likely to Succeed on Their Claims Against Provisions That Permit Insurers to Offer Less Comprehensive Coverage.................................................38

    A.    Provisions Reducing Standards for Network Adequacy Are Arbitrary ...............38

    B.    Provisions Eliminating Standardized Plans and Discontinuation of Non-standardized Plan Limits and Exceptions Are Arbitrary ....................................42

IV.    Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction........44

V.    The Remaining Factors Weigh in Favor of an Injunction ...............................................49

Conclusion ................................................................................................................50

**TABLE OF AUTHORITIES**

**CASES**

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*,
770 F. Supp. 3d 822 (D. Md. 2025)................................................................44

*Appalachian Voices v. State Water Control Bd.*,
912 F.3d 746 (4th Cir. 2019)................................................................20, 23

*Biden v. Nebraska*,
600 U.S. 477 (2023)................................................................35

*BLOM Bank SAL v. Honickman*,
605 U.S. 204 (2025)................................................................33

*Brown & Williamson Tobacco Corp. v. FDA*,
153 F.3d 155 (4th Cir. 1998)................................................................33

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020)................................................................50

*Casa de Maryland, Inc. v. Wolf*,
486 F. Supp. 3d 928 (D. Md. 2020)................................................................15, 16

*City of Columbus v. Cochran*,
523 F. Supp. 3d 731 (D. Md. 2021)................................................................*passim*

*City of Columbus v. Kennedy*,
796 F. Supp. 3d 123 (D. Md. 2025)................................................................*passim*

*City of Columbus v. Kennedy*,
No. 1:25-cv-02114-BAH (D. Md. Jan. 20, 2026)................................................................3

*City of Columbus v. Trump*,
453 F. Supp. 3d 770 (D. Md. 2020)................................................................7, 48

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)................................................................25, 44

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)................................................................40

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)................................................................33, 35

*Fishermen's Dock Co-op. v. Brown*,
75 F.3d 164 (4th Cir. 1996)................................................................25

*Grand Canyon Air Tour Coalition v. FAA,*
154 F.3d 455 (D.C. Cir. 1998)...................................................................................40

*Gustafson v. Alloyd Co.,*
513 U.S. 561 (1995) ..............................................................................................27, 32

*King v. Burwell,*
576 U.S. 473 (2015) ........................................................................................2, 3, 5, 6

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ..................................................................................................27

*Me. Cmty. Health Options v. United States,*
590 U.S. 296 (2020) .....................................................................................................3

*Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) .........................................................................................29, 35, 36

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land,*
915 F.3d 197 (4th Cir. 2019)...............................................................................44, 45

*Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship,*
918 F.3d 353 (4th Cir. 2019)......................................................................................45

*N. Mariana Islands v. United States,*
686 F. Supp. 2d 7 (D.D.C. 2009)................................................................................50

*Nat'l Elec. Mfrs. Ass'n v. Dep't of Energy,*
654 F.3d 496 (4th Cir. 2011)......................................................................................17

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) .....................................................................................................2

*Nat'l Treasury Emps. Union v. Horner,*
854 F.2d 490 (D.C. Cir. 1988)....................................................................................39

*Neumann v. Prudential Ins. Co. of Am.,*
367 F. Supp. 2d 969 (E.D. Va. 2005).........................................................................17

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.,*
354 F.3d 249 (4th Cir. 2003).......................................................................................50

*Nken v. Holder,*
556 U.S. 418 (2009) ...................................................................................................49

*Ohio v. EPA,*
603 U.S. 279 (2024) .............................................................................................25, 29

*Perez v. Cuccinelli*,
   949 F.3d 865 (4th Cir. 2020) ..........................................................................23

*Pharm. Coal. for Patient Access v. United States*,
   126 F.4th 947 (4th Cir. 2025) ........................................................................18

*Pulsifer v. United States*,
   601 U.S. 124 (2024) .......................................................................................33

*Roe v. Dep't of Defense*,
   947 F.3d 207 (4th Cir. 2020) ..........................................................................50

*United Techs. Corp. v. U.S. Dep't of Def.*,
   601 F.3d 557 (D.C. Cir. 2010) .......................................................................40

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .....................................................................................16, 44

*Wisc. Cent. Ltd. v. United States*,
   585 U.S. 274 (2018) .................................................................................27, 35

## STATUTES

5 U.S.C.
   § 705 ................................................................................................*passim*

26 U.S.C.
   § 24 .........................................................................................................17
   § 32 .........................................................................................................17
   § 36B ................................................................................................*passim*
   § 5000 ...................................................................................5, 11, 31, 32

42 U.S.C
   § 300gg-1 ..................................................................................................3
   § 300gg-6 ..................................................................................................3
   § 18021 ...................................................................................................27
   § 18022 ..........................................................................................*passim*
   § 18031 ..................................................................................................3, 4
   § 18032 ...................................................................................................34
   § 18071 .....................................................................................................5
   § 18081 ....................................................................................5, 17, 18, 23
   § 18082 .............................................................................................5, 8, 18
   § 18091 .....................................................................................................6

Pub. L. No. 111-148, 124 Stat. 119 (2010) ....................................................2

Pub. L. No. 111-152, 124 Stat. 1029 (2010) ..................................................2

Pub. L. No. 119-21, § 71303(a),
  139 Stat. 72, 324 (2025) ................................................................................17

## REGULATIONS

26 C.F.R.
  § 1.36B-2(b)....................................................................................................22
  § 1.6011-8 ......................................................................................................17

45 C.F.R.
  § 155.20 ..........................................................................................................13
  § 155.305 ...............................................................................................9, 16, 17
  § 155.320 ...............................................................................................9, 20, 22
  § 155.340 ..........................................................................................................16
  § 155.605 ...............................................................................................11, 32, 34
  § 155.1050 .................................................................................................12, 38
  § 156.201 ..........................................................................................................13
  § 156.202 ..........................................................................................................13
  § 156.230 .................................................................................................12, 41
  § 156.235 ..........................................................................................................12
  § 155.420 ..........................................................................................................23
  § 155.605 ...............................................................................................11, 32, 34

78 Fed. Reg. 39,494 (July 1, 2013) ......................................................................34

80 Fed. Reg. 75,488 (Dec. 2, 2015).....................................................................42

81 Fed. Reg. 12,204 (Mar. 8, 2016) ....................................................................13

83 Fed. Reg. 16,930 (Apr. 17, 2018) .................................................................6, 38

87 Fed. Reg. 78,206 (Dec. 21, 2022)...........................................................*passim*

89 Fed. Reg 26,218 (Apr. 15, 2024)...............................................................12, 38

90 Fed. Reg. 27,074 (June 25, 2025)...........................................................7, 23, 24

91 Fed. Reg. 29,526 (May 20, 2026)............................................................*passim*

## OTHER AUTHORITIES

Abigail Burman, *Laying Ghost Networks to Rest: Combatting Deceptive Health Plan Provider Directories*, 40 Yale L. & Pol'y Rev. (2021) ............................................41

Am. Acad. of Family Physicians Comment (Mar. 13, 2026),
  https://www.regulations.gov/comment/CMS-2026-0496-0634 ........................39, 41

Ass'n for Community Affiliated Plans Comment (Mar. 13, 2026),
  https://www.regulations.gov/comment/CMS-2026-0496-0800 ............................37

Bd. of Governors of the Fed. Rsrv. Sys., *Report on the Economic Well-Being of U.S. Households in 2024 – May 2025*, (June 12, 2025), https://perma.cc/PGN5-PDFR ..................................36

CMS, Consumer Info. & Ins. Oversight, *State-Based Exchanges*, https://perma.cc/L4DF-DQYJ ..................................................................4

CMS, *Guidance on Hardship Exemptions for Individuals Ineligible for Advance Payment of the Premium Tax Credit or Cost-Sharing Reductions* (Sept. 4, 2025), https://perma.cc/9QMD-RJH2 ..................................11, 30

CMS, Press Release, Over 24 Million Consumers Selected Affordable Health Coverage in ACA Marketplace for 2025 (Jan. 17, 2025), https://perma.cc/N8QF-NKHG .........................................................6

Colo. Consumer Health Initiative Comment (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0811 ..............................24

Community Catalyst Comment (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0872 ..............................42

Council of Econ. Advisors, *Expansion of HSA Eligibility Under OBBB Act to Improve Marketplace Coverage, Affordability, and Access* (Sept. 2025), https://perma.cc/3JZR-LHDZ) ..........................................31

Covered California comment (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0926 ..............................37

Ctr. on Budget & Policy Priorities (CBPP) Comment (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0922 ..........................*passim*

Cynthia Cox et al., *Repayments and Refunds: Estimating the Effects of 2014 Premium Tax Credit Reconciliation*, KFF (Mar. 24, 2015), https://perma.cc/AL3R-C5H5 ..............................................21

Families USA comment (Mar.13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0945 ..........................39, 43

*Hardship*, Black's Law Dictionary (12th ed. 2024) ..................................32

Jason Levitis et al. Comment (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0989 ..........................*passim*

Mass. Health Connector Comment (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0740 ..............................36

Matt McGough et al., *What We Know So Far About 2026 ACA Marketplace Enrollment, Premiums, and Deductibles*, KFF (May 19, 2026), https://perma.cc/BP79-D7RX ..............................................6

Matthew Fiedler Comment (Mar. 13, 2026),
    https://www.regulations.gov/comment/CMS-2026-0496-1027 .........................................26, 28

Nat'l Ass'n of Ins. Comm'rs Comment (Mar. 13, 2026),
    https://www.regulations.gov/comment/CMS-2026-0496-0812 ...............................................37

Nat'l Health Law Program Comment (Mar. 13, 2026),
    https://www.regulations.gov/comment/CMS-2026-0496-0615 ..............................24, 25, 39, 41

Nat'l Nurses United Comment (Mar. 13, 2026),
    https://www.regulations.gov/comment/CMS-2026-0496-0571 ...............................................36

Partnership to Protect Coverage Comment (Mar. 13, 2026),
    https://www.regulations.gov/comment/CMS-2026-0496-0762 ........................................37, 43

S. Rep. No. 111-89 (2009)..................................................................................................34

Shawnna Read-Richards & Teresa Keller, *The Marketplace Illusion: Coverage Without Care*,
    Health Aff. (Feb. 26, 2026), https://perma.cc/7MYJ-MKRH)...................................................41

State of California et al. Comment (Mar. 13, 2026),
    https://www.regulations.gov/comment/CMS-2026-0496-0797 ........................................*passim*

U.S. Government Accountability Office, *Private Health Insurance:*
    *State and Federal Oversight of Provider Networks Varies* (Dec. 2022),
    https://www.gao.gov/assets/gao-23-105642.pdf) .......................................................................40

UnidosUS comment (Mar. 13, 2026),
    https://www.regulations.gov/comment/CMS-2026-0496-0801 ...............................................37

Zachary Levinson et al., *Hospital Charity Care: How It Works and Why It Matters*,
    KFF (Nov. 3, 2022), https://perma.cc/8XJZ-8U4Q ..................................................................19

Zachary Sherman et al., *2027 Proposed NBPP: Analyzing State and Consumer Impacts*
    (Mar. 2026), https://perma.cc/V6SA-489C ................................................................................21

**INTRODUCTION**

Congress enacted the Affordable Care Act (ACA) to provide all Americans with access to comprehensive, affordable insurance that will pay for their health needs. Throughout both of his terms in office, however, President Trump has demonstrated his hostility to the statute. His administrations, through legislative and executive measures, have tried to chip away at the ACA's promise of affordable coverage for all. In his first term, his appointees at the Department of Health and Human Services (HHS) and the Centers for Medicare & Medicaid Services (CMS) adopted a rule that imposed barriers on people seeking to enroll in plans offered on the ACA's health insurance Exchanges. A judge in this district rejected that effort, vacating several provisions that would have driven people off the insurance rolls. As his second term began, his appointees returned to the same playbook, issuing a rule last year that would have degraded the value of coverage and made obtaining coverage more difficult. This Court responded by staying those provisions.

Undaunted, the administration again seeks to undermine Congress's vision for the ACA. CMS has issued a new rule governing enrollment in subsidized coverage on the Exchanges. 91 Fed. Reg. 29,526 (May 20, 2026). Many of the rule's provisions will already be familiar to this Court. CMS seeks to reinstate several provisions from last year's rule that would impose paperwork barriers against people seeking to enroll on the Exchanges. These provisions are just as contrary to law, arbitrary, or both, as they were last year, and they should meet the same fate in this Court as they did then. It also aims to revive two measures from the first Trump administration that would permit insurers to market plans that would not adequately serve enrollees' needs for comprehensive coverage. Here, too, the rule repeats the agency's errors from before, and this Court need only follow the prior ruling to stay or vacate them. And, for good measure, CMS breaks new ground with novel provisions designed to steer enrollees to far less generous coverage. These provisions, too, are unlawful and arbitrary.

