# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CITY OF COLUMBUS, *et al.*,

*Plaintiffs*,

v.

Case No. 1:26-cv-2215_

ROBERT F. KENNEDY, JR., *et al.*,

*Defendants*.

## DECLARATION OF DR. ERIC D. FETHKE

I, Eric Fethke, declare as follows:

1.      I am over 18 years old and competent to make this declaration. I have personal knowledge of the facts and information in this declaration. I respectfully provide this declaration to explain the ways the Centers for Medicare & Medicaid Services (CMS)'s "Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2027; and Basic Health Program," rule will harm my medical practice and endanger the children who rely on my services.  My statements in this declaration are my own, based on my own professional experience, and do not reflect the views, opinions, policies, or position of Boston Children's Health Physicians; I do not speak on the behalf of the Boston Children's Health Physicians or any other entities associated with my medical practice.

1

2.        I have a Bachelor of Arts from Princeton University and received my medical degree from Columbia University.  I completed my pediatric residency and pediatric cardiology fellowship at the Children's Hospital of New York Presbyterian in New York, New York.  For the last 30 years, I have been an active physician in New York, while also teaching medical, nursing and physician assistant students, residents and fellows at Columbia, Albert Einstein and Touro universities.  I have been a member of Doctors for America since 2023.

3.        I am a pediatric cardiologist known for successfully treating the most difficult heart conditions in babies, children and adults.  I specialize in noninvasive pediatric cardiology, including pediatric exercise testing, pediatric and fetal echocardiography, fetal and congenital heart disease, noninvasive cardiac diagnostic testing and community-based care.  My practice is highly specialized and not readily available to most patients.  The children I care for often live several counties, states and hours away from any alternative pediatric cardiology care.  Children with the complex heart conditions who cannot access the kind of specialty care I provide are at a higher risk of preventable sudden death or serious morbidity than their peers who have access to my clinical services.

4.        In 1998, I founded the Pediatric Cardiology Associates of Greater Hudson Valley, which provides specialty, regional community-based services for patients across a large expanse of the Hudson Valley, New York community—in some cases as far north as Albany, New York; west into Pennsylvania; and south into northern New Jersey.  In 2016 my practice expanded its clinical services by joining the Boston Children's Health Physicians (BCHP).  I have spent nearly three decades building out the practice's health care provider network through various alliances and partnerships, to create a complex web of localized, highly skilled children health specialists to serve patients in the Hudson Valley.  As a result, our patients include children and adults from all backgrounds: rural, suburban, metropolitan, low-income, and immigrant.

Roughly a quarter of our patients are on Medicaid; another quarter have private, non-exchange insurance; and over half of my patients have health care insurance via ACA Exchanges.

5. CMS' new rule would make it more complicated and expensive for many of our patients to obtain or keep their health coverage. In my experience, the more complicated and expensive it is for people to access care and insurance, the more patients— predominantly vulnerable and dependent babies, children and youth with complex conditions I have spent years creating access to care for—will go uninsured.

6. An increase in the uninsured population creates devastating problems for my pediatric cardiology practice as well as the BCHP practice as a whole. There are administrative burdens associated with taking care of patients when they are uninsured. Our staff and I spend hours, uncompensated and often after our office has closed, trying to find alternative sources of payment for services provided to the uninsured. These efforts are often unsuccessful, and the practice and I are left to incur these costs of treating patients who lack insurance.

7. Further, my practice does not turn away patients who come seeking emergency healthcare simply because they do not have insurance; when, for example, a parent shows up with a baby or newborn who is turning blue and needs help, I have an ethical responsibility to provide care.

8. As an additional example, I have had young patients with heart rhythm abnormalities or who are in need of urgent heart surgery who are uninsured or whose insurance will not cover specialty care beyond their local community's general cardiologist, even if that generalist does not perform the life-saving procedures my patient needs. As a result, I spend hours writing letters to insurance companies fighting to have specialty care such as catheterizations, electrophysiology studies and surgery at my trusted and accessible pediatric tertiary centers covered under their insurance. If I am unsuccessful, those patients' parents are

often forced to rely on other providers who are extremely far from their homes. And when their child has an emergency, and they come back to my office in crisis, I am often forced to provide care without compensation. Or, those parents try to travel long distances to make it to a covered, healthcare provider, risking that they might not get there in time to save their child. These emergencies will only be more frequent and overwhelming if more of my patients are under or uninsured as a result of the new rule.

9. Treating uninsured populations results in doctors providing uncompensated care. Under the new rule, more of our patients will become uninsured. The BCHP staff and I will spend even more hours than we currently do working without pay to provide services to our patients whom we cannot ethically neglect. Funds allocated for overhead expenses, like medical equipment, treatment, and testing cannot be reduced, so with less revenue for the practice, we may be forced to cut the salaries of our staff and our physicians like myself. If we are unable to pay our staff adequately, they may leave the practice, which would make the business inoperable. Even if we can pay them, they may leave on their own volition due to the stress of increased workload attending to uninsured patients. Without our highly-specialized staff, our practice may have to reduce services, close some of our sites, and jeopardize my own livelihood.

10. Even operating within a larger group of healthcare providers like BCHP, my practice cannot survive increased uncompensated care costs. The 25 percent of my patients with private insurance cannot make up for financial loss from increased uncompensated costs that will arise when even a fraction of my patients who formerly had ACA coverage lose or drop that coverage (especially considering the government's recent cuts to Medicaid). The network of care I have built over the last 31 years will collapse. And the burden of providing care will fall on tertiary health centers, city hospitals and clinics—even if patients can make it there in time during life-threatening emergencies.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on June 3, 2026 in Middletown, New York.

ERIC D. FETHKE, M.D.