1

If these provisions take effect, they will impose irreparable harm on Plaintiffs. Municipalities like Pima County and the cities of Columbus, Baltimore, and Chicago are providers of last resort. Because they operate clinics and other facilities that treat all comers without regard to insurance status, they are left to foot the bill when more people cannot pay their deductibles or are driven off insurance coverage. Main Street Alliance's members are small business owners and entrepreneurs who rely on the ACA's promise of affordable coverage for themselves and their employees. And Doctors for America's members are clinicians across the nation, whose practices will suffer when their patients lose health coverage under the rule.

In the absence of a stay of the rule under 5 U.S.C. § 705 or a preliminary injunction, these provisions take effect on <u>July 20, 2026</u>. Plaintiffs respectfully seek relief from this Court on or before that date to protect themselves and their members from irreparable harm and to vindicate the promise of the Affordable Care Act.

## BACKGROUND

### I. Statutory Background

In 2010, Congress enacted the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119 (2010) (as amended by Pub. L. No. 111-152, 124 Stat. 1029 (2010)). "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012); *see also King v. Burwell*, 576 U.S. 473, 479 (2015).

Before the Act's market reforms went into effect in 2014, "individual health insurance markets were dysfunctional." *City of Columbus v. Cochran* (*City of Columbus II*), 523 F. Supp. 3d 731, 740 (D. Md. 2021). Insurers were free to deny coverage for people with pre-existing conditions, to refuse to renew such coverage, or even to revoke such coverage after it had been issued. Now, however, the Act requires every "health insurance issuer that offers health insurance

coverage in the individual or group market in a State [to] accept every employer and individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), subject to specified exceptions, such as the restriction of enrollments to an annual open enrollment period or special enrollment periods, *id*. § 300gg-1(b); *see Me. Cmty. Health Options v. United States*, 590 U.S. 296, 301 (2020). "In other words, the Act 'ensure[s] that anyone can buy insurance.'" *Me. Cmty. Health Options*, 590 U.S. at 301 (quoting *King*, 576 U.S. at 493).

Health insurance plans must cover a set of "essential health benefits," such as prescription drugs. 42 U.S.C. § 300gg-6(a). And to protect patients from devastating costs when a medical condition exhausts their coverage, the Act limits so-called "cost-sharing"—like deductibles and copayments—for these essential health benefits. *See id.* § 18022(c)(3). The limitation on cost-sharing is adjusted each year by a "premium adjustment percentage," which compares average premiums for "health insurance coverage" in the current year with the same average for 2013, before the Act's marketplace reforms went into effect. *Id.* § 18022(c)(1), (4). Under the formula that CMS currently uses to calculate this premium adjustment percentage, the maximum out-of-pocket limit (MOOP) that a plan could impose on an enrollee for 2027 would be $12,000 for self-only coverage and $24,000 for family coverage. *See* 91 Fed. Reg. 29,526, 29,691 (May 20, 2026).[1]

To help individuals learn about and enroll in health insurance, the Act "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King*, 576 U.S. at 482 (quoting 42 U.S.C. § 18031(b)(1)). These Exchanges, also known as health insurance Marketplaces, enable people not eligible for Medicare or Medicaid to obtain adequate, affordable insurance independent of their jobs. The Exchanges therefore serve as "marketplace[s] that allow[] people to compare and purchase" ACA-compliant plans. *Id.* at 479.

---

[1] That formula is challenged in pending litigation. *See* Pls.' Mem. Supp. Summ. J. at 25-29, *City of Columbus v. Kennedy*, No. 1:25-cv-02114-BAH (D. Md. Jan. 20, 2026), ECF No. 65-1.

There are several different types of Exchanges. Some states have elected to create Exchanges themselves (state-based Exchanges or SBEs), as is the case in Maryland and Illinois, while others have created Exchanges that operate on the federal Healthcare.gov platform (state-based Exchanges on the federal platform, or SBE-FPs). The Exchange in other states, including Arizona, Ohio, and Wisconsin, is operated by the Centers for Medicare & Medicaid Services (CMS) (federally facilitated Exchange, or FFE). *See* CMS, Consumer Info. & Ins. Oversight, *State-Based Exchanges*, https://perma.cc/L4DF-DQYJ.

Plans that meet the requirements described above and that are offered on the Exchanges are known as "qualified health plans." CMS is responsible for "establish[ing] criteria for the certification of health plans as qualified health plans," including ensuring the plans' "network adequacy," to ensure the plan offers "a sufficient choice of providers" and includes within its network "essential community providers" that serve predominately low-income, medically underserved individuals. 42 U.S.C. § 18031(c)(1)(B), (C). Individuals enroll in qualified health plans for a given year during an annual open enrollment period or under specified special enrollment periods. *Id*. § 18031(c)(6).

Plans on the Exchanges offer various levels of generosity: a "bronze" plan is designed to provide benefits that are actuarially equivalent to 60% of the full value of benefits covered by the plan (meaning that premiums are calculated in the expectation that 40% of the cost of coverage would be paid for through enrollee out-of-pocket spending), and "silver," "gold," and "platinum" plans are designed to provide benefits that are actuarially equivalent to 70%, 80%, and 90%, respectively, of the full value of benefits under the plan. *Id*. § 18022(d)(1). Because actuarial predictions may be imprecise, the Act specifies that CMS may "provide for a de minimis variation … to account for differences in actuarial estimates." *Id.* § 18022(d)(3).

The Act also "seeks to make insurance more affordable by giving refundable tax credits to

individuals" who are enrolled in these metal levels of coverage. *King*, 576 U.S. at 482 (citing 26 U.S.C. § 36B). These "premium tax credits" (PTCs) vary depending on an individual's income but are generally pegged to the cost of the so-called "benchmark silver plan," or the second-lowest-cost silver plan offered within a market. *See, e.g.*, 26 U.S.C. § 36B(b)(3)(B)-(C). There was no income cap on these tax credits from 2021 to 2025, *see id.* § 36B(b)(3)(A)(iii), but a 400% income cap has been reinstated for 2026. In addition to PTCs, eligible individuals with incomes between 100% and 250% of the federal poverty level benefit from "cost-sharing reductions" that limit their exposure to out-of-pocket costs. 42 U.S.C. § 18071(c).

PTCs are claimed on an individual's tax return after the end of the year and are paid by the IRS. 26 U.S.C. § 36B(h). Rather than waiting to recover their costs later, enrollees may claim "advance premium tax credits" (APTCs) up front so that the value of the tax credits may be applied directly to the purchase of insurance. 42 U.S.C. §§ 18081, 18082; *City of Columbus II*, 523 F. Supp. 3d at 741. CMS is responsible for determining whether individuals meet the statutory eligibility requirements for APTCs and cost-sharing reductions, as well as for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances." 42 U.S.C. § 18081(f)(1)(B).

In addition to the metal levels of coverage, the Act permits insurers to offer "catastrophic plans" that do not cover any benefits (with the exception of three primary care visits and certain preventive services) until the enrollee reaches the statutory cost-sharing limitation—*i.e.*, the out-of-pocket maximum—in a given year. *Id.* § 18022(e)(1). Enrollees in catastrophic plans are not eligible for PTCs or cost-sharing reductions. 26 U.S.C. § 36B(c)(3)(A). The Act limits enrollment in catastrophic plans to individuals who are under 30 years of age, who cannot access to affordable health coverage based on income, or who, in a given month, are found by CMS "to have suffered a hardship with respect to the capability to obtain coverage," *Id.* § 5000A(e)(5); *see* 42 U.S.C. § 18022(e)(2).

In sum, the Act requires that insurers generally offer only quality health insurance and aims to lower the cost of coverage to encourage individuals to enroll. This coverage improves access to care and overall health and reduces financial burdens on consumers as well as providers that pay for uncompensated care. Decl. of Jason Levitis ¶¶ 9-12. Increasing enrollment in quality health insurance coverage is not only the ACA's immediate goal; it is also key to the Act's long-term success. Insurance market stability requires robust enrollment, particularly by relatively healthy individuals. *Id.* ¶¶ 19-20; 42 U.S.C. § 18091(2)(I) ("broaden[ing] the health insurance risk pool to include healthy individuals … will lower health insurance premiums"); *King*, 576 U.S. at 480. Making health insurance affordable is, in turn, essential to promoting enrollment. Levitis Decl. ¶ 20; *King*, 576 U.S. at 480-81.

When faithfully implemented, the Act's reforms enable more individuals to enroll in health insurance coverage. *See* Levitis Decl. ¶ 20. More than 24 million individuals were enrolled in Marketplace coverage in 2025. CMS, Press Release, Over 24 Million Consumers Selected Affordable Health Coverage in ACA Marketplace for 2025 (Jan. 17, 2025), https://perma.cc/N8QF-NKHG. Enrollment has dropped significantly in 2026, however, due to actions of the new administration along with the expiration of the enhanced PTCs that were in effect for the last five years; it is likely that an average of 17.5 million people will be enrolled in the Marketplace over the course of 2026. *See* Matt McGough et al., *What We Know So Far About 2026 ACA Marketplace Enrollment, Premiums, and Deductibles*, KFF (May 19, 2026), https://perma.cc/BP79-D7RX.

## II. Prior Litigation

In 2018, CMS issued a rulemaking addressing the operation of the Marketplace for the following year. 83 Fed. Reg. 16,930 (Apr. 17, 2018). Several plaintiffs (including some of the Plaintiffs here) brought suit to challenge some of that rule's provisions, including provisions that

are materially identical to provisions in this year's rule. This Court determined that the plaintiffs had standing, *City of Columbus v. Trump (City of Columbus I)*, 453 F. Supp. 3d 770, 787-88 (D. Md. 2020), and vacated the challenged provisions—including provisions eliminating federal review of plans for network adequacy, eliminating requirements for insurers to offer standardized plans on the Exchanges, and imposing income verification requirements on low-income enrollees—as arbitrary. *City of Columbus II*, 523 F. Supp. 3d at 751, 754, 762.

In 2025, CMS published a rule that sought again to impose some of the challenged provisions from the 2018 rule, along with other provisions that would have raised consumer costs and driven individuals off insurance coverage. 90 Fed. Reg. 27,074 (June 25, 2025). The cities of Columbus, Baltimore, and Chicago, along with Doctors for America (DFA) and Main Street Alliance (MSA), challenged several provisions of the 2025 rule in this Court and sought a stay under 5 U.S.C. § 705. The Court granted the plaintiffs' motion in relevant part. It held that MSA and the municipal plaintiffs had standing because the challenged provisions would lead to higher premiums and more uncompensated care. *City of Columbus v. Kennedy (City of Columbus III)*, 796 F. Supp. 3d 123, 143, 147 (D. Md. 2025). This Court found that the plaintiffs were likely to succeed on the merits on each of the challenged provisions, concluding that (1) the policy requiring more stringent verification for enrollees using special enrollment periods lacked sufficient explanation "to address the very real concern raised by numerous commenters that the Rule change will improperly hinder the enrollment of eligible individuals," *id.* at 160; (2) the provision denying eligibility for APTCs to any person who had failed to reconcile a prior year's PTCs was contrary to law because the agency sought to add a criterion for tax credit eligibility not found in the statute itself, *id.* at 162-63; (3) the provision requiring enrollees projecting income above the federal poverty level, when data sources indicate they had lower income in a prior year, was arbitrary because CMS repeated the same errors it had committed in 2018 with respect to that provision, *id.*

at 168; and (4) the provision requiring verification procedures for enrollees when the IRS fails to report tax data for those enrollees was arbitrary because the agency had failed to address the burden that the provision would impose on low-income enrollees, *id.* at 170.

CMS appealed this Court's order granting the section 705 stay, and that appeal remains pending. The parties filed cross-motions for summary judgment with respect to the plaintiffs' challenges to these and other provisions of the 2025 rule, and those motions also remain pending.

## III. The 2026 Final Rule

CMS has issued a new final rule adopting standards for the Exchanges for the upcoming 2027 plan year. 91 Fed. Reg. 29,526 (May 20, 2026). As in 2018 and 2025, the agency seeks to adopt (or re-adopt) several provisions that will raise consumers' premiums and out-of-pocket costs for Exchange plans, limit coverage under those plans, and deter millions of individuals from enrolling in coverage, leading to higher uncompensated care costs for providers. CMS itself projects that its rule will cause as many as two million additional enrollees to drop coverage and that the provisions of the rule at issue here will cause premiums to rise by as much as 2.4% next year. *Id.* at 29,854. The agency is almost certainly underestimating these effects; independent experts project that the rule will lead to at least three million fewer people enrolling on the Exchanges and will increase premiums substantially. Levitis Decl. ¶¶ 29-38. The rule accomplishes these results by imposing barriers on enrollees attempting to gain coverage, increasing costs for enrollees, and promoting less comprehensive coverage.

### A. The Final Rule Imposes Barriers on Obtaining Coverage

*Failure-to-Reconcile Penalty*. The amount of APTCs that an enrollee receives over the course of a year and the amount of PTCs that the enrollee receives on his or her tax return depend on the same statutory formula; APTCs are intended to be a substitute for the tax credit. 26 U.S.C. § 36B; 42 U.S.C. § 18082. But APTCs are calculated based on projected income, so if that

projection turns out to be incorrect (because, for example, the enrollee works more hours than expected), the enrollee might unwittingly owe a tax payment at the end of the year. Under current policy, any such enrollee must be given a notice of the tax debt in the first year of enrollment in coverage after the debt is incurred, so that the debt can be repaid; if he or she does not do so, eligibility for APTCs may be revoked in the second year. 45 C.F.R. § 155.305(f)(4)(i), (ii). The new rule revokes that grace period and requires the Exchanges to find the enrollee to be ineligible for APTCs in the first year, *id.* § 155.305(f)(4)(iii), even though CMS lacks any authority to alter the statutory formula for eligibility for APTCs, and even though this Court stayed the operation of an identical provision in last year's rule, *City of Columbus III*, 796 F. Supp. 3d at 162-63. Both the one-year and two-year versions of this policy are unlawful.

*Mandatory Verification for Low-Income Enrollees*. The rule adopts a policy requiring Exchanges to conduct additional verification for enrollees who project that their household income for the upcoming year will be greater than 100% of the federal poverty level, if the IRS reports data indicating that the enrollee's current income is below that threshold. CMS has tried to adopt this policy twice before, and the Court has rejected that attempt both times, because this policy created "immense administrative burdens" for low-income enrollees, "defie[d] logic," and was arbitrary under the APA. *City of Columbus III*, 796 F. Supp. 3d at 168; *City of Columbus II*, 523 F. Supp. 3d at 763. CMS again acknowledges that this policy would cause tens of thousands of enrollees to lose their coverage, 91 Fed. Reg. at 29,836, but nevertheless attempts to reinstate this policy on a permanent basis, *id.* at 29,618.

*Refusal to Accept Attestations from Applicants When Tax Data Is Lacking.* Under current policy, an Exchange must accept an applicant's attestation of his or her projected annual income if the IRS reports that there is no tax return data available. 45 C.F.R. § 155.320(c)(5). The new rule revokes that policy, and CMS will now require Exchanges to verify income with other data

9

sources and to require applicants to submit documentary evidence or otherwise resolve the income inconsistency; if no such evidence is available, the applicant will lose eligibility for APTCs. 91 Fed. Reg. at 29,621. CMS projects that these policies will cause more than 400,000 people to lose coverage for plan year 2027. *Id.* at 29,837. CMS sought to adopt an identical policy in last year's rule, but this Court stayed it as arbitrary. *City of Columbus III*, 796 F. Supp. 3d at 169-70.

*Verification Requirements for Special Enrollment Periods*. The final rule also requires the federally facilitated Exchange to expand the scope of pre-enrollment verification for SEP eligibility to additional SEPs and conduct this verification for at least 75% of new enrollments through SEPs. 91 Fed. Reg. at 29,631. As they did in response to the materially identical provision in last year's rule, commenters noted that the addition of this paperwork burden will depress coverage on the Exchanges, and CMS itself estimated that it would cost consumers more than $7 million in 2026. 91 Fed. Reg. at 29,838. Although CMS had sought last year to impose this policy for one year only, it now intends to make this policy permanent, despite the agency's failure to grapple with the considerations that caused this Court to find to stay last year's version of the policy as arbitrary. *See City of Columbus III*, 796 F. Supp. 3d at 159-60.

### B. The Final Rule Increases Costs for Enrollees

*Increased Out-of-Pocket Spending Burdens for Certain Enrollees*. For each metal-level plan (bronze, silver, gold, and platinum), the statute sets an annual limitation on cost-sharing—*i.e.*, the maximum amount that an insured consumer may be required to spend on covered medical expenses each year through deductibles, copayments, and coinsurance. *See* 42 U.S.C. § 18022(c)(1), (3). For plan year 2027, the statutory cost-sharing limitations for these plans will be $12,000 for an individual and $24,000 for a family, *see* 91 Fed. Reg. at 29,691, meaning that an insurer must set the maximum out-of-pocket (MOOP) that an enrollee could incur annually under a bronze plan at or below these amounts. The new rule, however, allows insurers to offer

individual market bronze plans with MOOPs up to 130% of the statutory limitation ($15,600 for an individual or $31,200 for a family), as long as the insurer offers at least one bronze plan that complies with the statutory limitation. *Id.* at 29,699. By increasing the amount that bronze plan enrollees may pay out of pocket, this change exposes consumers to increased costs for medical care, burdening providers with more uncompensated care, and negatively affecting the risk pool. This policy takes effect in plan year 2027; a similar policy for catastrophic plans will take effect in 2028.

*Expansion of Eligibility for Less Comprehensive Forms of Coverage.* Catastrophic plans, unlike metal-level plans, do not cover most benefits until after an enrollee has reached the statutory limit on out-of-pocket spending.[2] In light of the high out-of-pocket costs associated with catastrophic plans, premiums are generally lower for catastrophic plans relative to metal-level plans, but PTCs cannot be used to purchase them. The Act limits catastrophic plan enrollment to individuals under 30 years old or those who are certified as exempt from the individual mandate based on a hardship or because they cannot afford to enroll in a qualified health plan. *See* 42 U.S.C. § 18022(e)(2); *see also* 26 U.S.C. § 5000A(e)(5). CMS has long defined a qualifying hardship narrowly, requiring certain unexpected expenses or circumstances such as homelessness, domestic violence, bankruptcy, or a natural disaster. *See* 45 C.F.R. § 155.605.

In September 2025, CMS promulgated guidance that drastically expanded the hardship exemption, such that many more people would be eligible to enroll in catastrophic coverage. CMS, *Guidance on Hardship Exemptions for Individuals Ineligible for Advance Payment of the Premium Tax Credit or Cost-Sharing Reductions* (Sept. 4, 2025), https://perma.cc/9QMD-RJH2 ("*Guidance on Hardship Exemptions*"). The new rule codifies and builds on this guidance. CMS will now

---

[2] In plan year 2027, the MOOP under a catastrophic plan cannot exceed $12,000 for an individual or $24,000 for a family. *See* 91 Fed. Reg. at 29,691.

exempt anyone who is ineligible for PTCs or cost-sharing reductions because their projected annual household income is below 100% or above 250% of the federal poverty level. 91 Fed. Reg. at 29,634. This "broad nationwide hardship exemption," *id.*, will allow individuals over the age of 30 to obtain an exemption to enroll in catastrophic coverage based solely on income.

### C. The Final Rule Permits Insurers to Offer Less Comprehensive Coverage

*Reduced Standards for Network Adequacy*. The agency's current network adequacy standards ensure enrollees can access care from a sufficient number and type of providers "without unreasonable delay." 45 C.F.R. § 156.230(a)(1)(ii); *see id.* § 155.1050. These standards include time and distance thresholds to ensure a consumer can reach various in-network specialty providers. *Id.* § 156.230(a)(2)(i). The regulations also ensure access to essential community providers that serve primarily low-income and other underserved populations. *Id.* §§ 156.230(a)(1)(i), 156.235. Collectively, these standards set a "federal floor," 89 Fed. Reg. 26,218, 26,333 (Apr. 15, 2024), for network adequacy standards that apply to qualified health plans offered through the FFE, which reviews and determines whether plans meet these minimum federal standards. In addition, SBEs and SBE-FPs must "establish and impose network adequacy time and distance standards for [qualified health plans] that are at least as stringent as standards for [qualified health plans] participating on the [FFE]," 45 C.F.R. § 155.1050(a)(2)(i)(A), subject to limited exceptions.

The new rule (1) eliminates the quantitative network adequacy requirements for SBEs and SBE-FPs, 91 Fed. Reg. at 29,645; (2) adds new provisions permitting states, rather than the FFE, to conduct reviews of plans for network adequacy, including the adequacy of essential community provider networks, *id.* at 29,648, 29,650; and (3) modifies regulatory standards to make it harder for regulators to reject an insurer's narrative explanation of the network adequacy of the plans they submit for approval as qualified health plans, *id.* at 29,729, 29,739. These proposals mirror the

network adequacy provisions in the 2018 rule that the court vacated as arbitrary. *See City of Columbus II*, 523 F. Supp. 3d at 751. As was the case in 2018, these changes will hinder consumers' access to quality care. Many plans already have narrow network offerings, and the elimination of regulatory standards that have provided some measure of protection will jeopardize access to in-network providers and lead to more uncompensated care from safety net providers.

*Elimination of Standardized Plans and Non-standardized Plan Limits*. In an effort "to simplify the consumer shopping experience and to allow consumers to more easily compare plans across issuers," CMS introduced "standardized" plan options for 2017. 81 Fed. Reg. 12,204, 12,205 (Mar. 8, 2016); *see* 45 C.F.R. § 155.20. Standardized plans offer a standard cost-sharing structure specified by CMS that makes it easier for consumers to compare plans, including fixed deductibles, fixed annual limits on cost-sharing, and fixed copayments or coinsurance for specified benefits. 81 Fed. Reg. at 12,289-93. Issuers participating on the FFE must offer at least one standardized plan option at every product network type, at every metal level (except the non-expanded bronze metal level), and throughout every service area that it offers a non-standardized QHP option. 45 C.F.R. § 156.201(b) Issuers that offer "multiple standardized plan options within the same product network type, metal level, and service area," must ensure the plans meaningfully differ from one another. *Id*. § 156.201(c). Current regulations also impose limits on the number of "non-standardized" plans that issuers may offer on the FFE. *Id.* § 156.202(b).

Even though the court vacated the same policy in its 2018 rule, *City of Columbus II*, 523 F. Supp. 3d at 754-55, CMS once again seeks to discontinue the requirement that insurers offer standardized options. 91 Fed. Reg. at 29,708. Under the new rule, insurers may continue to offer standardized plans, with modified cost-sharing levels, but will not be required to do so, and any such offerings would not specifically be identified as "standardized" on Exchange websites. CMS also seeks to remove the limitations on the number of non-standardized plans that insurers may

offer. *Id.* at 29,720. These policies will make it harder for consumers to meaningfully compare plan options; as a result, confused consumers will be more likely to select plans that do not provide adequate coverage, or to drop out of the enrollment process altogether.[3]

## IV. The Disastrous Effects of the Final Rule

The new rule contains numerous provisions that will heighten administrative obstacles to access coverage on the Exchanges, make coverage more expensive, and result in less comprehensive plan offerings. Levitis Decl. ¶¶ 5-8. These provisions will cause at least three million people to lose coverage. *Id.* ¶ 7. Younger and healthier people are more likely to drop from coverage, worsening the risk pool and leading to higher health insurance premiums, which in turn can cause additional people to become uninsured. *Id.* ¶ 34. Even those who are insured will have less comprehensive and more expensive plans to choose from. *Id.* ¶ 6.

Plaintiffs, like many others, will suffer significant and irreparable harm if the challenged provisions of the rule were to take effect. The rule's policies would harm members of MSA who, as small business owners, rely on affordable coverage through the Exchange not only to access the care they, their families, and their employees need, but also to provide them the financial freedom to operate their own businesses. *See* Decl. of Shawn Phetteplace ¶¶ 3-6; Decl. of Brooke Legler ¶¶ 8, 11; Decl. of Mike Ohlinger ¶¶ 5, 7. The rule jeopardizes that freedom and puts small business owners at risk of shutting down. Legler Decl. ¶ 11; Ohlinger Decl. ¶ 10.

The new rule would also harm medical providers, like members of DFA. Many clinicians serve patients regardless of their patient's insurance status, and treating increasingly uninsured and underinsured patients will have devastating consequences for medical professionals. DFA

---

[3] These are not the only objectionable provisions in the rule. The rule also violates the statute by permitting insurers to offer "non-network" plans, by permitting them to offer catastrophic plans for as long as ten years, by removing flexibilities for insurers to forgive small debts for unpaid premiums, and by effectively requiring insurers to price silver plans unfairly on the basis of a subset of the overall risk pool. These provisions will be the subject of later briefing.

members would see patients with more serious or urgent needs; would receive less compensation for many of their patients, even while expending more time navigating administrative barriers for their patients; and would lose contact with many of their patients, particularly in low-income and rural communities. Decl. of Janet Krommes ¶ 6; Decl. of Dr. Beth Oller ¶¶ 7-9; Decl. of Dr. Eric Fethke ¶ 9. This greater expenditure of time, effort, and resources, combined with decreased compensation, will hinder their ability to provide their patients with optimal health care and endanger some providers' medical practices entirely. Oller Decl. ¶ 10; Fethke Decl. ¶¶ 9-10.

The harms from the new rule would radiate out further to local governments like Columbus, Baltimore, Chicago, and Pima County and their residents. These municipalities fund and operate a range of community health centers, general and specialty clinics, and other health care services, as well as emergency medical transport. *See* Decl. of Fikirte Wagaw ¶¶ 5, 13-14; Decl. of Edward Johnson ¶¶ 7, 9-12; Decl. of Faith Leach ¶¶ 6-8; Decl. of Theresa Cullen ¶¶ 6-9, 11. To ensure that their residents get needed care, they all provide these services to patients regardless of their insurance coverage or ability to pay. An increase in the number of uninsured and underinsured residents will create a strain on those services and, ultimately, these local governments' budgets, forcing them to make up the shortfall from lost compensation and increased demand for emergency services. *See* Wagaw Decl. ¶¶ 8-9; Johnson Decl. ¶¶ 9-14; Leach Decl. ¶ 9; Cullen Decl. ¶¶ 11-14. An erosion of insurance coverage will also lead residents to neglect to get the medical care that they need, when they need it, resulting in less healthy and productive communities.

**STANDARD OF REVIEW**

Under the APA, "a reviewing court may stay 'agency action' pending judicial review 'to prevent irreparable injury,'" *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 949 (D. Md. 2020) (quoting 5 U.S.C. § 705), and "may issue all necessary and appropriate process to … preserve status or rights pending conclusion of the review proceedings," 5 U.S.C. § 705. "The

15

factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Casa de Maryland*, 486 F. Supp. 3d at 950. "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on Their Claims Against Provisions That Impose Barriers on Coverage

#### A. The Failure-to-Reconcile Policy Is Unlawful and Arbitrary

As noted above, enrollees are required to reconcile on their tax returns the APTCs that they have claimed, on the basis of projected income, with the PTCs to which they are entitled, on the basis of the income actually received. *See* 26 U.S.C. § 36B(f)(3). CMS requires applicants for coverage to report whether they have reconciled their tax credits on prior tax returns, and CMS checks that reporting against IRS data. 45 C.F.R. § 155.340(c). But many people are flagged in error, due to inaccuracies in IRS data and staffing cuts at that agency. *See* Jason Levitis et al. comment at 22 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0989; Ctr. on Budget & Policy Priorities (CBPP) comment at 13 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0922.

Under the policy in effect before 2025, an applicant might lose eligibility for APTCs if they do not reconcile their tax return in a second year, after receiving notice in the first year of the issue. 45 C.F.R. § 155.305(f)(4)(i), (ii) (2025). Last year, CMS sought to revise that policy, for 2026 only, to require the Exchanges to determine the enrollee to be ineligible for APTCs in the first year that the issue arises, *id.* § 155.305(f)(4)(iii) (2025), but this Court stayed that provision. *City of Columbus III*, 796 F. Supp. 3d at 162-63. CMS is now revising the rule to provide that, for

the 2027 plan year, the FFE would apply the one-year version of the failure-to-reconcile policy, and SBE could apply either the one-year or two-year version of that policy. 91 Fed. Reg. at 29,866 (revising 45 C.F.R. § 155.305(f)(4)). Enrollees who lose eligibility under either version become responsible for the full cost of their coverage, which in many cases is prohibitively expensive.

Both versions of the policy are unlawful. CMS has authority to "determine" whether the statutory standards for APTC eligibility are met, but it does not have authority to alter those standards. *See* 42 U.S.C. §§ 18081(a), (f); *Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 975 (E.D. Va. 2005) (ERISA plan administrator's authority to "determine" eligibility under the plan is not a discretionary power to alter the plan terms). Eligibility for APTCs turns on whether an applicant is eligible for tax credits, 42 U.S.C. § 18081(a)(2), and eligibility for tax credits turns on whether one is an "applicable taxpayer," 26 U.S.C. § 36B(c), a term that depends on the applicant's income. The statute does not contemplate the existence of a prior tax debt affecting an applicant's eligibility for APTCs in any way, and CMS's "invocation of its general rulemaking authority … does not authorize it to flout separate, express provisions of the statute." *City of Columbus III*, 796 F. Supp. 3d at 162-63. Moreover, if Congress intended to condition eligibility for a tax credit on the reconciliation of old tax debts, it knew how to do so. *See* 26 U.S.C. §§ 24(*l*), 32(k) (conditioning eligibility for future child and earned income tax credits); *see also Nat'l Elec. Mfrs. Ass'n v. Dep't of Energy*, 654 F.3d 496, 507 (4th Cir. 2011); *City of Columbus III*, 796 F. Supp. 3d at 162.[4] So, if debt for a PTC is unresolved, the statute contemplates that the IRS, not CMS, would use its enforcement tools to ensure the debt is collected. *See* 26 C.F.R. § 1.6011-8.

CMS acknowledges that this Court has held its failure-to-reconcile policy to be unlawful,

---

[4] Last year, Congress adopted a version of this failure-to-reconcile policy, but pointedly chose to delay the effective date of this policy until 2028, thereby underscoring that the agency lacks authority to impose such a condition on eligibility for tax credits before that date. Pub. L. No. 119-21, § 71303(a), 139 Stat. 72, 324 (2025).

but it offers a new statutory theory this year. It reasons that "filing a tax return is a means of verifying a condition of eligibility and not itself a condition of eligibility." 91 Fed. Reg. at 29,609. It notes that the statute directs it to determine eligibility for APTCs on the basis of the individual's income "for the most recent taxable year" for which information is available, 42 U.S.C. § 18082(b)(1)(B), or on the basis of other information where an application form shows significant changes affecting eligibility, "including … cases where the taxpayer was not required to file a return of tax imposed by this chapter for the second preceding taxable year," *id.* § 18082(b)(2)(B). From this, CMS reasons that it may not determine eligibility based on anything other than last year's tax return in cases where the taxpayer was required to file a return. 91 Fed. Reg. at 29,609.

This theory is nonsensical. As an initial matter, "including" is a "term[] of enlargement, which clarify[ies] that given examples are merely illustrative." *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 960 (4th Cir. 2025). So the statutory mandate is precisely the opposite of the agency's reading; CMS must find eligibility on the basis of income for the most recent tax year for which information is available—meaning that it must look to other years if the previous year's return is not available, not deny eligibility altogether—and it further must adopt procedures to assess eligibility in any case where an application shows a significant change affecting eligibility, whether or not the taxpayer was required to file a return. *See* 42 U.S.C. § 18082(b)(1)(B), (b)(2)(B). In any event, section 18082 does not describe the information that an applicant must provide to show eligibility for APTCs; that list is instead set in the previous section, 42 U.S.C. § 18081(b), and nothing in that provision conditions eligibility on their filing of a tax return.[5]

---

[5] Moreover, CMS's new statutory theory doesn't match its policy. Under its (incorrect) logic, an applicant who filed a tax return but failed to reconcile tax credits should remain eligible for APTCs, while an applicant who didn't file a tax return but didn't claim APTCs in a prior year should lose eligibility, but its new policy reverses those outcomes.

CMS's failure-to-reconcile policy is also arbitrary. The rule will trap some consumers in a Catch-22. The one-year version of the policy that will be applied by the FFE, and by SBEs that choose to adopt it, will require APTCs to be revoked if tax issues aren't resolved immediately. But an applicant's federal tax information must be handled consistently with federal tax privacy law, and so many applicants with a failure-to-reconcile issue will learn only that they have been barred from subsidized insurance but not the reason why. *See* Levitis comment at 22. This "Kafka-esque" scenario will cause numerous people to lose coverage, *id.*; CMS estimates that 41,600 people will lose a total of $179 million in tax credits in 2027 as a result. 91 Fed. Reg. at 29,836.

CMS shows little concern that people will lose coverage, noting breezily that "for those who have lost coverage, many hospitals have charity care programs where consumers can apply to reduce their medical debt." 91 Fed. Reg. at 29,610. This misses the point. Charity care programs may reduce an individual's medical debt but will not eliminate it. And many people do not know of the availability of charity care, or they recognize that care will remain prohibitively expensive for them without insurance. As a result, they will skip care, leading to worse health outcomes and a greater reliance on safety net providers, at a higher cost, when patients' medical needs become too urgent for them to delay care any longer. *See* Zachary Levinson et al., *Hospital Charity Care: How It Works and Why It Matters*, KFF (Nov. 3, 2022), https://perma.cc/8XJZ-8U4Q.

At one time, CMS acknowledged a one-year failure-to-reconcile policy would be "overly punitive" on enrollees who lose access to subsidies as a result of "delayed data" from IRS, in many cases without knowing why their applications have been rejected. 87 Fed. Reg. 78,206, 78,256 (Dec. 21, 2022). Now, however, the agency brushes aside this concern, noting simply that rejected applicants may file an appeal. 91 Fed. Reg. at 29,610. This ignores that many frustrated applicants will drop out of the process altogether, and the loss of these enrollees, who tend to be healthier, will worsen the risk pool for everybody else. *See* Levitis comment at 22. CMS asserts that its

policy is nonetheless worthwhile to reduce improper enrollments by unscrupulous brokers. 91 Fed. Reg. at 29,608. But, even by the agency's own telling, that problem is not a genuine issue for the SBEs, and it has diminished substantially for the FFE, given the expiration of enhanced subsidies and CMS's efforts to address broker fraud. *Id.*[6] And, in any event, there is a fundamental mismatch between this rule and the problem that CMS claims it is trying to solve. The failure-to-reconcile policy does not in any way address the conduct of brokers, but it does deprive enrollees of coverage, often for reasons that the Exchange cannot even disclose to them. By failing to draw a "rational connection between the facts found and the choice made," CMS acted arbitrarily. *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 753 (4th Cir. 2019).

### B. The Verification Policy for Low-Income Enrollees Is Arbitrary

For a third time, CMS seeks to require additional verification for enrollees who project a household income higher than the poverty level, if IRS data indicates that their income is below that level. 91 Fed. Reg. at 29,867 (revising 45 C.F.R. § 155.320(c)(3)). Although CMS previously would have sunset this policy after one year, it now seeks to require these audits on a permanent basis. *Id.* at 29,615. The agency's third attempt to impose this policy is arbitrary for precisely the same reasons that the court vacated the same policy five years ago and stayed it last year. *See City of Columbus II*, 523 F. Supp. 3d at 763; *City of Columbus III*, 796 F. Supp. 3d at 168.

There are many reasons why an individual could, in good faith, project that he or she will have income next year higher than the poverty level even if prior-year IRS data shows a lower income. *See* CBPP comment at 17; State of California et al. comment at 7 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0797; *see also* Cynthia Cox et al.,

---

[6] At the same time that CMS asserts that the problem of broker fraud is so prevalent that it justifies a policy denying subsidies for eligible enrollees, it has proposed (and may yet finalize) a policy permitting the same brokers to operate the Exchange directly in the place of state officials. *See* 91 Fed. Reg. at 29,578. The agency's internal inconsistency on this score is yet another reason to conclude that its rationale is arbitrary.

*Repayments and Refunds: Estimating the Effects of 2014 Premium Tax Credit Reconciliation*, KFF (Mar. 24, 2015), https://perma.cc/AL3R-C5H5 (roughly half of low-income enrollees experience year-over-year income changes of 20% or more). Many such people are self-employed, or may have difficulty obtaining documentation to support their projections. *See City of Columbus II*, 523 F. Supp. 3d at 762. As a result, they will be more likely to drop out of the market. Although CMS expresses doubt that its new burdens "would deter many eligible people from enrolling," 91 Fed. Reg. at 29,622, by its own estimate, 81,000 people will lose coverage, *id.* at 29,836. And—as commenters noted, but the agency failed to acknowledge—this is almost certainly a vast understatement. *See* CBPP comment at 19 (citing Zachary Sherman et al., *2027 Proposed NBPP: Analyzing State and Consumer Impacts* 14 (Mar. 2026), https://perma.cc/V6SA-489C (noting that more than two million people may lose coverage under CMS's two new data-matching policies)). Because these individuals tend to be younger and healthier, their exit from the health insurance market will worsen the risk pool. *See* Levitis comment at 18-19.

As before, CMS improperly assumed, without evidence, that these enrollees must have been trying to defraud the Exchange. *See* Levitis comment at 14; California comment at 7. And it again "improperly elevated the objective of fraud prevention, for which it had no evidence, above the ACA's primary purpose of providing health insurance." *City of Columbus II*, 523 F. Supp. 3d at 762. Its "decision to prioritize a hypothetical risk of fraud over the substantiated risk that its decision result in immense administrative burdens at best, and a loss of coverage for eligible individuals at worst, defies logic." *City of Columbus III*, 796 F. Supp. 3d at 168 (quoting *City of Columbus II*, 523 F. Supp. 3d at 763).

CMS asserts that circumstances have changed since last year. It reasons (despite offering the opposite rationale for the same policy last year) that it is now more important to prevent broker fraud, because enrollees who are not aware that a broker has enrolled them will owe greater tax

liabilities, given that last year's budget reconciliation statute removed the cap on APTC repayments. 91 Fed. Reg. at 29,616. But individuals are already held harmless if they have incomes below the poverty level, *see* 26 C.F.R. § 1.36B-2(b)(6), or if they are fraudulently enrolled by a broker, *see* Levitis comment at 15, so this is a distinction without a difference. CMS also relies on a recent Government Accountability Office (GAO) study finding that fictitious applicants would remain enrolled after submitting false information. 91 Fed. Reg. at 29,615. But that study itself cautioned that it could not be extrapolated to make any conclusions whether fraud is widespread in the program. *See* CBPP comment at 16. And, by the agency's own telling, improper enrollment is not a genuine issue for the SBEs, but CMS imposes this requirement on these Exchanges nonetheless. *Id*. at 29,618. So CMS committed the same errors in this rule as it did before, and this provision should be vacated for the same reasons.

C.  **The Audit Policy for Enrollees Where Tax Data Is Lacking Is Arbitrary**

CMS once again seeks to revoke a rule that permits applicants to self-attest their income if IRS data is unavailable. 91 Fed. Reg. at 29,866-67 (removing 45 C.F.R. § 155.320(c)(5)). Although last year's policy would have sunset after one year, the agency now intends this policy to be permanent. 91 Fed. Reg. at 29,621. This Court stayed this policy last year, *City of Columbus III*, 796 F. Supp. 3d at 170, and it is arbitrary for the same reasons this year.

It is relatively common for tax data to be missing for an applicant, for entirely legitimate reasons. An individual might have had a change of name, family composition, or filing status, or might not have needed to file for the year in question. *See* CBPP comment at 18. CMS thus estimates its policy will generate *more than 2.7 million* instances of data discrepancies that Exchanges and applicants will need to resolve. 91 Fed. Reg. at 29,814. For many, documentation might not be readily available to substitute for tax data, which means that if these people cannot attest to their income, they will be deprived of subsidized coverage. *See* Levitis comment at 17.

Once again, younger and healthier people are more likely to be deterred by this paperwork burden, as sicker people will be more motivated to retain coverage. *Id.* at 18-19; CBPP comment at 16. CMS estimates that 407,000 people will lose some or all APTC as a result of this rule, 91 Fed. Reg. at 29,837, which again is almost certainly a vast undercount, *see supra* at 21.

CMS again attempts to justify these burdens and coverage losses by reciting, with no evidentiary support, that self-attestation "may have helped contribute to weakening the Exchange eligibility system." 91 Fed. Reg. at 29,619. Unscrupulous brokers, after all, would have no way of knowing whether tax data is available for a person before targeting him or her for unauthorized enrollment. Once again, CMS has adopted a rule that is entirely disconnected from the problem it claims it is trying to solve, with hundreds of thousands of people being driven out of coverage due to the IRS's inability to provide timely and accurate information regarding their income histories. *See* California comment at 7. This falls short of the basic standards for rational rulemaking. *See City of Columbus III*, 796 F. Supp. 3d at 170; *see also Appalachian Voices*, 912 F.3d at 753.[7]

### D.  The Verification Requirements for SEP Enrollments Are Arbitrary

CMS seeks to reimpose two additional verification requirements on the FFE. That Exchange must conduct pre-enrollment verification for additional special enrollment periods (SEPs), and must do so for at least 75% of new enrollments through each SEP. 91 Fed. Reg. at 29,867 (revising 45 C.F.R. § 155.420(g)). If the Exchange cannot complete the verification, the enrollment must be cancelled. *Id.* Even though last year CMS determined that, after one year, "the burden of continuing such policies will reach a point at which they outweigh any benefit," 90 Fed.

---

[7] The agency's reasoning is not apparent, but the preamble suggests that CMS believes it is compelled by the statute to revoke the self-attestation option. 91 Fed. Reg. at 29,620. CMS ignores 42 U.S.C. § 18081(c)(4)(B), which permits it to "modify" information verification methods if it finds that doing so "would reduce the administrative costs and burdens on the applicant." The agency properly invoked this modification authority when it adopted the self-attestation provision. 87 Fed. Reg. 78,206, 78,258 (Dec. 21, 2022). If CMS now believes that the statute requires it to revoke this rule, it has misread section 18081, and this provision must be vacated for that reason alone. *See Perez v. Cuccinelli*, 949 F.3d 865, 873 (4th Cir. 2020) (en banc).

Reg. at 27,151, this year CMS intends to make these policies permanent. 91 Fed. Reg. at 29,631-32.

This policy will generate an estimated 293,000 verification issues to resolve in the coming year, resulting in a further barrier to coverage, through additional paperwork and administrative burdens, and costing consumers more than $7 million annually. 91 Fed. Reg. at 29,814. Younger and healthier people are more likely to drop coverage as a result, worsening the risk pool, as CMS itself recognized when it previously considered (and rejected) a similar policy. 87 Fed. Reg. 27,208, 27,279 (May 6, 2022); *see* Levitis comment at 26; Colo. Consumer Health Initiative comment at 5 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0811; Nat'l Health Law Program comment at 25 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0615.

CMS claims that these requirements will have a positive impact on the risk pool, lowering premiums. 91 Fed. Reg. at 29,633. The agency does not explain why it believes this to be the case, or why it repudiates its own view on risk pool effects from only four years ago. CMS disregards the body of research showing what is now a well-known effect: when paperwork barriers are imposed on coverage, sicker people are more motivated to overcome those barriers, while younger and healthier people are more likely to give up. So new burdens drive the very people out of the market that are needed to ensure the stability of the risk pool.

CMS also attempt to justify this policy by pointing to shifting patterns in SEP enrollments. When stricter verification requirements were imposed for the SEP for persons who lose other coverage, for example, this resulted in an increase in enrollments under other SEPs. 91 Fed. Reg. at 29,632. CMS intuits from these trends that fraud must be widespread among SEP enrollees. *Id.* But this conclusion does not follow; many individuals may be eligible for multiple SEPs, and it is only natural to assume that, given a choice, they would choose the process with less burdensome

red tape. *See* Levitis comment at 25; Nat'l Health Law Program comment at 26.

Moreover, since—even on the agency's own telling—the problem of improper enrollments hasn't arisen on the SBEs, CMS should have considered why the FFE might be different, such as the ability of enhanced direct enrollment entities to apply on behalf of enrollees. *See* CBPP comment at 23. The agency's "utter failure to consider obvious alternative actions" that would have directly addressed the problem that it identified, *Fishermen's Dock Co-op. v. Brown*, 75 F.3d 164, 172 (4th Cir. 1996), coupled with the "significant mismatch" between that problem and the measures the agency chose, *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019), demonstrate the irrationality of its approach. Given that "the agency's chosen solution [was] unmoored from the problem is [sought] to address," *City of Columbus III*, 796 F. Supp. 3d at 159, CMS acted arbitrarily in imposing these new burdens for 2026. *See Ohio v. EPA*, 603 U.S. 279, 292 (2024).

## II. Plaintiffs Are Likely to Succeed on Their Claims Against Provisions That Increase Costs for Enrollees

### A. The Cost-Sharing Limitation Policy for Bronze Plans Is Unlawful and Arbitrary

Under the new rule, starting in plan year 2027, CMS will allow insurers to offer bronze plans on the individual market with MOOPs up to 130% of the statutory limitation on annual cost-sharing, as long as the insurers offer at least one bronze plan with a compliant MOOP.[8] 91 Fed. Reg. at 29,697, 29,699; *see supra* at 10-11. This provision is contrary to law, and it is also arbitrary.

***First***, this policy is explicitly contrary to 42 U.S.C. § 18022(c) and exceeds the agency's statutory authority to regulate under that provision. As CMS acknowledges, under section 18022(c), the annual cost-sharing under an individual market bronze plan cannot lawfully exceed the statutory cap, which is set annually and which CMS calculates to be $12,000 for self-only

---

[8] Starting in plan year 2028, CMS will also allow catastrophic plans to exceed the statutory limit by 130%. 91 Fed. Reg. at 29,705. Because this change will not take immediate effect, plaintiffs do not seek preliminary relief as to that provision of the rule.

coverage or $24,000 for a family for 2027. *See* 91 Fed. Reg. at 29,691-92 & tbl. 9. And yet, the new rule allows an insurer to offer bronze plans with MOOPs that exceed those very limits by 30%, as long as the insurer also offers at least one bronze plan that complies with the statutory limits. 91 Fed. Reg. at 29,697, 29,699. By CMS's own telling, then, this policy is contrary to law and in excess of the agency's authority under the ACA.

Notwithstanding this express conflict with the statute, CMS defends this change based on a theory that at some point in the future it will become impossible for insurers to design bronze plans that both fall within the permissible range for the actuarial value of such plans and have MOOPs within the statutory cost-sharing limitation. 91 Fed. Reg. at 29,691, 29,694. CMS reasons that the components of the actuarial value calculation are changing at such a rate that insurers will face difficulty in designing bronze plans that comply with the statute and that are still significantly lower in value than silver plans. *Id.* at 29,693-29,696. The agency concludes that "eventually the maximum annual limitation on cost sharing will be too low to allow for an [actuarial value] calculation for the most basic bronze plan design." *Id.* at 29,694.

The agency's premise is incorrect; there is no serious danger that insurers will be unable to design bronze plans in the foreseeable future. *See* Matthew Fiedler comment at 3 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-1027. But even on the agency's own telling, it remains possible today to design bronze plans that comply with the ACA's limitations. Indeed, the new rule requires that insurers offering bronze plans on the individual market design at least one bronze plan that complies with the statutory limitations. 91 Fed. Reg. at 29,697. Only then may an insurer offer bronze plans that violate the statute. *Id.* CMS's theory of statutory infeasibility that may "eventually" occur, *id.* at 29,694, is thus no defense of the rule's unlawful change to bronze plans beginning in plan year 2027. Moreover, even if designing compliant bronze plans were currently impossible, that would still be no defense: the ACA does not require insurers

26

to offer any bronze plans in the first instance. *See* 42 U.S.C. § 18021(a)(1)(C)(ii) (requiring insurers on the Exchanges to offer at least one silver plan and one gold plan).

CMS invokes agencies' responsibility to "harmonize" statutory provisions "wherever possible," and, "where two statutory requirements cannot reasonably be satisfied simultaneously," to "act in a manner that best effectuates congressional intent and preserves the operability of the relevant statutory framework." 91 Fed. Reg. at 29,696 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)). But this principle is not license for an agency to modify a statute by purporting to override its express limitations. Only Congress has the "constitutional authority to revise statutes in light of" subsequent changes in circumstances, and until Congress "exercises that power, the people"—and executive agencies tasked with enforcing the law—"may rely on the original meaning of the written law." *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018).

CMS also cites *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995), for the proposition that "statutory provisions should not be interpreted in a manner that renders any part 'superfluous.'" 91 Fed. Reg. at 29,696 n.276. But the agency does not explain how enforcing compliance with the annual cost-sharing limitation under 42 U.S.C. § 18022(c) would render any provision of the ACA superfluous. In fact, CMS's new policy does just that: allowing noncompliant bronze plans would render section 18022(c) superfluous.

In any event, CMS admits that its perceived future statutory conflict is not real today. The agency states that "*[i]f* the market reaches th[e] point … that a bronze plan with a MOOP set at the maximum annual limitation on cost sharing will be unable to fit within the bronze [actuarial value] *de minimis* range" *then* the agency believes it "would need to propose a new approach to maintaining bronze plans' viability through future notice-and-comment rulemaking." 91 Fed. Reg. at 29,698. So the agency "intend[s] to require [statutorily compliant] plans for as long as these bronze plans remain actuarially viable." *Id.* In other words, CMS is allowing insurers to violate

the statute, as long as they sometimes comply with the statute, because it *might one day* be infeasible for insurers who offer bronze plans to comply with the statute. This is not a lawful policy under any theory of statutory construction.[9]

***Second***, the rule's change to bronze plans is neither reasonable nor reasonably explained. *See Ohio*, 603 U.S. at 292. Most obviously, as just explained, CMS disregards that the new policy reflects a blatant violation of the statutory cost-sharing limitations. CMS also ignores that it could adjust the components of its actuarial value calculations in future years to address any issues that might arise in the design of bronze plans. *See* Fiedler comment at 3. But CMS is equally insouciant about the negative effects of its policy on financially vulnerable consumers and their providers. CMS does not dispute commenters' concerns that higher cost-sharing limits for bronze plans would lead to more unexpected health care costs, increased medical debt, coverage losses, increased uncompensated care for safety net providers, and worse health outcomes as enrollees delay or forgo care. *See* 91 Fed. Reg. at 29,699-700; *see also, e.g.*, Levitis comment at 40; California comment at 12. Indeed, it acknowledges that this change "could shift more of the increasing costs of health care and potentially result in more enrollees who are unable to pay for their share of the cost," 91 Fed. Reg. at 29,699, an outcome it waves away elsewhere in the preamble with the suggestion that insurers could offer a cascading series of loans to enrollees who face difficulty paying their out-of-pocket costs, *id.* at 29,687. CMS also acknowledges commenters' concerns regarding the impact of this policy change on the risk pool, conceding that it creates a "downside risk of an adverse enrollment shift." *Id.* at 29,700.

CMS brushes aside these concerns about the effects on the risk pool and on consumers and

---

[9] Elsewhere, CMS insists that the fact that insurers that offer bronze plans are required to offer one plan that still complies with the statutory cost-sharing limitation "is not an acknowledgement that the underlying conflict does not exist." 91 Fed. Reg. at 29,702. This is nonsensical: if insurers are still able to offer bronze plans that are in compliance with the statute, then there is manifestly no "conflict" rendering statutory compliance impossible.

providers by emphasizing that the rule does not "*require* any issuer to offer an individual market bronze plan with a plan design that exceeds" the statutory cost-sharing limitation; it merely provides insurers with "full discretion over whether to offer such plans." *Id.* at 29,699 (emphasis added); *see id.* at 29,701. But permitting statutory violations by private actors is no more reasonable than requiring statutory violations. At the same time, CMS insists that this change is necessary to solve a perceived problem and preserves "meaningful differentiation between metal tiers." *Id.* at 29,703. CMS thus tries to justify an unlawful and harmful policy by contending that the policy is both optional and yet essential. The agency cannot have it both ways. *See Ohio*, 603 U.S. at 292 (an agency must articulate "a rational connection between the facts found and the choice made" (quoting *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). An agency does not have authority to permit private actors—or, indeed, anyone else—to violate the clear terms of a statute, much less in a way that would increase negative outcomes for consumers that the statute was designed to decrease.[10]

The arbitrariness of the new policy is further revealed by the fact that the rule imposes the same 130% cost-sharing limitation on catastrophic plans, even though, unlike bronze plans, catastrophic plans do not have prescribed actuarial value requirements and therefore do not even arguably face the same future statutory difficulties that the agency perceives as to bronze plans. Nonetheless, the agency cites the unjustified 130% limitation for catastrophic plans as a principal basis for also capping bronze plan cost-sharing at 130% in the final rule. 91 Fed. Reg. at 29,700.

In support of its selected 130% annual cost-sharing limitation, CMS also asserts that this value "preserves the core consumer protection function of the annual limitation on cost sharing,"

---

[10] As to the risk pool, CMS states that it "believe[s] this policy would attract currently uninsured individuals who are deterred by the high deductibles of bronze plans and not eligible for subsidies, which could improve the overall risk pool," but it provides no data or other evidence in support of this belief. 91 Fed. Reg. at 29,700-01.

*id.*—but this assertion is irrational. Exceeding the statutory limitation by any amount—much less by one-third—necessarily undermines the "function of [that] annual limitation." *Id.* The agency is also wrong to suggest that a higher limit would "restore a meaningful distinction" between catastrophic and bronze plans that it believes Congress intended. *Id.* at 29,706. This suggestion ignores that (1) millions of consumers enrolled in bronze plans in 2026 while only about 67,500 consumers (0.3%) enrolled in catastrophic plans; (2) the ACA requires catastrophic plans to comply with the annual cost-sharing limitation, *see* 42 U.S.C. § 18022(e)(1)(B); and (3) the ACA limits eligibility for catastrophic plans, showing that Congress did not intend for catastrophic plans to compete alongside bronze plans for the healthiest consumers, *see id.* § 18022(e)(2).[11]

Contrary to its suggestions, CMS can "best signal [its] good faith efforts to adhere to the statute," 91 Fed. Reg. at 29,698, by actually adhering to the statute. Because the new rule's rewrite of the statute does not comply with the ACA and is arbitrary, the rule is unlawful.

### B. The Expansion of Catastrophic Plan Eligibility Is Unlawful and Arbitrary

Codifying and elaborating on the September 2025 guidance, CMS is drastically expanding eligibility for catastrophic plans. The agency will allow a hardship exemption for anyone, in any state, who is ineligible for PTCs or cost-sharing reductions because their projected annual household income is below 100% of the federal poverty level or above 250% of the federal poverty level. 91 Fed. Reg. at 29,634; *see Guidance on Hardship Exemptions* at 2. This far-reaching expansion cannot be squared with the meaning and purpose of the exceptions for catastrophic coverage under the ACA and is neither reasonable nor reasonably explained.

*First*, this categorical expansion of the hardship exemption—as set forth in both the September 2025 guidance and the new rule—is contrary to the ACA and in excess of CMS's

---

[11] CMS also states that a 120% limit would not be "sufficient to address" its perceived "viability problem," and only a 130% limit would give insurers "adequate flexibility" in designing bronze plans. 91 Fed. Reg. at 29,700. It cites no data or evidence in support of these conclusory assertions.

authority under the statute, which specifically limits eligibility for catastrophic plans to narrow categories. The statute limits eligibility "only" to those who have "not attained the age of 30" or who "ha[ve] a certification" of exemption (1) "relating to individuals without affordable coverage" or (2) "relating to individuals with hardships." 42 U.S.C. § 18022(e)(1), (2). An individual qualifies for the affordability exemption if his or her required insurance contribution exceeds 8.5% of his or her household income. 26 U.S.C. § 5000A(e)(1); 42 U.S.C. § 18022(e)(2)(B)(i). For the exemption relating to individuals with hardships, the statute says nothing of income; rather, it applies to individuals who CMS determines have "suffered a hardship with respect to the capability to obtain coverage under a qualified health plan," based on the individual's particular circumstances. 26 U.S.C. § 5000A(e)(5). Accordingly, an individual may qualify for a catastrophic plan under narrow exceptions pertaining to age, income, or individualized hardship.

Rather than treating hardship as a narrow exception, CMS leverages that provision to render a majority of adults categorically eligible for catastrophic coverage. Moreover, CMS will automatically certify that exemption on the FFE.[12] 91 Fed. Reg. at 29,636. Catastrophic plans will now be available to about 80% of adults under the age of 64, without any individualized proof of hardship. *See* Levitis comment at 41. As a result, eligibility for catastrophic plans becomes the rule rather than the exception. The administration projects that about three million people will take up catastrophic coverage now, a dramatic increase relative to the tens of thousands of people who had enrolled before. Levitis comment at 43 (citing Council of Econ. Advisors, *Expansion of HSA Eligibility Under OBBB Act to Improve Marketplace Coverage, Affordability, and Access* 2 (Sept. 2025), https://perma.cc/3JZR-LHDZ).

---

[12] CMS provides that individuals may either (1) attest to their income for the hardship exemption when applying for coverage through the Exchange, and their eligibility will be automatically adjudicated on the federally facilitated Exchange, or (2) attest on a paper request form that "they are no longer eligible for financial assistance." 91 Fed. Reg. at 29,636. In stark contrast to the rule's other provisions, neither method requires income documentation. *Id.*

This result cannot be reconciled with the text or structure of the ACA, which make clear that catastrophic plans may be made available to narrow categories of consumers who, for specific reasons, cannot access affordable coverage through the metal-level plans. To start, the hardship exemption is a distinct provision from the income-based affordability exemption. It is necessarily more circumscribed, speaking to individual circumstances, such as "an unexpected natural or human-caused event" causing "a significant, unexpected increase in essential expenses," or "other circumstances that prevented [the individual] from obtaining coverage under a qualified health plan," as determined by the Exchange. 45 C.F.R. § 155.605(d)(1). A broad, categorical, income-based, and automatic "hardship" exemption is therefore wholly incompatible with section 50001(e)(5). Even if the statute allowed for the hardship exemption to be categorically defined by income alone, making *any* amount greater than 250% of the federal poverty level—even as much as, say, 3,000% or more—could scarcely be described as a "hardship." *See, e.g.*, *Hardship*, Black's Law Dictionary (12th ed. 2024) ("[p]rivation; suffering or adversity").

The agency defends its new expansion of eligibility by pointing to "market-wide premium increases" that have "far outpace[ed] inflation and wage growth" over the last several years. 91 Fed. Reg. at 29,634. But Congress already provided an exemption intended to address these affordability-related concerns—that is, the affordability exemption described at section 5000A(e)(1). *See Gustafson*, 513 U.S. at 575 (describing principle that "a word is known by the company it keeps," so courts "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words"). Congress further provided that the eligibility criteria for the affordability exemption be indexed to reflect the excess rate of premium growth over the rate of income growth over time. *See* 26 U.S.C. § 5000A(e)(1)(D). In providing for this updating mechanism, Congress thus already addressed the divergence between premium growth rates and income growth that CMS points to as justification for expanding the hardship exemption. CMS

cannot purport to replace the policy choice that Congress made with its own, preferred affordability exemption under the guise of a hardship exemption. *See Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998) ("[N]either federal agencies nor the courts can substitute their policy judgments for those of Congress."), *aff'd*, 529 U.S. 120 (2000).

CMS reasons that "[t]he indexing mechanism in section 5000A(e)(1)(D) governs the affordability exemption; it does not constrain the Secretary's independent authority under section 5000A(e)(5)" to determine the scope of "the hardship pathway." 91 Fed. Reg. at 29,637. But the indexing mechanism necessarily informs the correct interpretation of the hardship exemption— that is, one distinct from the exemption concerned with household income. Underscoring that the plain meaning of the statute distinguishes between the income-based affordability exemption and the hardship exemption, CMS appears to acknowledge inadvertently that its categorical income-based policy does not constitute a "hardship circumstance" under the statute. The agency states that the pathways for obtaining certification of the new hardship exemption "ensure that the exemption is grounded in an affirmative attestation by the individual, *whether of income or of hardship circumstance*." 91 Fed. Reg. at 29,637 (emphasis added).

What's more, CMS's expanded hardship exemption would entirely subsume the statute's affordability exemption. This result is insupportable under the statute: "When a statutory construction thus renders an entire subparagraph meaningless," as CMS's construction of "hardship" does to the affordability exemption here, "the canon against surplusage applies with special force." *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (cleaned up); *see also BLOM Bank SAL v. Honickman*, 605 U.S. 204, 211 (2025) ("catchall provision" should not be read to "swallow the preceding paragraphs"). The expanded hardship exemption would similarly render the age-related exemption largely redundant. *See* 42 U.S.C. § 18022(e)(1).

CMS attempts to compare the new expanded eligibility with the scope of the existing

33

hardship exemption regulations, but that comparison only underscores that the new categorical exemption is beyond the pale. 91 Fed. Reg. at 29,637. Since 2013, CMS regulations have included an "other circumstances" category, under which the Exchange may grant a hardship exemption to an individual who "has experienced other circumstances that prevented him or her from obtaining coverage under a qualified health plan." *Id.* (quoting 45 C.F.R. § 155.605(d)(1)(iii)). As CMS explains, the 2013 rule "noted that the hardship exemption was drafted with 'broad language to include a range of *personal scenarios*' and that [CMS] expected to 'clarify these criteria in future guidance.'" *Id.* (emphasis added) (quoting 78 Fed. Reg. 39,494, 39,499 (July 1, 2013)). Thus, the broad language of this catchall provision is intended not to sweep in huge swaths of the population but to avoid excluding individuals who may encounter unanticipated "personal scenarios" constituting a hardship circumstance that is not expressly contemplated in the regulations. 78 Fed. Reg. at 39,510. Unlike the expansive, new categorical exemption, the existing regulations provide for individual determinations of hardship, premised on an inability to obtain coverage otherwise, which fits comfortably within section 5000A(e)(5).

Even if this expansion of eligibility for catastrophic coverage were not so clearly contrary to the statutory text providing for the relevant exemptions, it would still be contrary to the ACA because it undermines the statutory structure—i.e., the design of the ACA marketplace. Through its metal-level plans, the ACA requires that insurers generally offer only quality health insurance and aims to lower the cost of coverage to encourage individuals to enroll. This coverage improves access to care and overall health and reduces financial burdens on consumers as well as institutions that pay for uncompensated care. *See* Levitis Decl. ¶¶ 14-20. The catastrophic plans were created not to compete with those metal-level plans but to serve as a backstop for those few Americans who, for specified reasons, could still not obtain coverage through metal-level plans. *See* 42 U.S.C. § 18032(d)(3) (limiting eligibility); S. Rep. No. 111-89, at 33 (2009) (describing limited backstop).

CMS's expansion of the hardship exemption to cover the vast majority of adults functionally creates a parallel insurance market for catastrophic plans that would compete with the metal-level plans, thereby directly undermining the statutory goals. As CMS itself recognizes, "statutes should be interpreted" not in this self-defeating way but "as a 'symmetrical and coherent regulatory scheme.'" 91 Fed. Reg. at 29,636 n.276 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

At bottom, the new rule does not define the scope of the hardship exemption so much as bulldoze over it by making the vast majority of adults eligible for catastrophic coverage. CMS does not have the authority to rewrite the law in this way. *See Biden v. Nebraska*, 600 U.S. 477, 494 (2023) (authority to define exceptions in statute "does not authorize basic and fundamental changes in the scheme designed by Congress"); *Wisc. Cent. Ltd.*, 585 U.S. at 284 ("Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences.").

**Second**, even if this expansion of eligibility could be squared with the ACA, it is neither reasonable nor reasonably explained. CMS has failed to articulate "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

To start, CMS avers that its goal is to "expand[] access to affordable coverage options," 91 Fed. Reg. at 29,634, but its policy will likely have the opposite effect by increasing out-of-pocket costs for consumers. It asserts that individuals who do not qualify for PTCs or cost-sharing reductions face a "structural" barrier to coverage and thus, in the agency's view, should qualify for catastrophic coverage. *Id.* Because Congress's chosen affordability exemption does not stretch this far, CMS leverages the hardship exemption to reach that outcome. Although it is true that premiums and deductibles on market-level plans can be high, CMS's solution to affordability challenges is for consumers to enroll in catastrophic plans for which no premium subsidies are

available and under which deductibles are even higher than metal-level plans (other than bronze).

Commenters observed that, contrary to CMS's assertions, there is no evidence that increased access to catastrophic plans would increase the affordability of medical care for consumers. *See, e.g.*, Levitis comment at 43. Under the new rule, individuals enrolled in catastrophic coverage would receive almost no benefits until they pay $15,600 out of pocket (or $31,200 for a family). *Id.*; *see* 91 Fed. Reg. at 29,699. This amount "dwarf[s] the $535 average increase in premium from 2013 to 2026 and far exceed[s] what most Americans can afford to pay out-of-pocket on medical bills." Levitis comment at 43. Enrollment in catastrophic plans, for which the deductible far exceeds what most Americans can afford to spend on an unexpected medical cost,[13] leads individuals to "skip[] recommended treatments, or not fill[] prescriptions due to cost, which for many is followed by worsening health problems." *Id.* Those who proceed with treatment they cannot afford "face medical debt and worsening credit scores," and the costs of that uncompensated care are often "borne by providers and state and local governments." *Id.* at 44; *see* California comment at 14; Nat'l Nurses United comment at 1 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0571; Mass. Health Connector comment at 11 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0740.

CMS does not dispute these likely outcomes but merely emphasizes that the "final rule expands consumer choice; it does not require any individual to enroll in a catastrophic plan." 91 Fed. Reg. at 29,635. In neglecting to balance its goals of expanding consumer choice with actually improving the affordability of healthcare for consumers, CMS thus entirely "failed to consider [these] important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.

CMS also fails to meaningfully compare the costs of catastrophic plans with the lower-cost

---

[13] *See, e.g.*, Bd. of Govs. of the Fed. Res. Sys., *Report on the Economic Well-Being of U.S. Households in 2024 – May 2025*, at fig. 20 (June 12, 2025), https://perma.cc/PGN5-PDFR.

metal-level plans. Even although the premiums for catastrophic plans are lower than those for metal-level plans, the average lowest-cost catastrophic plan in 2026 costs $346 per month, CBPP comment at 25, which is only $23 more than for the average lowest-cost bronze plans—and yet enrollees cannot use PTCs to reduce the cost for catastrophic plans, unlike for bronze plans, *id.*; UnidosUS comment at 33 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0801; *see* Partnership to Protect Coverage comment at 3-4 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0762. Lowest-cost bronze plans can thus be *more* affordable on net—and provide essential health benefits before the deductible that catastrophic plans do not cover. Relatedly, CMS fails to acknowledge that expanding access to catastrophic coverage to older people would likely increase those premiums even more, as people typically need more care as they age. CBPP comment at 25.

Commenters also pointed out that a drastic increase in enrollment in catastrophic plans would increase premiums for everyone and risk destabilizing the market. *See* Levitis comment at 43; California comment at 14-15; Covered California comment at 7-8 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0926. Catastrophic plans are in a separate risk pool from metal-level plans, for purposes of risk adjustment. *See* 91 Fed. Reg. at 29,638. The expanded eligibility for catastrophic coverage risks drawing away relatively healthier enrollees, creating a parallel market that would compete with the metal-level plans and causing an increase in premiums for those enrolled in metal-level plans. *See* Ass'n for Cmty. Affiliated Plans comment at 7 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0800; Nat'l Ass'n of Ins. Comm'rs comment at 6 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0812; Levitis comment at 43.

CMS acknowledges this risk to the risk pool in the new rule, but it states—without support or evidence—that it concluded that concerns regarding market stability "do not outweigh" the

"barriers" that the agency believes consumers who are newly eligible for catastrophic plans face. 91 Fed. Reg. at 29,639. CMS also observes that enrollment in catastrophic plans was "minimal" for 2026, *id.*, but it does not support its expectation of similarly low uptake for 2027 following codification of the September 2025 guidance in the new rule, or acknowledge the administration's estimates that three million people will now take up catastrophic coverage. *See supra* at 32.

The result of the new rule's expansion of the hardship exemption is therefore likely to be even higher costs for most consumers across all plans and more uncompensated care. The expansion of eligibility for catastrophic plans is therefore arbitrary and capricious.

### III. Plaintiffs Are Likely to Succeed on Their Claims Against Provisions That Permit Insurers to Offer Less Comprehensive Coverage

#### A. Provisions Reducing Standards for Network Adequacy Are Arbitrary

Before 2018, CMS reviewed plans to be offered on the Exchanges to ensure that they offered a network of providers that complied with time and distance network adequacy standards. *See City of Columbus II*, 523 F. Supp. 3d at 750. In the 2018 rule, CMS deferred network adequacy review and certification solely to state regulators. 83 Fed. Reg. at 17,025. The court vacated that policy as arbitrary and capricious. *City of Columbus II*, 523 F. Supp. 3d at 751-52. CMS resumed network adequacy evaluation beginning in 2023, and it imposed time and distance network adequacy standards for plans on the FFE. *See* 87 Fed. Reg. 27,208, 27,322 (May 6, 2022). And beginning in 2025, CMS required SBEs and SBE-FPs to establish quantitative time and distance network adequacy standards at least as stringent as the FFE, subject to limited exceptions. 89 Fed. Reg 26,218, 26,328 (Apr. 15, 2024); 45 C.F.R. § 155.1050(a)(2)(i).

The new rule eliminates this federal floor. Instead of requiring network adequacy standards as strong as federal thresholds, CMS will now require only that SBEs and SBE-FPSs ensure "sufficient" access to providers in network and non-network plans, without further defining that

term. 91 Fed. Reg. at 29,727. The rule also establishes an "Effective Provider Access Review Program" and an "Effective ECP [Essential Community Provider] Review Program" that transfers reviews of provider access standards from the FFE to states that demonstrate sufficient authority and technical capacity to conduct the reviews by meeting certain criteria; CMS will continue to conduct reviews for states that do not conduct reviews themselves. 91 Fed. Reg. at 29,736-37.

CMS fails to reasonably explain its about-face from its prior rulemakings on the need for meaningful network adequacy standards. Its justification depends on its belief "that restoring authority to the States will enable them to proactively adapt their Exchange standards to meet their market's needs, as they will be better able to take into consideration the needs of their enrollee population." 91 Fed. Reg. at 29,655. But CMS offers no meaningful support for this conclusion. It simply appeals to its "expert judgment," without "point[ing] … to any data of the sort it would have considered if it had considered [the issue] in any meaningful way." *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 499 (D.C. Cir. 1988). Such conclusory reasoning is arbitrary.

Moreover, numerous commenters noted that removing the FFE network adequacy standards as the minimum requirements for SBEs and SBE-FPs risks states *lowering* adequacy standards, at the particular expense of rural communities and consumer access to mental health, substance use disorders, and other specialty care. *See* Levitis comment at 60; Nat'l Health Law Program comment at 34; Families USA comment at 6 (Mar.13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0945; Am. Acad. of Family Physicians comment at 13-14 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0634 (detailing ways in which "removing the federal time-and-distance standards harms patients" and noting that harms "are not theoretical" based on GAO reporting that "provider network oversight varies substantially across states and federal agencies and that inadequate networks can impede timely access and push patients out of network" (citing U.S. Government Accountability Office,

*Private Health Insurance: State and Federal Oversight of Provider Networks Varies* (Dec. 2022), https://www.gao.gov/assets/gao-23-105642.pdf)).

These comments challenged a fundamental premise of the agency's decision to entrust network adequacy standards to the states. CMS was obligated to respond to them. *See Grand Canyon Air Tour Coalition v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998). And because the policy "rests upon factual findings that contradict those which underlay its prior policy," CMS also needed to "provide a more detailed justification." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). As it did eight years ago, however, CMS "made no attempt to refute, mitigate, or explain away any of these significant concerns" let alone offer any detailed justification for its change. *City of Columbus II*, 523 F. Supp. 3d at 752. Instead, CMS merely stated that any advantages to a uniform federal standard do not outweigh the cost of impeding states' ability to "adapt their standards as they see fit," 91 Fed. Reg. at 29,648, and opined without any supporting evidence that "States will not see this change in policy as an opportunity to roll back their current programs," *id*. These "conclusory or unsupported suppositions" are not reasoned decisions. *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010).

Similarly, CMS's decision to shift review of network adequacy from the FFE to states with "effective" review programs is also arbitrary**.** CMS acknowledges commentors' concerns that deferring provider access reviews to these states "may result in negative impacts in rural areas, such as longer wait times, reduced access to specialty care, including mental health and substance use disorder services, or the removal of certain specialties from their standards entirely; and generally narrower networks compared to those in FFE States where [CMS] will continue to conduct provided access reviews." 91 Fed. Reg. at 29,733. But CMS dismisses these concerns as mere possibilities, noting that a state "*could* choose to implement standards that differ from the Federal review standards and *hypothetically* opt to remove a specialty type," yet it accepts such an

outcome because insurers would not be prevented "from continuing to contract with that provider type in an effort to better serve their enrollees." *Id*. (emphasis added). Commenters, however, specifically noted that these harms "are not theoretical," pointing to empirical evidence that insurers will race to the bottom and offer inadequate networks when they are permitted to do so. *See* Am. Acad. of Family Physicians comment at 13-14; *see also supra* at 39.

Commenters also highlighted states' inability to review and enforce network adequacy reviews. *See* Nat'l Health Law Program comment at 33 ("[M]ore recent analyses have continued to find that state enforcement to network adequacy provisions in private insurance plans has been 'severely underwhelming,' with most state insurance regulators reporting an average of one to zero enforcement actions related to network adequacy annually." (citing Abigail Burman, *Laying Ghost Networks to Rest: Combatting Deceptive Health Plan Provider Directories*, 40 Yale L. & Pol'y Rev. 78, 122 (2021)); *see also, e.g.*, Shawnna Read-Richards & Teresa Keller, *The Marketplace Illusion: Coverage Without Care*, Health Aff. (Feb. 26, 2026), https://perma.cc/7MYJ-MKRH). In response to comments that many states lack this capacity, the agency deflected. CMS pointed to other regulations that require states to provide "sufficient access" to providers (sections 156.230(a)(1)(ii), (iii), and 156.236(a)), and the alternative provider access review activities—like checking appointment wait times and conducting "spot check" reviews—that states might chose to employ in lieu of matching federal standards. 91 Fed. Reg. at 29,648. But CMS did not address states' review capacity and "summarily concluded without explanation or evidence that the alternative procedures were adequate." *City of Columbus II*, 523 F. Supp. 3d at 752. Such "failure to consider or respond meaningfully to the significant points raised is not indicative of reasoned decision-making." *Id.*

**B. Provisions Eliminating Standardized Plans and Discontinuation of Non-standardized Plan Limits and Exceptions Are Arbitrary**

The new rule's discontinuance of standardized plan options is arbitrary and capricious for many of the same reasons the court rejected the materially identical policy in *City of Columbus II*, 523 F. Supp. 3d at 754. Standardized options have been proven to assist consumers in selecting affordable plans with consumer-friendly cost sharing, increasing the odds that consumers will enroll in coverage that is appropriate for their needs. *See* CBPP comment at 31-32. When consumers have their choices clearly explained to them, they are more likely to complete the enrollment process, and they are more likely to enroll in more generous coverage that meets their health needs. *See* Levitis comment at 35-36. On average, enrollees in standardized plans pay about 15% less out of pocket than other enrollees. Community Catalyst comment at 8 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0872. So, when it first provided for standardized options, CMS recognized that "[a]n excessive number of health plan options makes consumers less likely to make any plan selection, more likely to make a selection that does not match their health needs, and more likely to make a selection that leaves them less satisfied." 80 Fed. Reg. 75,488, 75,542 (Dec. 2, 2015); *see also* 87 Fed. Reg. 27,208, 27,316 (May 6, 2022).

Now, however, CMS contends that its plan standardization polices have "failed to achieve the originally articulated objectives of enhancing the consumer experience, increasing consumer understanding, and combatting discriminatory benefit designs." 91 Fed. Reg. at 29,715. "While [CMS] is not required to refute the factual underpinnings of its prior policy with new factual data, it must provide a reasoned explanation for discounting the importance of the facts that it had previously relied upon." *City of Columbus II*, 523 F. Supp. 3d at 755. The agency did not do so here. It does not suggest that market conditions have changed in any material way. Instead, CMS concludes that plan standardization has been ineffective because "each issuer on average tended

to offer a higher number of plans after the imposition of the requirement to offer standardized plan options than the year before this requirement was made effective." 91 Fed. Reg. at 29,722. But this increase occurred only in the first year that standardized plans were required, and the proliferation of plans was instead addressed in a separate provision limiting the number of non-standardized offerings (which the agency also now intends to repeal, as addressed below). *See* P'ship to Protect Coverage comment at 13.

CMS also uses "the comparatively low uptake" in standardized plan options despite differential display features to justify its reversal in policy. 91 Fed. Reg. at 29,715. Contrary to this characterization, more than eight million enrollees chose standardized plans last year, according to the agency's own data. *See* Families USA comment at 2. And the agency even acknowledges that "a significant number of consumers have actively selected and enrolled in standardized plan options." 91 Fed. Reg. at 29,717. CMS's failure to meaningfully support its change in policy renders it decision-making arbitrary and capricious.

CMS acknowledges commenters' concerns that enrollees would be steered to inadequate plans if standardized options weren't available for those enrollees to review. It asserted, however, that there are more effective and less burdensome alternatives to standardized plan options, like making enhancements to "plan display, choice architecture, decision-support tools, and other forms of consumer assistance" online, *id.*, and that maintaining standardized plans might not be the "most effective means" to address the issue, *id.* at 29,719. But the agency did not adopt any of these alternatives, committing instead only to "continue to research" them. *Id.* The agency's casual suggestion that there may by multiple ways to protect consumers from information overload cannot justify its failure to adopt any of those methods; such "mere nodding" to commenters' concerns does not reflect reasoned decision-making. *City of Columbus III*, 796 F. Supp. 3d at 156.

The elimination of non-standardized plan limits is also arbitrary and capricious. These limits prevent excessive plan proliferation and reduce consumer choice overload. *See* Levitis comment at 37. Without these limits, enrollees will have greater difficulty comparing plans, leading to dropped enrollments, harm to the risk pool, and increased premiums. *See id.* CMS acknowledges that this policy has succeeded in reducing duplicative plan offerings, but it dismisses this effect as a "marginal" one that does not justify a burden on insurers. 91 Fed. Reg. at 29,723. The agency does not explain why it prioritizes insurers' interests over the need to protect consumers. Given that CMS acknowledged the severe problems that choice overload can pose for the health of the Exchange, its choice of a policy that will only increase that problem, without substituting any other policies that could address it, shows a "significant mismatch" between the problem that CMS identified and the measures the agency chose, *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019), further demonstrating the irrationality of its approach.

## IV. Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction

The new rule will cause Plaintiffs irreparable harm sufficient to warrant preliminary relief. A plaintiff seeking a section 705 stay or preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction," *Winter*, 555 U.S. at 22, and that it will suffer actual, imminent harm that "cannot be fully rectified" by a final judgment, *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (cleaned up). Though "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough, irreparable harm may still occur in extraordinary circumstances, such as when monetary damages are unavailable or unquantifiable." *Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 858 (D. Md. 2025) (cleaned up). "[E]conomic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation," *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*,

918 F.3d 353, 366 (4th Cir. 2019), or where such injury "threaten[s] a party's very existence," *Mountain Valley Pipeline*, 915 F.3d at 218. Plaintiffs' injuries easily meet these standards.

The final rule's challenged provisions, both individually and in combination, will raise premiums for plans on the Exchanges, limit and reduce the quality of coverage under those plans, and deter millions of individuals from enrolling in coverage, leading to higher uncompensated care costs for providers of last resort. Levitis Decl. ¶¶ 5-8. The resulting increase in costs, erosion of coverage, and decreased enrollment will increase the number of uninsured and underinsured individuals and will cause Plaintiffs irreparable harm.

*First*, the erosion of coverage under the 2026 rule will create burdensome additional costs for MSA members and will negatively affect the health of the member businesses' owners and employees who rely on care or medication that they cannot afford without insurance coverage. *See* Phetteplace Decl. ¶¶ 3-5. Crucially, the increase in premiums and limitations on insurance coverage will threaten the "very existence" of some of MSA's members' businesses. *Mountain Valley Pipeline*, 915 F.3d at 218. For example, Mike Ohlinger, an MSA member, and his wife own a small business in Wisconsin. Ohlinger Decl. ¶ 4. They have six employees and would like to be able to provide them with quality healthcare. *Id.* ¶ 5. But costs are too high. *Id.* When the Ohlingers offered insurance coverage in 2023 to their employees, the plan option cost $1,000 per person in out-of-pocket costs, not including dependents. *Id.* Their employees ultimately chose coverage under the ACA or via their spouse's insurance, where they were able to get better out-of-pocket rates. *Id.* If ACA coverage becomes even more unaffordable, their employees will likely leave for jobs that will sponsor their healthcare. *Id.* ¶ 10. The loss of their employees could force the Ohlingers to shut down their company. *Id.* ¶ 5. The rule therefore threatens the existence of the Ohlingers' business, and those of other MSA members, causing them irreparable harm.

The Ohlingers also struggle to afford health insurance for themselves. *Id.* ¶ 7. Mike and

their children have coverage through the ACA. *Id.* Their monthly premium used to be subsidized, but after Congress refused to extend ACA subsidies last year, they became unsubsidized. *Id.* ¶ 8. Today, the family's monthly premium is about the same cost as their monthly mortgage payment. *Id.* ¶ 7. The Ohlingers need healthcare and are willing to continue to pay for it, even if the new rules make coverage more expensive. *Id.* ¶ 8. But the Ohlingers will not purchase a plan that provides less than the level of coverage they have now, even if CMS permits the sale of cheaper plans of lesser quality. *Id.* ¶ 9.

Brooke Legler, another MSA member located in Wisconsin, has a chronic condition that requires her to take significant medication, including a biologic that costs approximately $10,000 per month. Legler Decl. ¶ 5. By giving her access to affordable and comprehensive health insurance, the ACA gave her the freedom to start and operate her small business. Legler's business operated on narrow margins, and last year she sold it. *Id.* ¶¶ 4, 11. Legler hopes to enter the industry again if economic factors, like the cost of health insurance, allow her to do so. *Id.* ¶ 4. But because of her medical condition, Legler is dependent on unaffordable medication. *Id.* ¶ 8. If her health insurance coverage costs increase, or the quality of her insurance plan is diminished, it will be impossible for Legler to re-enter her line of work, let alone afford the medications she needs to survive. *Id.* ¶¶ 8, 11.

*Second*, the 2026 rule will irreparably harm DFA's members, including physicians and medical trainees. If implemented, the challenged provisions will increase the number of uninsured and underinsured patients whom DFA's members treat. Krommes Decl. ¶ 5. As a result, DFA's members will bear the cost caring for patients who are sicker (because they have delayed care until their needs are acute), who cannot afford to pay out of pocket for healthcare, or who do not have insurance coverage (or have limited coverage) to reimburse DFA members for their services. *Id.* ¶ 6. Some members will lose contact with many patients altogether, particularly in low-income

communities. *Id.* And all of this will reduce total compensation for DFA's members and put their medical practices under financial strain or at risk of closing altogether. *Id.* ¶¶ 6-7.

Even when clinicians provide uncompensated care—which will occur more often if the final rule is implemented—their work does not end with the patient's visit. *Id* ¶ 7. When a patient requires treatment but lacks insurance, clinicians must spend time finding a willing and available specialist, trying to find an alternative medicine that the patient may be able to afford but is not the optimal treatment, and intervening on the patient's behalf to get testing or procedures performed. *Id.* As patients lose coverage, these efforts will consume greater amounts of clinicians' time—for which DFA members do not get paid—that detracts from patient care. *Id.* Ultimately, medical providers will expend more time and effort and receive less compensation, all of which will prevent them from providing optimal care to their patients. Over time, the burden of caring for uninsured and underinsured patients will jeopardize the operations of these doctors' practices and harm DFA members' compensation and livelihood. *See* Oller Decl. ¶ 7; Fethke Decl. ¶¶ 9-10.

For example, DFA member Dr. Beth Oller is a family medicine physician who treats more than 800 patients of all ages in Rooks County, Kansas, for a broad range of health care needs. Oller Decl. ¶¶ 3-4. Sustaining her practice is particularly difficult in a rural area like hers, where providers are sparse and many residents are low-income and self-employed (for example, as farmers and ranchers). *Id.* ¶¶ 4-5. If the rule were to go into effect, many of her patients would see the value of their insurance coverage erode or lose coverage altogether. *Id.* ¶¶ 6-7, 9. Dr. Oller would treat fewer patients and would be paid less for the treatments she provides. *Id.* ¶¶ 7, 8. The increase in administrative burdens would also require Dr. Oller and her practice to spend more time (without compensation) helping patients navigate red tape to determine their coverage. *Id.* ¶ 7. These results would hinder her ability to provide optimal care to her patients and jeopardize their long-term health. *Id.* Uncompensated care costs put Dr. Oller's entire practice at risk. *Id.*

Dr. Eric Fethke faces similar harms. His pediatric cardiology practice does not turn away uninsured or underinsured patients seeking emergency care. Fethke Decl. ¶ 7. Treating those patients is costly, resulting in hours of uncompensated work for both him and his staff, and less revenue for his practice. *Id.* ¶¶ 9-10. Even though Dr. Fethke's practice operates within a larger group of providers, his practice cannot survive an increase in uncompensated care costs. *Id.* ¶ 10.

*Third*, Columbus, Baltimore, Pima County, and Chicago (the municipal Plaintiffs) would likewise suffer irreparable injury. Fulfilling their responsibility to care for their residents, the municipal Plaintiff governments operate a range of clinics and programs that offer health care services to residents regardless of their insurance coverage and ability to pay. *See* Wagaw Decl. ¶ 5, 10; Johnson Decl. ¶¶ 7, 9-12; Leach Decl. ¶¶ 6-8; Cullen Decl. ¶¶ 6-9, 14. By driving up the rate of uninsured or underinsured individuals within the municipal Plaintiffs' jurisdictions, *see, e.g.*, Levitis Decl. ¶¶ 5, 7, 28, the rule would force these cities and county to devote additional funding, personnel, and other resources to subsidizing and providing uncompensated care for their residents. The rule thereby hits the municipal Plaintiffs' funding decisions and budgets, including the budgets for their public health departments, free or reduced-cost clinics, and ambulance services. *See* Wagaw Decl. ¶¶ 8-9, 13-14; Johnson Decl. ¶¶ 9-14; Leach Decl. ¶¶ 9-11, Cullen Decl. ¶¶ 6, 11; *see also Columbus I*, 453 F. Supp. 3d at 787-88 (recognizing that city plaintiffs challenging CMS's 2018 rule suffered injury from having to pay greater costs to provide uncompensated care to their under- and uninsured residents); *Columbus II*, 523 F. Supp. 3d at 744 (same); *Columbus III*, 796 F. Supp. 3d at 147-48.

In addition, uninsured individuals often delay seeking care until conditions become severe, which will likely increase the volume of ambulance calls and demand for emergency medical services. *See* Wagaw Decl. ¶ 14. This would increase the strain on the municipal Plaintiffs' often already overstretched emergency medical services and, again, create budgetary shortfalls that the

cities will have to make up. *See* Wagaw Decl. ¶¶ 8-9, 13-14; Johnson Decl. ¶¶ 12-14; Leach Decl. ¶¶ 11-14; Cullen Decl. ¶ 11. Moreover, as uninsured and underinsured individuals neglect the medical care that they need, they are necessarily less healthy, less productive, and less able to participate in city life. *See, e.g.*, Wagaw Decl. ¶ 14; Johnson Decl. ¶ 15; Leach Decl. ¶ 15; Cullen Decl. ¶ 12. This would have cascading negative and irreparable effects on municipal Plaintiffs' programs and communities.

These injuries could not be rectified after final judgment. Issuers are preparing for next year's plan offerings right now based on the new rule's provisions and how it will impact the market. *See Columbus III*, 796 F. Supp. 3d at 173 (noting that the insurance marketplace does not just "spring into effect on October 31st to allow open enrollment to happen on November 1st" (cleaned up)). As a result, "[o]nce the rule goes into effect, it will be difficult, if not impossible to unwind the harm Plaintiffs complain of." *Id.* at 172.

## V. The Remaining Factors Weigh in Favor of an Injunction

The balance of equities and public interest prongs merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Preliminary relief here is in the public interest. The challenged provisions of the rule will reduce enrollment and coverage loss for millions of Americans. Levitis Decl. ¶ 5-8. And those who manage to stay insured will see higher out-of-pocket costs, less comprehensive coverage, and greater administrative burdens. *Id.* Increases in uninsured people lead to more uncompensated care, straining providers of last resort and emergency services. *Supra* at 45. These circumstances create life-or-death situations for both the insured and uninsured, as patients without coverage forgo standard medical care altogether, with particularly harmful consequences for lower-income people. Krommes Decl. ¶¶ 6, 8.

In light of these real and immediate harms, the equities and public interest strongly favor preliminary relief. Additionally, "the public undoubtedly ha[s] an interest in seeing its

governmental institutions follow the law." *Roe v. Dep't of Defense*, 947 F.3d 207, 230-31 (4th Cir. 2020). In particular, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). A stay under the APA would require nothing more. And on the other side, the burden of a stay or injunction on the government would be minimal. "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (cleaned up); *see Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

**CONCLUSION**

For these reasons, the Court should stay the effective date of the challenged provisions of the final rule or, in the alternative, enter a preliminary injunction.

Dated: June 4, 2026

Respectfully submitted,

*/s/ Joel McElvain*
JOEL MCELVAIN (BAR NO. 31673)
CORTNEY ROBINSON HENDERSON (BAR NO. 31968)
CHRISTINE L. COOGLE (BAR NO. 21846)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 935-2082
jmcelvain@democracyforward.org
crhenderson@democracyforward.org
ccoogle@democracyforward.org

*Counsel for Plaintiffs*