# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CITY OF COLUMBUS, *et al.*,

    *Plaintiffs*,

v.

ROBERT F. KENNEDY, JR., *et al.*,

    *Defendants*.

Case No. 1:26-cv-2215

## DECLARATION OF JASON LEVITIS

I, Jason Levitis, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. The facts contained in this declaration are known to me personally and, if called as a witness, I could and would testify competently thereto under oath. I submit this sworn declaration in support of Plaintiffs' challenge to the 2027 Notice of Benefit and Payment Parameters Final Rule (Final Rule).

2. I am a senior fellow in the Health Policy Division within the Urban Institute, a non-partisan, non-profit organization committed to rigorous research. The views expressed here are my own and do not represent the Urban Institute, its trustees, or its funders. My research concerns a variety of topics in health policy, including the regulation of health insurance, how health insurance is financed, how Americans enroll in health insurance, and how the system can be improved to make health care more affordable and accessible. I have published many pieces of scholarly analysis on these topics. I have testified before Congress and state legislatures; my work is frequently cited in national and local media; and I have served in the federal government,

1

leading the Treasury Department's work implementing the Affordable Care Act (ACA). My full curriculum vitae, including a list of publications, appears as an Appendix to this declaration.

**Summary of Observations**

3. Health insurance is crucial to protecting Americans' health and financial well-being. Americans go without health insurance for two primary reasons. Health insurance remains too expensive for some people to purchase, despite the availability of federal subsidies. And the enrollment process is beset with administrative burdens that make it confusing, costly, and frustrating.

4. The ACA sought to expand enrollment in quality, affordable health coverage by reforming the individual market for health insurance. The ACA regulated this coverage to ensure quality and fairness, established Marketplaces to promote competition and ease enrollment, and provided financial assistance to help people afford coverage. Together, these provisions ensured the broad availability of quality, affordable coverage, with a strong single risk pool.

5. The rule includes several provisions that would impose substantial new administrative burdens and higher costs on individuals seeking to enroll in Marketplace coverage. This will reduce enrollment and worsen risk pools, raising premiums overall and hurting providers that rely on revenue from Marketplace enrollees. These provisions will be particularly harmful for safety net providers, such as clinics operated by municipalities, which disproportionately serve Marketplace enrollees and serve patients without regard to their insurance status.

6. The rule also includes several provisions that will expand the availability of lower-quality health plans. The expanded availability of such plans will tend to siphon the healthiest enrollees away from higher-quality plans, thereby increasing premiums for the people

who remain in those plans and increasing providers' uncompensated care costs, again especially harming safety net providers.

7.  While CMS claims that the rule would reduce Marketplace enrollment by 1.2 to 2 million people and that the rule as a whole would reduce the premiums charged by insurance companies, more reasonable estimates suggest the rule would reduce Marketplace enrollment by closer to 3 to 4 million people and would substantially increase premiums.

8.  CMS's analysis of the challenged provisions and other aspects of the rule includes numerous errors that do not indicate reasoned consideration. The Final Rule repeatedly fails to acknowledge or respond to comments raising questions about the analysis in the proposed rule.

**Background on Health Insurance and the Affordable Care Act**

9.  Health insurance is crucial to protecting Americans' health and financial well-being. There is extensive evidence that health insurance leads to better health outcomes, lower mortality, and better financial well-being.[1] About 97 percent of Americans either have health insurance or wish that they did.[2]

10.  Almost all Americans qualify for substantial federal subsidies to help pay for health insurance. About 120 million Americans receive coverage from Medicare, Medicaid, or

---

[1] Amy Finkelstein et al, The Oregon Health Insurance Experiment: Evidence from the First Year, *National Bureau of Economic Research* (2011), https://pubmed.ncbi.nlm.nih.gov/23293397/;
Mark Borgschulte and Jacob Vogler, Did the ACA Medicaid expansion save lives? *Journal of Health Economics*, *72*, 102333 (2020), https://pubmed.ncbi.nlm.nih.gov/32592924/; and
Angela Wyse and Bruce D. Meyer, "Saved by Medicaid: New Evidence on Health Insurance and Mortality from the Universe of Low-Income Adults," *NBER* Working Paper 33719 (2025), https://doi.org/10.3386/w33719; Jacob Goldin, Ithai Z Lurie, and Janet McCubbin, Health Insurance and Mortality: Experimental Evidence from Taxpayer Outreach, 136 *The Quarterly Journal of Economics* 1 (2020), https://doi.org/10.1093/qje/qjaa029; and Darius Erlangga, Marc Suhrcke, Shehzad Ali S, and Karen Bloor, The impact of public health insurance on health care utilisation, financial protection and health status in low- and middle-income countries: A systematic review, 14 PLOS ONE 8: e0219731 (2019), https://doi.org/10.1371/journal.pone.0219731.
[2] Jennifer Tolbert, Sammy Cervantes, Clea Bell, and Anthony Damico, Key Facts about the Uninsured Population, KFF (Apr 9, 2026), https://www.kff.org/uninsured/key-facts-about-the-uninsured-population/.

the Children's Health Insurance Program.[3] Another 160 million or so have employer-sponsored coverage, which is subsidized by the tax exclusion for employer-sponsored health benefits, the largest tax benefit in the Internal Revenue Code.[4] Individuals ineligible for these types of coverage have long relied on the individual market for health insurance. Before the ACA, such individuals were generally not eligible for any federally subsidized coverage. Today, about 20 million people have subsidized individual market coverage through the ACA Marketplaces.[5]

11. Americans go without health insurance for two primary reasons. First, health insurance remains too expensive for some people to purchase, despite the availability of federal subsidies.[6] Second, the enrollment process is beset with "administrative burdens" that make it confusing, costly, and frustrating.[7]

12. A primary goal of the ACA was to expand enrollment in quality, affordable health coverage at a reasonable cost. The ACA achieved this through two primary mechanisms: first, it expanded Medicaid eligibility to low-income adults and simplified Medicaid eligibility rules; second, it reformed the individual market by regulating it to ensure quality and fairness, established Marketplaces to promote competition and ease enrollment, and provided financial assistance to help people afford coverage and ensure a broad risk pool.

13. The ACA's regulation of the individual market for health insurance is an interlocking set of provisions to ensure that coverage is of high quality, fairly designed and priced, relatively easy to understand and compare, and broadly accessible, including to those

---

[3] Health Insurance Coverage of the Total Population, KFF (accessed June 4, 2026), https://www.kff.org/state-health-policy-data/state-indicator/total-population/.
[4] Tax Expenditures, *US Department of the Treasury* (Feb. 8, 2025), https://home.treasury.gov/policy-issues/tax-policy/tax-expenditures and Health Insurance Coverage of the Total Population, *supra* note 3.
[5] Health Insurance Exchanges 2026 Open Enrollment Report, CMS (Mar. 2026), https://www.cms.gov/files/document/health-insurance-exchanges-2026-open-enrollment-report.pdf.
[6] *See* Tolbert et al., *supra* note 2.
[7] *See* Tolbert et al., *supra* note 2.

with greater health care needs. Requirements include coverage of essential health benefits; limits on enrollees' out-of-pocket spending; prohibitions on benefits caps, enrollment denials, and exclusions for pre-existing conditions; and adequate networks of providers. It ensures fair and uniform health insurance premiums by prohibiting price differentials based on gender and health status and requiring a "single risk pool" in each state so insurers can't subdivide enrollment into a healthier group paying less and a sicker group paying more. The ACA also established a risk adjustment program that requires insurers enrolling healthier people to compensate insurers that enroll sicker people, though, like other risk adjustment systems, it is far from perfect at eliminating insurers' incentive to attract the healthiest enrollees.[8] Finally, to help consumers understand their choices, it created four "metal levels" that categorize plans based on actuarial value, which is a measure of plan generosity. Bronze plans have an actuarial value of 60 percent, silver 70 percent, gold 80 percent, and platinum 90 percent. There are also "catastrophic" plans that can have an actuarial value below 60 percent, but by statute they are available only to limited groups and do not qualify for subsidies.

14.    The Marketplaces are centralized purchasing hubs where consumers can learn about and compare these plans, apply for coverage and financial assistance, and enroll in the plan of their choice.

15.    The subsidies for Marketplace coverage are the premium tax credit (PTC) and cost-sharing reductions (CSRs). They are available to relatively low-income individuals who are ineligible for Medicaid or other affordable coverage.

---

[8] Matthew Fiedler and Timothy Layton, CMS should abandon its "two-stage" risk adjustment estimation proposal, Brookings (Jan. 27, 2022), https://www.brookings.edu/articles/cms-should-abandon-its-two-stage-risk-adjustment-estimation-proposal/.

16.     Among consumers shopping for coverage through the Health Insurance Marketplaces, some enrollees—including those with relatively higher incomes—pay the full or "gross" premium charged by insurance companies. Therefore, policies that increase gross premiums will directly increase the cost of coverage for this group.

17.     The gross premium of Marketplace coverage is determined by two key factors. The first is the plan's characteristics, including the benefits provided, the reimbursement rates paid to providers, and the cost-sharing (deductibles and co-payments) that consumers must pay to use the coverage. The second is the risk pool, which reflects the claims experience of individuals enrolled in the insurer's plans in the state. A risk pool consisting of sicker individuals will mean higher health care spending on average and thus higher premiums needed to cover that cost. A healthier risk pool will mean lower average health care spending and thus lower premiums.

18.     Most consumers who enroll through the Marketplace qualify for the PTC and so pay a net premium smaller than the gross premium.[9] The PTC is based on the premium of a "benchmark plan"–the second lowest-cost silver plan. As a result, individuals receiving the tax credit are insulated from changes in gross premiums that affect all plans equally. Allowing insurers to offer lower-quality coverage would reduce this benchmark premium while leaving the premiums of existing plans unchanged. This would leave PTC recipients with the option of either paying higher net premiums for the same coverage or paying the same amount for lower-quality coverage. Thus, maintaining quality standards is an important part of supporting affordability.

---

[9] Health Insurance Exchanges 2026 Open Enrollment Report, *supra* note 5.

19. Taken together, this system makes coverage affordable in two crucial ways. First, the subsidies directly reduce individuals' cost to enroll and their deductibles and other cost-sharing. Second, the subsidies attract healthier people into the risk pool, which lowers gross premiums throughout the system.

20. The ACA's structure has been broadly successful in meeting its goals—all Americans can now purchase quality coverage on the same terms, and subsidies have proven sufficient to ensure broad enrollment that has kept premiums relatively stable and generally in line with group insurance premiums.[10] The rate of uninsurance has fallen dramatically,[11] though recent policy changes threaten those gains.[12]

**Extensive Literature Establishes that High Premiums and Increased Administrative Obstacles Decrease Enrollment and Worsen Risk Pools**

21. As noted above, the two main reasons people go without health insurance are high costs and administrative burdens. Both barriers can substantially reduce enrollment and

---

[10] Between 2020 and 2025, Marketplace benchmark premiums grew by an average annual rate of just 2 percent — slower than employer-sponsored insurance and inflation, both of which grew at around 5 percent annually. *See* Marketplace Average Monthly Benchmark Premiums, KFF (accessed June 4, 2026), https://www.kff.org/affordable-care-act/state-indicator/marketplace-average-benchmark-premiums/; Premiums and Worker Contributions Among Workers Covered by Employer-Sponsored Coverage, 1999-2025, KFF (Oct. 22, 2025), https://www.kff.org/health-costs/premiums-worker-contributions-among-workers-covered-by-employer-sponsored-coverage/; and Current US Inflation Rates: 2000-2026, US Inflation Calculator (accessed June 4, 2026), https://www.usinflationcalculator.com/inflation/current-inflation-rates/.

[11] Lisa N. Bunch and Halelujha Ketema, Health Insurance Coverage in the United States: 2024, Current Population Reports P60-288, US Census Bureau (Sept. 9, 2025), https://www.census.gov/library/publications/2025/demo/p60-288.html.

[12] Jason Levitis, Statement of Jason Levitis Before the Senate Finance Committee, Urban Institute (Nov. 19, 2025), https://www.urban.org/research/publication/statement-jason-levitis-senate-finance-committee; Matthew Buettgens et al., Projected Reductions in Medicaid Expansion Enrollment Under OBBBA's Work Requirements and Six-Month Redeterminations, Urban Institute (Mar. 25, 2026), https://www.urban.org/research/publication/projected-reductions-medicaid-expansion-enrollment-under-obbbas-work; Matthew Buettgens et al., 4.8 Million People Will Lose Coverage in 2026 If Enhanced Premium Tax Credits Expire, Urban Institute (Sept. 17, 2025), https://www.urban.org/research/publication/48-million-people-will-lose-coverage-2026-if-enhanced-premium-tax-credits; and Matthew Buettgens et al., Reconciliation Bill Would Cut Marketplace Enrollment by over 5 Million People, Urban Institute (June 13, 2025), https://www.urban.org/research/publication/reconciliation-bill-would-cut-marketplace-enrollment-over-5-million-people.

disproportionately reduce enrollment among healthier people, and thus tend to increase insurance premiums.

***Premiums***

22.     Enrollment decisions are highly sensitive to the premium the consumer is charged. Higher costs significantly reduce enrollment and hurt the risk pool, which increases gross premiums.

- Sixty-two percent of uninsured adults reported that coverage was not affordable as a reason for being uninsured.[13]

- A study published in the American Economic Review found that decreases in financial assistance and the associated increase in net premiums have a large enrollment effect: each $40 increase in net monthly premiums decreases enrollment by 25 percent. The study also found that healthier enrollees are most subject to discouragement.[14]

- The American Academy of Actuaries has explained[15] that higher premiums disproportionately deter enrollment among healthier people,[16] since they expect to use less health care.[17]

- A study by the actuarial firm Wakely found that, for enrollees without financial

---

[13] *See* Tolbert et al., *supra* note 2.

[14] Amy Finkelstein et al., Subsidizing Health Insurance for Low-Income Adults: Evidence from Massachusetts, 109 *American Economic Review* 1530 (2019), https://doi.org/10.1257/aer.20171455.

[15] Academy Dissects What the Shifting Health Care and Policy Landscape Could Mean for 2026 ACA Premium Rates and Under-65 Health Insurance Markets, The American Academy of Actuaries (2025), https://actuary.org/academy-dissects-what-the-shifting-health-care-and-policy-landscape-could-mean-for-2026-aca-premium-rates-and-under-65-health-insurance-markets/.

[16] Drivers of 2026 Health Insurance Premium Changes Effects on Premiums, The American Academy of Actuaries (2025), https://actuary.org/wp-content/uploads/2025/07/Infographic-26-Premiums.pdf.

[17] For a discussion of this literature, see, e.g., Linda J. Blumberg and John Holahan, Early Experience with the ACA: Coverage Gains, Pooling of Risk, and Medicaid Expansion, 44 *J Law Med Ethics* 538 (2016), https://pubmed.ncbi.nlm.nih.gov/28661254/.

assistance, increases in gross premiums are associated with large reductions in Marketplace enrollment, including a decline of more than 5 percent in one year.[18]

- A study of the Massachusetts health reform finds that reducing the effective price of health insurance mitigates adverse selection and improves the risk pool.[19]

- Overall, studies find a high price elasticity of demand for coverage in the Marketplaces: a 1 percent premium increase for a plan decreases enrollment by 1.7 percent,[20] although it should be noted that this is not a direct measure of coverage loss.

*Administrative Burdens*

23.     The Marketplace application process is complex, especially for individuals with limited time, education, or language proficiency. Consumers (on their own, or with help from a broker or assister) must (1) collect application information about themselves and their family members, including details about sources of income, family structure, residency, and other health insurance options available to them; (2) complete an application attesting to this information; (3) receive and understand fairly detailed information about their eligibility; (4) select a health plan from among the (often dozens of) available options; (5) make decisions about the financial assistance they will receive, with the potential to owe back any overpayments; and (6) establish a relationship with the insurance company offering their coverage, including providing payment

---

[18] Michael Cohen and Michelle Anderson, Premium Effects on ACA Enrollment, Wakely (Apr. 2019), https://www.wakely.com/wp-content/uploads/2024/04/premium-effects-aca-enrollment-final.pdf.
[19] Martin B. Hackmann, Jonathan T. Kolstad, and Amanda E. Kowalski, Adverse Selection and an Individual Mandate: When Theory Meets Practice, 105 *American Economic Review* 3: 1030–66 (2015), https://doi.org/10.1257/aer.20130758.
[20] Jean Abraham et al., Demand for Health Insurance Marketplace Plans Was Highly Elastic in 2014-2015, 159 *Econ. Letters* 69 (2017), https://www.sciencedirect.com/science/article/abs/pii/S0165176517302823; *see also* Benjamin Hopkins, Jessica Banthin and Alexandra Minicozzi, How Did Take-up of Marketplace Plans Vary with Price, Income, and Gender?, 11 *Am. J. Health Econ.* (2025), https://doi.org/10.1086/727785.

information in most cases. Some applicants must submit additional documentation by mail or through an online portal, or resolve issues that may be affecting their coverage with other entities, like the Internal Revenue Service (IRS), their state Medicaid agency, or an insurance plan.[21]

24.    There is extensive evidence that administrative burdens reduce take-up, and that this attrition disproportionately affects lower-risk individuals, since sicker people are more willing to fight through obstacles to gain or maintain coverage. For example:

- A KFF brief reported that 21 percent of the uninsured say the primary reason they do not have coverage is that "signing up was too difficult or confusing." An additional 18 percent report difficulty finding a plan that meets their needs, which may also reflect administrative barriers.[22]

- A 2025 study in the American Economic Review finds that adding one step to the enrollment process prompted a 33 percent decline in enrollment. Moreover, imposing administrative burdens on enrollment "differentially exclud[es] young, healthy, and economically disadvantaged people." Enrollees who would potentially lose coverage if an additional administrative step were required at reenrollment have health costs 44 percent lower than those who are not likely to be affected.[23]

---

[21] Rachel Schwab et al., Policy Innovations in the Affordable Care Act Marketplaces, Commonwealth Fund (Nov. 21, 2023), https://www.commonwealthfund.org/publications/issue-briefs/2023/nov/policy-innovations-affordable-care-act-marketplaces.
[22] Tolbert et al., *supra* note 2.
[23] Mark Shepard and Myles Wagner, Do Ordeals Work for Selection Markets? Evidence from Health Insurance Auto-Enrollment,115 *American Economic Review* 3: 772–822 (2025), https://doi.org/10.1257/aer.20231133.

- A 2021 study in the American Economic Review finds that healthier individuals are more responsive to the removal of administrative frictions.[24]

- A 2021 study published by the American Economic Association on auto-retention–a key tool for bypassing administrative burdens–finds that "automatic retention has a sizable impact...differentially retaining healthy, low-cost individuals."[25]

- A 2024 study in Health Affairs finds that states that implemented nominal monthly premiums (meaning the main bar is not the monetary cost but the administrative burden of paying it) saw enrollment fall by 14 percent, with larger effects among younger individuals.[26]

- A nominal premium of less than $10 per month was associated with a 14 percent reduction in enrollment.[27]

- The availability of $0 premium plans increases days of enrollment in the Marketplace.[28]

- A report in The Review of Economics and Statistics found that reducing administrative barriers increases take-up of subsidized health insurance coverage.[29]

---

[24] Richard Domurat, Isaac Menashe, and Wesley Yin, The Role of Behavioral Frictions in Health Insurance Marketplace Enrollment and Risk: Evidence from a Field Experiment, 111 *American Economic Review* 5: 1549–74 (2021). https://doi.org/10.1257/aer.20190823.

[25] Adrianna McIntyre, Mark Shepard, and Myles Wagner, Can Automatic Retention Improve Health Insurance Market Outcomes?, 111 *AEA Papers and Proceedings* 560–66 (2021), https://doi.org/10.1257/pandp.20211083.

[26] Adrianna McIntyre, Mark Shepard, and Timothy J. Layton, Small Marketplace Premiums Pose Financial and Administrative Burdens: Evidence From Massachusetts, 2016–17, 43 *Health Affairs* 1 (2024), https://doi.org/10.1377/hlthaff.2023.00649.

[27] Adrianna McIntyre, Mark Shepard and Timothy J. Layton, Small Marketplace Premiums Pose Financial and Administrative Burdens: Evidence from Massachusetts, 2016-17, 43 *Health Affairs* 80 (2024), https://www.healthaffairs.org/doi/10.1377/hlthaff.2023.00649.

[28] Coleman Drake et al., Financial Transaction Costs Reduce Benefit Take-up Evidence from Zero-Premium Health Insurance Plans in Colorado, 89 *J. Health Econ.* 102752 (2023), https://www.sciencedirect.com/science/article/abs/pii/S0167629623000292.

[29] Keith Marzilli Ericson, Timothy J. Layton, Adrianna McIntyre, and Adam Sacarny, Reducing Administrative Barriers Increases Take-Up of Subsidized Health Insurance Coverage: Evidence from a Field Experiment, *The Review of Economics and Statistics* (2025), https://doi.org/10.1162/rest_a_01573.

25.     Outside of the Marketplaces, researchers have documented similar impacts, including the following examples:

- Making an administrative component of the food assistance application process more flexible increased enrollment by 6 percentage points.[30]

- Offering assistance in resolving administrative obstacles to enrollment in food assistance increased enrollment by 12 percentage points.[31]

- Simplifying enrollment in retirement savings plans increases take-up significantly.[32]

26.     Because of administrative burdens, take-up rates have consistently remained well below 100 percent even for programs like Medicaid that don't charge a premium.[33] Most uninsured people are eligible for subsidized coverage. For instance, a recent analysis using data from 2024 to study the nonelderly uninsured finds that 52 percent are eligible for subsidized coverage, 24 percent through Medicaid, and 28 percent for subsidized ACA coverage.[34]

27.     This evidence suggests that the large and widespread administrative burdens imposed by the rule would substantially reduce enrollment and increase premiums.

28.     Reductions in Marketplace enrollment and the increase in the uninsured population will reduce provider revenue and increase the burden of uncompensated care, especially for safety net providers.[35]

---

[30] Eric Giannella et al., Administrative Burden and Procedural Denials: Experimental Evidence from SNAP, 16 *Am. Econ. J.: Econ. Pol'y* 316 (2024), https://doi.org/10.1257/pol.20220701.

[31] Amy Finkelstein and Matthew J. Notowidigdo, Take-Up and Targeting: Experimental Evidence from SNAP, 134 *Q.J. Econ.* 1505 (2019), https://doi.org/10.1093/qje/qjz013.

[32] See, e.g., Brigitte C. Madrian and Dennis F. Shea, The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior, 116 *Q.J. Econ.* 1149 (2001), https://doi.org/10.1162/003355301753265543.

[33] Rebecca Brooks Smith, Gabriella Aboulafia, and Benjamin D. Sommers, Who Enrolls in Coverage and Who Remains Uninsured? Medicaid Take-Up Before and After the Affordable Care Act and During Unwinding, 103 *Milbank Quarterly*: 349-389 (2025), https://onlinelibrary.wiley.com/doi/10.1111/1468-0009.70020.

[34] *See* Tolbert et al., *supra* note 2.

[35] *See*, for example, an Urban Institute report found that if 2.4 million people disenrolled in Marketplace coverage and became uninsured, hospitals would experience a $5.3 billion decrease in revenue. Fredric Blavin, Reconciliation

**The Rule Is Expected to Substantially Reduce Marketplace Coverage and Increase Gross Premiums, Contrary to CMS's Projections.**

29.     CMS projects that the rule will reduce 2027 enrollment by 1.2 to 2 million people and that the rule, as a whole, will reduce individual market premiums by 1.2 to 1.8 percent.[36] Both of these estimates are implausibly rosy. More plausible estimates suggest the rule will lead to coverage losses of 3 to 4 million people and to substantial premium increases.

30.     While CMS's coverage loss estimates seem understated in general, its estimates for two provisions are especially implausible.

31.     First, CMS claims that provisions requiring several million individuals to submit additional documentation to verify their income to gain subsidized coverage would reduce enrollment by less than half a million people. As explained below, this appears to be based on implausible assumptions about attrition due to administrative burdens. Using more reasonable assumptions, Wakely estimates coverage losses due to these provisions at 2.3 million people.[37]

---

Bill and End of Enhanced Subsidies Would Cut Health Care Provider Revenue and Spike Uncompensated Care, Urban Institute (May 29, 2025), https://www.urban.org/research/publication/reconciliation-bill-and-end-enhanced-subsidies-would-cut-health-care-provider; Fredric Blavin and Michael Simpson, Changes in Health Care Spending and Uncompensated Care under Enhanced Tax Credit Expiration for Marketplace Coverage, Urban Institute (Sept.25, 2025), https://www.urban.org/research/publication/changes-health-care-spending-and-uncompensated-care-under-enhanced-tax-credit; Fredric Blavin, Matthew Buettgens, Michael Simpson, Health Care Providers Would Experience Significant Revenue Losses and Uncompensated Care Increases in the Face of Reduced Federal Support for Medicaid Expansion, Urban Institute (March 11, 2025), https://www.urban.org/research/publication/health-care-providers-would-experience-significant-revenue-losses-and-uncompensated-care-increases-in-the-face-of-reduced-federal-support-for-medicaid-expansion; and Fredric Blavin, Michael Simpson, and Laura Skopec, Rural Hospital Revenue Could Drop by $87 Billion over 10 Years Because of the Reconciliation Bill and Expiring Enhanced Tax Credits, Urban Institute (June 30, 2025), https://www.urban.org/urban-wire/rural-hospital-revenue-could-drop-87-billion-over-10-years-because-reconciliation-bill.

[36] Page 2,976 of the Final Rule (91 FR 29526) https://www.federalregister.gov/d/2026-10050/p-2976. In the same sections, CMS claims the range is 1.2 to 2.4 percent, but this seems to be a typo. Page 2,982 of the Final Rule (91 FR 29526), https://www.federalregister.gov/d/2026-10050/p-2982 .

[37] *See* Zachary Sherman, Michael Cohen, and Lina Rashid, 2027 Proposed NBPP: Analyzing State and Consumer Impacts, Health Management Associates (March 10, 2026), https://www.healthmanagement.com/insights/briefs-reports/2027-proposed-nbppanalyzing-state-andconsumer-impacts/.

13

32.     Second, CMS inexplicably claims that the failure to reconcile (FTR) change would eliminate advance premium tax credits (APTC) (and therefore likely end coverage) for at most 42,000 households in 2027, notwithstanding CMS data showing that the current, less stringent rule ended APTC for 199,000 households (representing 235,000 consumers) in 2025 and 366,000 households (representing 430,000 consumers) in 2026.[38] CMS gives no meaningful explanation for this immense discrepancy, as noted below in the section on FTR.

33.     Taken together, just these two implausible estimates of coverage losses are understated by at least 2 million people. Adding that differential to CMS's overall estimate suggests coverage losses of 3 to 4 million people under the rule.

34.     The rule is also expected to increase gross premiums overall. CMS concedes that provisions that account for most of the rule (including those at issue in this lawsuit) will increase premiums, but it understates by how much. Specifically, CMS claims that, excluding its changes to special enrollment periods and the user fee, the rule will increase premiums by 1.7 to 2.4 percent. This figure is implausibly small considering the numerous burdensome administrative barriers imposed by the rule and the substantial coverage losses that would result, as detailed below. As summarized above, there is extensive evidence that administrative burdens reduce enrollment among healthier individuals, worsen risk pools, and ultimately, substantially increase premiums.

35.     Wakely highlighted similar concerns about the credibility of CMS's estimates in discussing the premium effects of last year's Marketplace Affordability and Integrity Rule,

---

[38] *See* CMS Actions to Protect Consumers and Strengthen Exchange Program Integrity, CMS (Jan. 28, 2026), https://www.cms.gov/newsroom/fact-sheets/cms-actions-protect-consumers-strengthen-exchange-program-integrity. The 2025 household figure (rounded to 200,000) is also included in the Final Rule at 91 FR 29836, https://www.federalregister.gov/d/2026-10050/p-2792.

which included many of the same provisions, noting that "many pricing actuaries will likely not price into their 2026 rates…the reduction in average claims (-0.9 to -5.4 percent) HHS is projecting. Rather, we would expect these changes to increase average costs."[39] This underestimation may be related to CMS's underestimation of coverage losses, as discussed above. Because administrative burdens especially deter enrollment among healthier individuals, larger coverage losses likely mean larger premium increases.

36.     CMS also errs by claiming that eliminating the special enrollment period (SEP) for those under 150 percent of the federal poverty level (FPL) will reduce premiums by 2 to 3 percent and thus reverse any premium increases from the rule's other provisions. This effect is implausible, since the One Big Beautiful Bill Act (OBBBA) eliminated PTC and CSRs for people using this SEP, rendering it useless for the low-income population eligible to use it. The population eligible for this SEP (individuals with income under $23,940 for plan year 2027) cannot afford to purchase or use coverage without PTC and CSRs. And many of them can purchase coverage with PTC and CSRs during the open enrollment period or using other SEPs. In short, as the Congressional Budget Office (CBO) noted in its analysis of OBBBA, OBBBA "effectively eliminate[d] this SEP."[40] As a result, CMS can't plausibly claim that formally eliminating it will further reduce premiums, let alone counteract the premium increases of actual policy changes.

37.     After accounting for this 2 to 3 percent estimate, CMS's own estimates indicate that the provisions challenged in this rule would increase premiums, even if there is some small

---

[39] Lydia Tolman and Michael Cohen, Pricing Considerations for the Program Integrity Rule, Wakely (Apr 2025), https://www.wakely.com/blog/pricing-considerations-for-the-program-integrity-rule/.
[40] Phillip L. Swagel, Re: Estimated Effects on the Number of Uninsured People in 2034 Resulting From Policies Incorporated Within CBO's Baseline Projections and H.R. 1, the One Big Beautiful Bill Act, Congressional Budget Office (June 4, 2025), https://www.cbo.gov/system/files/2025-06/Wyden-Pallone-Neal_Letter_6-4-25.pdf#page=13.

offsetting reduction due to the SEP verification changes and the smaller user fee. Combining this with more realistic estimates of premium increases due to new administrative burdens, the rule overall is likely to increase gross premiums by a substantial amount.

38.     What's more, the provisions that CMS concedes would increase premiums are generally the ones that the plaintiffs in this case are asking to be stayed. Of the provisions for which a stay is requested, the only one that CMS claims would reduce premiums is verification of SEP eligibility in the federal Marketplace. That claim is inconsistent with the actual experience of Exchanges in implementing SEPs, as discussed below. But even if one were to accept CMS's claim at face value, it asserts that the SEP provision would reduce premiums by 0.5 to 0.8 percent, which is substantially less than the premium increase CMS concedes would result from the FTR, data matching issue (DMI) verification, and other provisions. As a result, it is clear from CMS's own estimates that granting the requested stay would reduce premiums.

**The Analysis in the Rule Includes Several Additional Obvious Errors, Many of Which Were Noted in Comments that CMS Ignored.**

39.     Beyond its estimates of the rule's overall coverage and premium effects, CMS's analysis includes numerous major errors that are incompatible with a reasoned consideration of the facts. Many of these errors were pointed out in comments on the analysis in the proposed rule, but CMS generally excludes these comments from its comment summaries and fails to respond to them.

40.     All of CMS's estimates of the effects of the rule are built from its "baseline"–its understanding of the world absent the rule. Yet CMS's baseline coverage figures are plainly implausible for years at issue here.

41.     First, CMS estimates that, between 2025 and 2026, total Marketplace enrollment is set to fall by "approximately 725,000 to 1,800,000."[41] But every credible estimate shows a much larger decline over this span, due to recent policy changes like the expiration of the PTC enhancements and changes in OBBBA. CBO estimates a reduction of 5.5 million people,[42] KFF a reduction of 4.8 million people,[43] and the Urban Institute a reduction of 7.3 million people due to the expiration of the enhanced PTCs alone.[44] CMS's estimates are a third or less of these estimates. No explanation is given for this discrepancy.

42.     Second, between 2026 and 2027, CMS projects that Marketplace enrollment in the baseline will *increase* slightly. This is implausible in light of baseline facts on the ground, including OBBBA eliminating eligibility for many immigrants in 2027 and the expiration of the PTC enhancements being felt more over time. Credible estimates show a substantial enrollment decline in 2027–CBO puts it at 3.8 million people.[45] Comments noted this clear error in the regulatory impact analysis (RIA) in the proposed rule,[46] but CMS neither acknowledged these concerns nor responded.

43.     Since the baseline estimates are the foundation for all other estimates in the rule, these errors call into question all of CMS's estimates.

44.     Many of CMS's estimates regarding the impact of particular provisions are also implausible. As discussed in more detail below, CMS's estimates regarding the impact of the two

---

[41] *See* page 2,793 of the Final Rule (91 FR 29526), https://www.federalregister.gov/d/2026-10050/p-2793.
[42] Baseline Projections: Federal Subsidies for Health Insurance, Congressional Budget Office (Feb. 2026), https://www.cbo.gov/system/files/2026-02/51298-2026-02-healthinsurance.pdf.
[43] Matt McGough, Jared Ortaliza, Justin Lo, and Cynthia Cox, What We Know So Far About 2026 ACA Marketplace Enrollment, Premiums, and Deductibles, KFF (May 19, 2026), https://www.kff.org/affordable-care-act/what-we-know-so-far-about-2026-aca-marketplace-enrollment-premiums-and-deductibles/.
[44] Matthew Buettgens et al., 4.8 Million People Will Lose Coverage, *supra* note 12.
[45] *See* Baseline Projections, *supra* note 42.
[46] *See*, for example, Comment CMS-2026-0496-0989, https://www.regulations.gov/comment/CMS-2026-0496-0989.

DMI provisions, the SEP verification provision, the elimination of the low-income SEP, and the FTR rule are all plainly flawed in light of available evidence.

45.     CMS received comments directly questioning many of these estimates and of other aspects of its regulatory impact analysis. Yet CMS generally finalized its estimates without change and fails to acknowledge these concerns in its comment summaries or address them in its responses.

**Several Challenged Provisions of the Final Rule Will Increase Administrative Obstacles and Reduce Access to Subsidies, and Therefore Are Expected to Reduce Enrollment and Increase Premiums**

46.     The Final Rule includes several provisions that are expected to impose additional administrative obstacles and thus increase gross premiums, both of which are expected to decrease enrollment. This lower enrollment will impose costs on providers, and especially safety net providers.

***Denying Financial Assistance under FTR Rules***

47.     The Final Rule requires Marketplaces to impose burdensome and confusing rules known as "Failure to Reconcile." Under the ACA, Marketplace enrollees can receive PTCs as "advance payments" to reduce their monthly premiums. They must then file a tax return to "reconcile" that assistance based on their actual income for the year. Individuals who fail to file and reconcile are subject to having their returns rejected and to normal tax enforcement measures like the withholding of tax refunds and liens and levies. The Final Rule requires Marketplaces to impose an additional penalty: denying financial assistance for the current year if the IRS reports that an individual has failed to file a tax return and reconcile their advance payments for one or more prior years.

48.     The FTR rules impose complex administrative burdens on affected consumers. The tax forms used for reconciling advance payments are complicated, especially for consumers facing complex situations.[47] Because the fact of having filed and reconciled is considered federal tax information, that information must be protected from disclosure and handled consistently with federal tax privacy laws. As a result, the Marketplace cannot generally discuss a consumer's FTR status with that consumer–even when denying financial assistance on that basis. For the same reason, many Marketplaces cannot notify consumers that they are at risk of losing assistance due to FTR status; instead, they send vague notices indicating that the consumer is at risk of losing financial assistance for any of several potential reasons. When recipients of these vague notices ask the Marketplace to explain, it cannot do so. Consumers also face risks of FTR "false positives," where individuals who have in fact filed are still denied financial assistance. The IRS has been plagued by processing delays and errors over the years.[48] There are no data on the prevalence of errors. But in the analogous case of Marketplaces requesting tax data to verify income, state-based Marketplaces (SBMs) report that the IRS fails to return income data for some 40 percent of applicants across income levels[49]–a share much larger than the fraction of non-filers. And these concerns are exacerbated by IRS customer service shortcomings. Both the

---

[47] *See* About Form 8962, Premium Tax Credit, IRS (accessed June 4, 2026), https://www.irs.gov/forms-pubs/about-form-8962 and About Publication 974, Premium Tax Credit (PTC), IRS (accessed June 4, 2026),https://www.irs.gov/forms-pubs/about-publication-974.

[48] Jessica Lucas-Judy, More Delays Ahead—Pandemic Continues to Slow Down IRS, Government Accountability Office (March 25, 2021), https://www.gao.gov/blog/more-delays-ahead-pandemic-continues-slow-down-irs; National Taxpayer Advocate, 2023 Annual Report to Congress: Most Serious Problems, IRS (2023), https://www.taxpayeradvocate.irs.gov/reports/2023-annual-report-to-congress/most-serious-problems/; and National Taxpayer Advocate, 2024 Annual Report to Congress: Most Serious Problems, IRS (2024), https://www.taxpayeradvocate.irs.gov/reports/2024-annual-report-to-congress/most-serious-problems/.

[49] New CMS Proposed Rule: ACA Marketplace Integrity, State Health and Value Strategies (Apr 1, 2025), https://www.shvs.org/wp-content/uploads/2025/04/New-CMS-Proposed-Rule-on-ACA-Marketplace-Integrity_Final.pdf#page=32.

IRS Inspector General and the IRS Taxpayer Advocate recently warned of increases in errors and customer service delays due to recent staffing reductions.[50]

49.     There are two versions of the FTR rules, one stricter and one less strict. Under the stricter version, consumers are denied financial assistance if the IRS reports that they have failed to reconcile for a single year. Under the less-strict version, consumers are denied financial assistance only with two years of FTR status. The Final Rule provides that the federal Marketplace will use the one-year rules, while state Marketplaces may choose between the two for the 2027 plan year.

50.     Under either approach, FTR rules create a complicated administrative obstacle for some consumers. The literature discussed above shows that even simple administrative obstacles reduce enrollment, especially by healthier people. The Kafka-esque features of FTR rules are likely to have even greater effects, reducing enrollment and worsening risk pools.

51.     The FTR policy is expected to eliminate APTC and cause loss of coverage for hundreds of thousands of individuals. With the two-year rules in effect, CMS eliminated APTC for 199,000 households (representing 235,000 consumers) in 2025 and 366,000 households (representing 430,000 consumers) in 2026.[51] With the one-year rules in effect in 2027, at least in the Federally-facilitated Marketplace (FFM), APTC losses are expected to be even higher. The vast majority of these would be unable to afford the premium without APTC and so would lose

---

[50] Diana M. Tengesdal, The Internal Revenue Service's Readiness for the 2026 Filing Season, Department of the Treasury (Jan. 26, 2026), https://www.oversight.gov/sites/default/files/documents/reports/2026-01/2026400002_Readiness%20Memo_Final.pdf and National Taxpayer Advocate, 2025 Annual Report to Congress, IRS (2025) https://www.taxpayeradvocate.irs.gov/wp-content/uploads/2026/01/ARC_Publication-2104_2025_Web.pdf.

[51] CMS Actions to Protect Consumers and Strengthen Exchange Program Integrity, CMS (Jan. 28, 2026), https://www.cms.gov/newsroom/fact-sheets/cms-actions-protect-consumers-strengthen-exchange-program-integrity. The 2025 household figure (rounded to 200,000) is also included in the Final Rule at 91 FR 29836, https://www.federalregister.gov/d/2026-10050/p-2792.

coverage altogether, degrading the risk pool. These coverage losses would also harm providers, as explained above.

52. CMS's projections for APTC loss due to FTR are implausibly low. Despite the clear recent history of APTC losses in the hundreds of thousands, the Final Rule projects that at most 42,000 households would lose APTC in 2027 due to FTR–and that assumes every state uses the stricter one-year rules. The only explanation given for this precipitous decline is that total Marketplace enrollment is expected to fall by 725,000 to 1.8 million in 2027. In other words, CMS projects that an enrollment decline of perhaps 5 to 10 percent will reduce APTC loss due to FTR by almost 90 percent.

### Requiring Additional Paperwork to Address DMIs

53. The Final Rule broadens the set of circumstances where consumers must submit additional documentation to prove their eligibility for financial assistance. Under the ACA, federal tax information and other trusted data sources are used to verify eligibility for financial assistance. When a consumer's application claims income lower than shown in tax data or other administrative data sources, a "DMI" is generated, and the consumer must collect and then come back to submit additional information. Those who do not do so have their financial assistance reduced—generally to $0. Most of this group can be reasonably expected to lose coverage because they can no longer afford it.

54. The Final Rule would expand these rules to also generate a DMI when the consumer attests to income higher than is shown in tax data or other sources, and when this data is not available.

55. These provisions add additional paperwork burdens for large numbers of consumers. The IRS is currently unable to provide tax data for about 40 percent of consumers,

including many with moderate incomes who certainly file tax returns.[52] As a result, this provision would result in millions of DMIs each year. CMS estimates they would lead to 3.3 million additional DMIs per year, while the actuarial firm Wakely estimates 4.7 million per year.[53]

56.     Resolving a DMI requires consumers to submit information like pay stubs, invoices, or a narrative explaining their income situation. This additional paperwork is especially burdensome for eligible low-income people, those with variable incomes, and small business owners and the self-employed, all of whom face greater challenges documenting their income.

57.     Consistent with the literature above, this sort of burden leads to substantially reduced enrollment. This coverage loss will disproportionately affect healthy consumers, worsening risk pools. Indeed, CMS has long underscored that coverage losses associated with DMIs are concentrated among the young.[54]

58.     This expanded paperwork burden is expected to reduce Marketplace enrollment by about 2.3 million people, according to the actuarial firm Wakely.[55]

59.     CMS claims a much smaller impact: that 488,000 people will lose financial assistance. Comments noted that CMS's analysis "greatly understates the expected impact" of these provisions and suggested likely methodological errors.[56] But CMS's summaries of comments[57] on the estimates make no reference to these comments, and its responses[58] do not

[52] New CMS Proposed Rule: ACA Marketplace Integrity, *supra* note 49.
[53] Sherman et al., *supra* note 37.
[54] Strengthening the Marketplace – Actions to Improve the Risk Pool, CMS (Jun 8, 2016), https://www.cms.gov/newsroom/fact-sheets/strengthening-marketplace-actions-improve-risk-pool.
[55] Sherman et al., *supra* note 37.
[56] *See*, for example, Comment CMS-2026-0496-0989, https://www.regulations.gov/comment/CMS-2026-0496-0989.
[57] Pages 2,800 and 2,807 of the Final Rule (91 FR 29526), https://www.federalregister.gov/d/2026-10050/p-2800.
[58] Pages 2,801 and 2,808 of the Final Rule (91 FR 29526), https://www.federalregister.gov/d/2026-10050/p-2801.

address them, instead focusing exclusively on commenters' substantive concerns about the provisions.[59]

60.     In addition, CMS's estimate of coverage losses from requiring a DMI when there is no applicant tax data seems too low relative to CMS's estimates for the same provision in the proposed Marketplace Integrity Rule.[60] CMS's estimate of the number of DMIs created increased from 2.1 million to 2.8 million. But the same number of people (407,000) are projected to lose APTC. It is unclear how–and no explanation is given–a 30 percent increase in DMIs would lead to no increase in coverage loss. Comments noted this disparity,[61] but CMS's comment summaries and responses make no reference to these comments.

***Requiring Additional Paperwork for SEPs***

61.     The ACA requires consumers to enroll during the year-end open enrollment period, unless they qualify for one of several SEPs based on circumstances like a change in family composition or loss of coverage. The Final Rule expands the set of circumstances where a consumer seeking to enroll during a SEP must submit specific documentation to the FFE to demonstrate that they are eligible.

62.     Affected individuals must obtain some specific document (like a letter from their former employer about the loss of employer-based coverage or a marriage certificate) and upload or mail that information. This is in addition to the information described above that all applicants for coverage must provide. Consumers are unlikely to have this information on hand and will need to set aside time to collect it. This will generally make it impossible for consumers to

---

[59] *See*, for example, Comment CMS-2026-0496-0989, https://www.regulations.gov/comment/CMS-2026-0496-0989.
[60] *See* page 617 of the Proposed Marketplace Integrity Rule https://www.federalregister.gov/d/2025-04083/p-617.
[61] *See*, for example, Comment CMS-2026-0496-0989, https://www.regulations.gov/comment/CMS-2026-0496-0989.

complete the application process in a single sitting, substantially increasing the likelihood that they will not complete it at all. Consistent with the literature above, this will decrease enrollment, especially among healthier individuals.

63. CMS estimates that this provision would require an additional 293,000 consumers to submit documentation, resulting in about 40,000 failing to enroll.[62]

64. CMS asserts that expanding SEP verification will reduce premiums by 0.5 to 0.8 percent, explaining that the "positive impact on program integrity by verifying eligibility for SEPs" would decrease premiums.[63] This is inconsistent with available evidence about those who enroll through a SEP.

65. For example, actuarial data from the Massachusetts Connector[64] show that their population with the most SEP eligibility generally has lower risk than other enrollees and that consumers enrolling through an SEP tend to be slightly younger than those enrolling through an open enrollment period (OEP).

66. Data from Covered California suggest that SEP enrollees do not generally worsen the risk pool. Data about the prospective risk scores of SEP and OEP enrollees indicate that the overall health profile of SEP enrollees is consistently slightly better than that of those enrolling during the OEP.[65]

67. The actuarial firm Wakely has found that SEP eligibility supports a stable insurance market, since "members joining via SEP have a similar loss ratio (claims/premium) as

---

[62] Page 2,822 of the Final Rule (91 FR 29526), https://www.federalregister.gov/d/2026-10050/p-2822.
[63] Page 2,821 of the Final Rule (91 FR 29526), https://www.federalregister.gov/d/2026-10050/p-2821.
[64] Gary D. Anderson, Report Of The Merged Market Advisory Council, (2022) https://www.mass.gov/doc/final-report-of-the-merged-market-advisory-council/download.
[65] Data Snapshot: Covered California Open and Special Enrollment Periods, Covered California (Apr. 3, 2025), https://hbex.coveredca.com/data-research/library/CoveredCA_OE_SEP_Data_Snapshot_20250403.pdf.

those who joined during the open enrollment period in 2022" and the current rule creates a "bigger pool to spread risk and administrative costs."[66] Moreover, the tighter rules are self-defeating, since "prospective joiners who are sicker will be more likely to gain coverage even under tightened rules compared to healthier prospective joiners."[67]

68.     These data generally look at all SEP enrollees together, not just those enrolling through the low-income SEP, and they do not specifically identify who would be deterred from enrollment by administrative barriers, so they are not a perfect predictor. Nonetheless, they indicate that the likely effect of eliminating the low-income SEP and creating an additional verification burden would be to worsen risk pools.[68]

69.     Comments raised concerns about CMS's analysis in the proposed rule, but the Final Rule did not acknowledge or respond to these comments. Commenters noted that "CMS…seemingly overstates the premium benefit of its proposal to require more paperwork for individuals enrolling through a SEP, while failing to explain its methods [and ignoring] available evidence about those who enroll through a SEP."[69] Yet CMS finalized its analysis without change, and its comment summary[70] and response[71] focused exclusively on substantive concerns about the provisions and on estimates regarding state Marketplace implementation costs.

***Eliminating Standardized Plans and Limits on Non-Standardized Plans***

70.     The ACA includes several requirements, such as metal level tiers, to help consumers select a Marketplace plan that fits their health needs and their budget. Even with these

---

[66] Tolman and Cohen, *supra* note 39.
[67] Tolman and Cohen, *supra* note 39.
[68] To the extent this policy reduced the share of enrollment attributable to low-income people, gross silver plan premiums would likely fall, separate from any risk pool effects, but this would not translate to consumers facing lower costs as described above.
[69] Comment CMS-2026-0496-0989, https://www.regulations.gov/comment/CMS-2026-0496-0989.
[70] Page 2,826 of the Final Rule (91 FR 29526), https://www.federalregister.gov/d/2026-10050/p-2826.
[71] Page 2,827 of the Final Rule (91 FR 29526),https://www.federalregister.gov/d/2026-10050/p-2827.

minimum standards in place, health insurance is complex, and it remains difficult for consumers to assess and meaningfully compare their plan options.[72]

71. Comparing plans is especially daunting in the face of many complex options. "Choice overload"—where consumers presented with more choices make lower-quality decisions—is a well-documented phenomenon in the behavioral economics literature.[73]

72. Choice overload is especially concerning in the context of health insurance, where the products themselves are so complicated and the stakes so high. Whether for Marketplace, Medicare, or job-based coverage, choice overload has led consumers to select a plan that does not meet their needs—or to not enroll in coverage at all.[74] In a review of the extensive literature, choice overload was found to cause worse enrollment decisions due to the difficulty consumers face in processing complex health insurance information.[75] Choice overload has a particularly

[72] *See* Rayna Wallace, Meghan Salaga, Michelle Long, and Kaye Pestaina, Navigating the Maze: A Look at Patient Cost-Sharing Complexities and Consumer Protections, KFF (Mar. 28, 2025), https://www.kff.org/private-insurance/navigating-the-maze-a-look-at-patient-cost-sharing-complexities-and-consumer-protections/.

[73] *See, e.g.*, Barry Schwartz, The Paradox of Choice (2004).

[74] *See* Rose C. Chu et al., Facilitating Consumer Choice: Standardized Plans in Health Insurance Marketplaces (Assistant Secretary for Planning and Evaluation Office of Health Policy, HP-2021-29, 2021) http://resource.nlm.nih.gov/9918538381606676 (reviewing the research literature on how standardized plans affect consumers and insurance markets); *see also* J. Michael McWilliams et al., Complex Medicare Advantage Choices May Overwhelm Seniors—Especially Those With Impaired Decision Making, 30 *Health Affairs* 1786 (2011), https://doi.org/10.1377/hlthaff.2011.0132; Keith M. Marzilli Ericson and Amanda Starc, How Product Standardization Affects Choice: Evidence from the Massachusetts Health Insurance Exchange, 50 *J. Health Econ*. 71 (2016), https://doi.org/10.1016/j.jhealeco.2016.09.005; *see* also Saurabh Bhargava et al., Do Individuals Make Sensible Health Insurance Decisions? Evidence from a Menu with Dominated Options, NBER Working Paper No. 21160, (2015), https://www.nber.org/papers/w21160; M. Kate Bundorf et al., Are Prescription Drug Insurance Choices Consistent with Expected Utility Theory?, 32 *Health Psych.* 986 (Sept.. 2013), https://doi.org/10.1037/a0033517; M. Kate Bundorf and Helena Szrek, Choice Set Size and Decision Making: The Case of Medicare Part D Prescription Drug Plans, 30 *Med. Decision Making* 582 (Mar. 2010), https://doi.org/10.1177/0272989X09357793; Yaniv Hanoch et al., How Much Choice Is Too Much? The Case of the Medicare Prescription Drug Benefit, 44 *Health Servs. Res.* 1157 (Aug. 2009), https://doi.org/10.1111/j.1475-6773.2009.00981.x; and Yaniv Hanoch et al., Choosing the Right Medicare Prescription Drug Plan: The Effect of Age, Strategy Selection and Choice Set Size, 30 *Health Psych*. 719 (Nov. 2011), https://doi.org/10.1037/a0023951.

[75] Erin Audrey Taylor et al., Consumer Decisionmaking in the Health Care Marketplace, Rand (2016), https://www.rand.org/pubs/research_reports/RR1567.html.

negative impact on low-income applicants, many of whom have limited time to undertake the enrollment process, as well as lower levels of health insurance literacy.[76]

73. To mitigate these well-known challenges, state Marketplaces[77] and the federal government[78] have required health insurers to offer standardized plan options and limited the number of non-standardized plan options. Standardized plans offer an additional level of comparability through consistent cost sharing and benefit design within a metal-level tier. By requiring consistent cost sharing, standardized plans enable consumers to compare plans based on key metrics such as premiums, provider networks, and quality.[79] Standardized plans are paired with Marketplace choice architecture, such as preferential display, to further increase the likelihood that consumers purchase coverage that best meets their needs.[80]

74. Standardized plans, preferential display, and limits on non-standardized plans simplify the plan selection process and improve the consumer experience.[81] For instance, a 2026 evaluation recently found that Colorado's standardized plans "made it easier for consumers to understand what benefits they get from their plans, what they will pay out of pocket, and compare across plans— especially for common services."[82] Standardized plans also improve affordability and lower consumer costs. Standardized plans have had to waive the deductible or

---

[76] *See*, e.g., Rose C. Chu et al., *supra* note 74.
[77] *See*, e.g., Rose C. Chu et al., *supra* note 74.
[78] *See*, e.g., Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2023, 87 Fed. Reg. 27,208, 27,310 (May 6, 2022); Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2017, 81 Fed. Reg. 12,204, 12,330 (Mar. 8, 2016).
[79] *See, e.g.*, Sabrina Corlette, Sandy Ahn, Kevin Lucia, and Hannah Ellison, Missed Opportunities: State-Based Marketplaces Fail to Meet Stated Policy Goals of Standardized Benefit Designs. Urban Institute (July 2016), https://www.urban.org/research/publication/missed-opportunities-state-based-marketplaces-fail-meet-stated-policy-goals-standardized-benefit-designs-0.
[80] *See*, e.g., Rose C. Chu et al., *supra* note 74.
[81] *See*, e.g., Rose C. Chu et al., *supra* note 74.
[82] R. Vincent Pohl et al., Analysis of the Colorado Option, pursuant to § 10-16-1310, C.R.S.: Final Report, Colorado Division of Insurance (Jan. 16, 2026), https://doi.colorado.gov/sites/doi/files/documents/CO-Option-10-16-1304-Report.pdf.

charge a fixed-dollar copay for a core set of high-value services, including primary care, behavioral health services, urgent care visits, and generic drugs.[83]

75.     In addition to helping consumers understand their plan options, standardized plan requirements force health insurers to compete based on price and thus help hold down health Marketplace premiums. For instance, the introduction of standardized plans through the FFM was shown to reduce premiums across metal levels.[84] By ensuring a level playing field across plans, health insurers compete more directly on premiums and quality instead of through benefit design that attempts to cherry-pick healthier, lower-risk consumers.[85]

76.     Given these benefits, eliminating standardized plans, preferential display, and limits on non-standardized plans is expected to worsen consumer decisionmaking and outcomes, leading to more uninsured and underinsured people. Without these tools, consumers can no longer rely on the "standard" plan designation, making it even more challenging to understand and compare plan options.

77.     In the absence of standardized cost sharing across plans, consumers will be asked to understand and account for countless new plan features, in the form of copays and coinsurance, that vary across multiple benefit categories. Consumers will be forced to consider this complex cost sharing information alongside information about premiums, provider networks, and quality. This complexity, in turn, will increase the cognitive burden of selecting a

---

[83] Karen Pollitz, Justin Lo, and Rayna Wallace, Standardized Plans in the Health Care Marketplace: Changing Requirements, KFF (May 8, 2026), https://www.kff.org/private-insurance/standardized-plans-in-the-health-care-marketplace-changing-requirements/.
[84] Ben Hopkins and Sean Lyons, The effect of offering standardized "Simple Choice" plans on premiums in the Federally Facilitated ACA marketplaces, *Journal of Health Economics* (July 2026), https://doi.org/10.1016/j.jhealeco.2026.103142.
[85] *See*, e.g., Rose C. Chu et al., *supra* note 74.

Marketplace plan for millions of consumers who could see their standardized plans discontinued beginning with the 2027 plan year.[86]

78.    Consumers who cannot overcome these barriers might not complete the enrollment process at all. Others might enroll in coverage but select a suboptimal plan that leaves them with higher health care costs than if standardized plans were still required and identified by the Marketplace. For instance, a consumer might select a plan with the same premium but less generous coverage than a standardized plan if the plan has higher cost sharing, out-of-network providers, or off-formulary drugs.[87] Some consumers in suboptimal plans will pay higher out-of-pocket costs while others might choose to drop the coverage because it is too costly and does not meet their needs.

79.    Removing standardized plans, preferential display, and limits on non-standardized plans will also reduce incentives for insurers to compete based on price. Instead, plans will be able to vary cost sharing levels and even actuarial value levels in ways that obscure meaningful plan differences and lead to more consumers being enrolled in a suboptimal plan.

**Effects of Expanding Availability of Lower-Quality Plans**

80.    Economic theory and empirical evidence show that expanding the availability of lower-quality coverage has several effects.[88]

81.    Lower-quality products are cheaper, for two reasons. First, their lower quality (higher cost-sharing, smaller network, etc.) makes them a cheaper product for a given enrollee.

---

[86] About one-third of all federal Marketplace enrollees selected a standardized plan for 2025. Page 2,787 of the Final Rule (91 FR 29526), https://www.federalregister.gov/d/2026-10050/p-1787.

[87] *See*, e.g., Rose C. Chu et al., *supra* note 74.

[88] For discussions of these dynamics, *see*, e.g., Michael Geruso, Timothy J. Layton, Grace McCormack, and Mark Shepard, The Two-Margin Problem in Insurance Markets, *The Review of Economics and Statistics* (2023) 105 (2): 237–257, https://doi.org/10.1162/rest_a_01070; Michael Geruso, Timothy Layton, and Daniel Prinz, Screening in Contract Design: Evidence from the ACA Health Insurance Exchanges, *American Economic Journal: Economic Policy* vol. 11, no. 2 (May 2019), https://doi.org/10.1257/pol.20170014.

Second, they attract healthier consumers, since sicker people do not generally enroll, and healthier consumers are generally quite price-sensitive and so are drawn to these lower-quality plans.[89]

82.     When permitted to offer lower-quality products, insurers consistently do so, since it permits them to attract healthier consumers.[90]

83.     Healthier consumers within the market are more likely to enroll in these plans. This disproportionately decreases the premium revenue in the risk pool from healthy enrollees, reducing risk sharing across the single risk pool.

84.     As a result, expanding the availability of lower-quality plans results in splitting the risk pool and increasing premiums for the higher-quality products that sicker consumers want and need.

85.     Within the individual market, the ACA includes several provisions to mitigate this dynamic. It limits variation in plan quality by imposing minimum standards on benefits, cost-

---

[89] *See*, for example, Edward Kong, Timothy Layton, and Mark Shepard, Adverse Selection and (un)Natural Monopoly in Insurance Markets, *NBER Working Paper* (Nov. 2024), https://www.nber.org/papers/w33187. Consumers' price sensitivity can also be seen in this year's open enrollment results so far. As a result of out-of-pocket premium increases due to the expiration of the PTC enhancements, consumers have shifted to lower-premium plans (generally bronze plans), resulting in average ACA Marketplace deductibles increasing by 37 percent (or $1,027 per person). Matt McGough, Jared Ortaliza, Justin Lo, and Cynthia Cox, What We Know So Far About 2026 ACA Marketplace Enrollment, Premiums, and Deductibles, KFF (May 19, 2026), https://www.kff.org/affordable-care-act/what-we-know-so-far-about-2026-aca-marketplace-enrollment-premiums-and-deductibles/.

[90] For example, CMS data shows that, when insurers were permitted to offer silver plans with lower actuarial values, "approximately 87 percent of counties across 23 States ha[d] an SLCSP that is below 70 percent AV." Page 2,109 of the Notice of Benefit and Payment Parameters for 2023 (87 FR 27208), https://www.federalregister.gov/d/2022-09438/p-2109. Another example can be found in the proliferation of non-ACA-compliant coverage. Notwithstanding ACA insurance regulations, federal and state regulators have carved out several exceptions for less-regulated coverage. Insurance companies and others have jumped into these opportunities, offering a wide proliferation of non-ACA-compliant plans to try to skim the best risk. *See*, e.g., Christen Linke Young, Taking a broader view of "junk insurance", Brookings (July 6, 2020), https://www.brookings.edu/articles/taking-a-broader-view-of-junk-insurance/; Amy Killelea and JoAnn Volk, The Peddling Of "Junk Plans" To Consumers Facing Higher Insurance Premiums, Center on Health Insurance Reforms (Feb. 27, 2026), https://chir.georgetown.edu/the-peddling-of-junk-plans-to-consumers-facing-higher-insurance-premiums/; John Dicken, Private Health Coverage: Information on Farm Bureau Health Plans, Health Care Sharing Ministries, and Fixed Indemnity Plans, Government Accountability Office (July 26, 2023), https://www.gao.gov/assets/gao-23-106034.pdf

sharing, and networks. Lower-quality plans like catastrophic plans are available only in limited situations and without financial assistance. It also includes a risk adjustment program that transfers premium dollars from insurers with healthier enrollees to those with sicker enrollees. However, this program does not work perfectly. And catastrophic coverage is separately risk adjusted, effectively creating a separate risk pool.

86. Expanded enrollment in lower-quality plans with higher cost-sharing also leads to lower provider revenue and more uncompensated care, since consumers are unable to afford to pay thousands of dollars in cost sharing. As a result, enrollment in lower-quality plans hurts providers. This is especially true of safety net providers, who are more likely to serve consumers who have trouble paying their bills.[91]

87. The Final Rule includes several provisions that expand the availability of lower-quality plans. These provisions are expected to have the effects described above: attracting healthier consumers to these lower-quality plans, resulting in higher gross premiums for other coverage and higher cost-sharing overall, which in turn will increase providers' uncompensated care costs.

**Several Challenged Provisions of the Final Rule Expand Availability of Lower-Quality Plans and thus Are Expected to Raise Premiums for Higher-Quality Coverage and Increase Uncompensated Care**

***Expanded Eligibility for Catastrophic Plans***

88. The Final Rule greatly expands eligibility for catastrophic coverage. Because catastrophic coverage is lower-quality and less expensive, it is expected to attract enrollment

---

[91] In December 2018, 28 percent of community health center visits were covered by private/Marketplace coverage in nonexpansion states and 12 percent in expansion states. Anne E. Larson et al., Private/marketplace insurance in community health centers 5 years post-affordable care act in Medicaid expansion and non-expansion states, 141 *Preventive Medicine* (2020), https://doi.org/10.1016/j.ypmed.2020.106271. *See* also Benedic Ippolito, Erin Trish, Erin L Duffy, and Boris Vabson, Patient Repayment of US Hospital Bills From 2018 to 2024, 6 *JAMA Health Forum* 8 (2025), https://doi.org/10.1001/jamahealthforum.2025.2284.

among healthier consumers. This is especially a concern since catastrophic plans are separately risk adjusted, so metal-level plans are not compensated when catastrophic plans siphon off the healthier risk. Therefore, this change will increase gross premiums for metal-level plans.

89. In addition, shifting more people into lower-quality, higher-deductible coverage will result in higher uncompensated care costs for providers.

90. The ACA carefully limits access to catastrophic plans to avoid this dynamic. Specifically, eligibility is limited only to individuals under age 30, those without access to affordable coverage (meaning coverage costs more than 8 percent [indexed] of income), and those who face a hardship in accessing coverage.

91. The rule upends this structure by providing a categorical hardship exemption to individuals with incomes under 100 percent FPL and over 250 percent FPL: a group that includes roughly 80 percent of adults.[92] This includes individuals with very high incomes who can easily afford to purchase health insurance and have high rates of coverage.

92. CMS claims it did not receive any comments on its analysis of this proposal,[93] but this is not true. Comments noted that "the RIA omits important information that could help stakeholders evaluate the proposal," that CMS "fails to consider the potential harms to consumers," that CMS "has not provided the evidence to support" its claim that the proposal will improve affordability, that a recent study "strongly suggests the exemption is too broad to achieve its stated goal," that CMS "fails to take into consideration potential increased costs associated with the proposal, [including] increase[d] premiums."[94]

---

[92] Urban Institute analysis of the 2024 American Community Survey Data.
[93] Page 2,841 of the Final Rule (91 FR 29526), https://www.federalregister.gov/d/2026-10050/p-2841.
[94] Comment CMS-2026-0496-0989, https://www.regulations.gov/comment/CMS-2026-0496-0989.

*Higher Maximum Out-of-Pocket Spending Limits for Bronze Plans*

93.     The Final Rule allows insurers to offer bronze plans with maximum out-of-pocket spending limits, or MOOPs, that exceed statutory limits by 30 percent. While higher deductibles mechanically reduce premiums for a particular plan, they expose consumers to very high out-of-pocket costs.

94.     According to KFF, the weighted average deductible for a bronze plan is $7,476 for 2026.[95] If bronze deductibles were 30 percent higher, that would be an increase of $2,243, to an average deductible of almost $10,000. Such higher cost-sharing requirements mean greater uncompensated care, since many consumers are unable to afford to pay their cost sharing. As explained above, this is especially harmful to safety net providers, who are more likely to serve consumers who have trouble paying their bills.[96]

95.     Despite CMS's assertions otherwise, there is no doubt that insurers will offer plans with higher maximum out-of-pocket limits if they are permitted to do so. As explained above, when insurers have the option to offer lower-priced coverage, they will do so, even at the expense of quality. In a similar setting, when insurers were permitted to offer silver plans with actuarial values below 70%, there was widespread adoption. According to data from CMS, "approximately 87 percent of counties across 23 States ha[d] an SLCSP [Second-Lowest-Cost Silver Plan] that is below 70." [97] Similarly, insurers will offer these plans with MOOPs that exceed statutory limits as they compete over premium costs for consumer enrollments, according to data from CMS.

---

[95] Deductibles in ACA Marketplace Plans, 2014-2026, KFF (Nov. 6, 2025), https://www.kff.org/affordable-care-act/deductibles-in-aca-marketplace-plans/.
[96] Ippolito et al., *supra* note 91.
[97] Page 2,109 of the Notice of Benefit and Payment Parameters for 2023 (87 FR 27208), https://www.federalregister.gov/d/2022-09438/p-2109.

96.     It is also clear that healthier consumers within the market will be more likely to enroll in these higher-deductible bronze plans. This will disproportionately decrease the premium revenue in the risk pool from healthy enrollees. And given that risk adjustment only imperfectly compensates insurers for sicker risk, this will increase gross premiums for higher-quality plans.

97.     This proposal is perplexing, because CMS concedes that the new bronze plans violate statutory requirements. CMS claims this departure is necessary to preserve the existence of bronze plans. But CMS also concedes that it is quite possible for bronze plans to satisfy statutory rules. Indeed, CMS conditions an insurer's right to offer these extra-statutory bronze plans on its also offering a bronze plan that complies with the statutory rules.

98.     It is also not the case that insurers are in any imminent danger of being unable to design bronze plans that satisfy the statute. As Matthew Fiedler of the Brookings Institution explained in his comment on the proposed rule, designing bronze plans that comply with the statute is possible today, will remain possible for years to come, and may never become impossible.[98] CMS does not contest these claims.

***Weaker Network Adequacy Standards***

99.     The ACA charges the Secretary of Health and Human Services with establishing standards to ensure Marketplace plans have adequate provider networks, which must include essential community providers.[99] Marketplaces must ensure that Marketplace plans meet these standards.[100]

100.     Consistent with this statutory charge, CMS has developed specific standards for network adequacy for FFM plans, including specific numeric time and distance standards for

---

[98] Comment CMS-2026-0496-1027, https://www.regulations.gov/comment/CMS-2026-0496-1027.
[99] ACA section 1311(c)(1)(B) and (C).
[100] ACA section 1311(d)(4).

many types of providers that adjust at the county level to reflect a given area's population size and density (e.g., CMS applies different standards for metro counties and rural counties to reflect the differences between them).[101] SBMs have generally been permitted to establish their own network adequacy standards so long as they are at least as strict as the federal baseline requirements. These standards are generally enforced by the Marketplace or state insurance regulators in each state.

101. The Final Rule undermines this structure in several ways. It eliminates the obligation for SBMs and SBMs on the federal platform to apply standards that are as stringent as the federal baseline. It also permits states that use the FFM to opt out of federal quantitative review requirements and use weaker standards, including with respect to essential community providers.

102. These changes will have little effect in some states. For example, some states have long had network adequacy rules more rigorous than the federal standards.

103. But in other states, including Wisconsin and Ohio, CMS's standards through the FFM are more robust than the state's network adequacy review processes for other health insurance. Reverting to these states' rules will permit insurers to offer narrower-network plans at lower premiums.

104. While narrower networks may decrease gross premiums for some consumers, they would be expected to increase costs for consumers receiving financial assistance who want to maintain the same size network. This is because Marketplace financial assistance is based on the price of the second-lowest-cost silver plan available to the consumer. If narrow-network

---

[101] 2023 Final Letter to Issuers in the Federally-facilitated Exchanges, CMS (Apr. 28, 2022), https://www.cms.gov/sites/default/files/2022-04/Final-2023-Letter-to-Issuers_0.pdf.

options are newly permitted to be sold, it will drive down financial assistance and increase costs for the higher-quality plans. This cost increase for subsidized consumers to maintain comparable coverage may deter some from seeking coverage. Narrower networks will also increase consumers' out-of-pocket costs, resulting in larger uncompensated care burdens for providers. Inadequate networks may also make it more difficult for enrollees to obtain care.

105. Plans with narrow networks will also disproportionately appeal to healthier consumers. This will disproportionately decrease the premium revenue in the risk pool from healthy enrollees. And given that risk adjustment only imperfectly compensates insurers for sicker risk, this will increase gross premiums for plans with adequate networks.

**Conclusion**

106. The challenged provisions of the Final Rule each operate to impose administrative burdens, worsen Marketplace risk pools, increase gross or net premiums, or some combination of those effects. The result will be lower-quality coverage at greater expense for both enrollees in the Marketplace, whether those enrollees are subsidized or not. They are expected to decrease Marketplace enrollment and increase the number of uninsured or underinsured persons. When more people are uninsured or underinsured, safety net providers will incur greater costs in the form of uncompensated care for these people.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

*Signature on following page.*

36

Dated: June 4, 2026

Washington, D.C.

_____
JASON LEVITIS

# APPENDIX

# JASON A. LEVITIS

**CONTACT INFORMATION**

jlevitis@urban.org
203-671-2609
C/o Urban Institute
500 L'Enfant Plaza SW
Washington, DC 20024
www.linkedin.com/in/jason-levitis/

**SUMMARY**

Jason Levitis is a leading expert on the Affordable Care Act (ACA) and the intersections of health and tax policy and law. He is currently a senior fellow in the Health Policy Division at the Urban Institute and a nonresident senior fellow at Yale Law School's Solomon Center for Health Law and Policy. He publishes research and provides technical assistance to federal and state health policymakers and advocates on the financing and regulation of private health coverage, health insurance subsidies, Section 1332 waivers, federal and state tax policy, programmatic operations, and approaches to minimizing consumers' administrative burdens. He provides technical assistance to state officials through State Health and Value Strategies, a project of the Robert Wood Johnson Foundation.

Levitis served at the US Treasury Department from 2009 to 2017. He represented the Treasury on the interagency team that helped craft and then implemented the ACA, and he led Treasury's ACA implementation as counselor to the assistant secretary for tax policy. He also co-chaired the interagency working group that stood up the Section 1332 waiver program.

Levitis earned a BA in mathematics from Wesleyan University and a JD from Yale Law School, where he was co–editor in chief of the Yale Journal of Health Policy, Law, and Ethics.

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| 2022-Present | Senior Fellow, Urban Institute |
| 2017-Present | Senior Fellow (Nonresident) and Distinguished Visiting Scholar, Yale Law School Solomon Center for Health Law and Policy |
| 2017-2022 | Principal, Levitis Strategies LLC. Clients include State Health and Value Strategies, Massachusetts Health Connector, Brookings Institution, Urban Institute, and Yale Law School Solomon Center for Health Law and Policy |
| 2017-2022 | Nonresident Fellow, Economic Studies, Brookings Institution |

| | |
|---|---|
| 2012-2017 | Counselor and ACA Implementation Lead (previously Senior Advisor for ACA Implementation), Office of Tax Policy, U.S. Treasury Department |
| 2010-2012 | Senior Advisor to the Assistant Secretary for Tax Policy, U.S. Treasury Department |
| 2009-2010 | Senior Advisor to the Counselor to the Secretary, U.S. Treasury Department |
| 2008-2008 | Economics and International Trade Group, Obama Presidential Transition |
| 2005-2009 | Senior Analyst and Counsel (previously Policy Analyst), Center on Budget and Policy Priorities |
| 2002-2004 | Founding Director of Legal Intern Program, Connecticut Voices for Children |
| 2003-2004 | Co-Editor-in-Chief, Yale Journal of Health Policy, Law, & Ethics |
| 2003 | Legal Intern, Senate Democratic Policy Committee |
| 2002 | Legal Intern, Georgetown Federal Legislation Clinic |
| 1998-2001 | Senior Analyst (Previously Economic Analyst), Greater New York Hospital Association |
| 1997-1998 | Teaching Fellow in Math and Computer Science, The Taft School |
| 1996-1997 | Cabinet Shop Manager, Habitat for Humanity of Wake County, NC |

**EDUCATION**

| | |
|---|---|
| 2005 | J.D., Yale Law School |
| 1996 | B.A., Mathematics, Wesleyan University |

**BAR ADMISSIONS**

Maryland

**HONORS**

U.S. Treasury Department: The Treasury Medal, 2017
Yale Law School: Stephen J. Massey Prize, 2004
Wesleyan University
    Rice Prize in mathematics, 1996
    Phi Beta Kappa, 1995
    CRC Award in chemistry, 1993
    Sherman Prize in mathematics, 1993

**PUBLICATIONS**

"Final Notice of Benefit & Payment Parameters: Implications for State-Based Marketplaces and Insurance Regulators" (with Sabrina Corlette and Tara Straw), State Health and Value Strategies, May 29, 2026.

"Changes to the Actuarial Value Calculator for 2027" (with Sabrina Corlette), State Health and Value Strategies, April 30, 2026.

"State Marketplace Subsidies to Support Health Insurance Affordability" (with Claire O'Brien, Caitlin Rowley Gallamore, and Rachael Totz), State Health and Value Strategies, March 27, 2026.

"What's Worse than a Ghost Network Plan? A No-Network Plan" (with Sabrina Corlette and Lindsey Murtagh), CHIR, March 18, 2026.

"Comment Letter on Proposed 2027 Notice of Benefit and Payment Parameters" (with Sabrina Corlette, Lindsey Murtagh, and Claire O'Brien), Urban Institute, March 13, 2026.

"Proposed Marketplace and Insurance Changes in the 2027 Notice of Benefit & Payment Parameters" (with Sabrina Corlette and Tara Straw), State Health and Value Strategies, February 13, 2026.

"Latest Premium Tax Credit Proposal Would Raise Premiums for Millions of People" (with Claire O'Brien and Michael Simpson), Urban Institute, February 2, 2026.

"ACA Compacts For Interstate Insurance Sales: How Much Flexibility Do They Provide? (Part 2)" (with Lindsey Murtagh), Health Affairs Forefront, January 28, 2026.

"ACA Compacts For Interstate Insurance Sales: How Much Flexibility Do They Provide? (Part 1)" (with Lindsey Murtagh), Health Affairs Forefront, January 27, 2026.

"Enhanced Premium Tax Credits Direct Almost All of Their Benefit to Lower- and Moderate-Income Americans" (with Claire O'Brien and Michael Simpson), Urban Institute, December 24, 2025.

"Six Questions to Evaluate the White House's Proposal to Extend Affordable Care Act Enhanced Premium Tax Credits" (with Claire O'Brien), Urban Wire, November 26, 2025.

Statement Before the Senate Finance Committee, November 19, 2025.

"The Jury Is Still Out On ICHRAs" (with Claire O'Brien and Rachael Totz), Health Affairs Forefront, October 22, 2025.

"Eligibility Cliff on ACA Tax Credits Would Make Health Care Unaffordable for Middle-Class Families" (with Claire O'Brien and Caitlin Rowley Gallamore), Urban Institute, October 17, 2025.

"Damage from Inaction on ACA Tax Credits Has Begun and Will Grow with Further Delays" (with Sabrina Corlette and Claire O'Brien), Health Affairs Forefront, October 8, 2025.

"Ruling in Challenge to Marketplace Rule: Initial Analysis and Implications for States" (with Sabrina Corlette), State Health and Value Strategies, September 26, 2025.

"4.8 Million People Will Lose Coverage in 2026 If Enhanced Premium Tax Credits Expire" (with Matthew Buettgens, Michael Simpson, Fernando Hernandez-Lepe, and Jessica Banthin) Urban Institute, September 17, 2025.

"Reconciliation Bill Would Cut Marketplace Enrollment by over 5 Million People" (with Matthew Buettgens, Jameson Carter, Jessica Banthin, and Michael Simpson), Urban Institute, June 13, 2025.

"The Reconciliation Bill Eliminates Long-Standing State Flexibility to Operate Marketplaces and Regulate Private Health Insurance" (with Christen Linke Young, Sabrina Corlette, Ellen Montz, and Claire O'Brien), CHIR, June 13, 2025.

"The Hidden Costs Of Expanding HSAs In One Big, Beautiful Bill" (with Elena Spatoulas Patel), Taxvox, June 5, 2025.

"The Sleeper Provision in the Reconciliation Bill That Could Hobble the ACA Marketplaces" (with Christen Linke Young), CHIR, May 19, 2025.

"The Pointless Proliferation Of Tax-Preferred Health Spending Arrangements, Part 2: The Landscape" (with Claire O'Brien and Rachael Totz), May 2, 2025.

"The Pointless Proliferation Of Tax-Preferred Health Spending Arrangements, Part 1: The Landscape" (with Claire O'Brien and Rachael Totz), May 1, 2025.

Comment Letter on the Marketplace Integrity and Affordability Rule (with Christen Linke Young and Sabrina Corlette), April 11, 2025.

"Recent Federal Marketplace Proposal Imposes New Requirements for States and Consumers" (with Sabrina Corlette), State Health and Value Strategies, March 14, 2025.

"HHS Proposes To Restrict Marketplace Eligibility, Enrollment, And Affordability In First Major Rule Under Trump Administration (Part 2)" (with Katie Keith), Health Affairs Forefront, March 13, 2025.

"HHS Proposes To Restrict Marketplace Eligibility, Enrollment, And Affordability In First Major Rule Under Trump Administration (Part 1)" (with Katie Keith), Health Affairs Forefront, March 12, 2025.

"Final 2026 Notice Of Benefit & Payment Parameters: Marketplace Standards And Insurance Reforms" (with Sabrina Corlette), Health Affairs Forefront, February 4, 2025.

"Considerations for a Potential State-Based Marketplace in Texas" (with Jennifer M. Haley, Claire O'Brien, Rachael Totz, Zachary Sherman), Urban Institute, December 5, 2024.

Comment Letter on Proposed Notice of Benefit and Payment Parameters for 2026 (with Sabrina Corlette), November 12, 2024.

"The Proposed 2026 Payment Notice: Implications for States" (with Sabrina Corlette and Tara Straw), State Health and Value Strategies, November 5, 2024.

"Proposed 2026 Payment Notice: Marketplace Standards and Insurance Reforms" (with Sabrina Corlette), Health Affairs Forefront, October 8, 2024.

"Delays In Extending Enhanced Marketplace Subsidies Would Raise Premiums and Reduce Coverage" (with Sabrina Corlette and Claire O'Brien), Health Affairs Forefront, September 6, 2024.

"Current Considerations for State Reinsurance Programs" (with Sabrina Corlette and Claire O'Brien), State Health and Value Strategies, September 6, 2024.

"Who Benefits from Enhanced Premium Tax Credits in the Marketplace?" (with Jessica Banthin, Matthew Buettgens, and Michael Simpson), Urban Institute, June 17, 2024.

"State Variation in Medicaid and CHIP Unwinding for Children and Adults as of November 2023" (with Matthew Buettgens, Jameson Carter, Jessica Banthin), Urban Institute, May 2, 2024.

Public Comment on Proposed Rulemaking to Expand Tax Data Sharing with the US Census Bureau (with co-authors), April 30, 2024.

"The Final 2025 Notice of Benefit and Payment Parameters: Implications for States" (with Sabrina Corlette), State Health and Value Strategies, April 12, 2024.

"Final 2025 Payment Notice: Marketplace Standards and Insurance Reforms" (with Sabrina Corlette), Health Affairs Forefront, April 8, 2024.

"Expanding Health Coverage through Marketplace Facilitated Enrollment Programs" (with Claire O'Brien), Urban Institute, December 12, 2023.

"The Proposed 2025 Notice of Benefit and Payment Parameters: Implications for States" (with Sabrina Corlette), State Health and Value Strategies, December 1, 2023.

"Proposed 2025 Payment Rule: Marketplace Standards and Insurance Reforms" (with Sabrina Corlette), Health Affairs Forefront, November 20, 2023.

Comment Letter on Proposed Regulations Addressing Tax Treatment of Fixed Indemnity Insurance and Similar Products (with Chye-Ching Huang), February 24, 2023.

"Medicaid Forward in New Mexico" (with Matthew Buettgens, Jessica Banthin, Urmi Ramchandani, and Michael Simpson), Urban Institute, August 25, 2023.

"The Basic Health Program: Considerations for States and Lessons from New York and Minnesota" (with Sabrina Corlette, Erik Wengle, Rachel Swindle), Urban Institute, April 26, 2023.

"Secrets to a Successful Unwinding: Actions State-Based Marketplaces and Insurance Departments Can Take to Improve Coverage Transitions" (with Sabrina Corlette and Tara Straw), State Health and Value Strategies, February 24, 2023.

"Proposed 2024 Payment Rule, Part 3: Exchange Operational Standards And APTC Policies," Health Affairs Forefront, December 16, 2022.

"Supporting Continuity of Coverage from Medicaid into the Marketplace: Unwinding Considerations for States" (with Sabrina Corlette), State Health and Value Strategies, November 9, 2022.

"Ensuring Continuity of Care for Individuals Transitioning from Medicaid to Marketplace: Post-PHE Considerations for States" (with Sabrina Corlette), State Health and Value Strategies, July 20, 2022.

"Delays Extending the American Rescue Plan's Health Insurance Subsidies Will Raise Premiums and Reduce Coverage" (with Sabrina Corlette), Health Affairs Forefront, July 5, 2022.

"Using Marketplace Retroactive Coverage to Facilitate Continuous Enrollment in the Public Health Emergency Unwinding" (with Joel Ario and Tara Straw), State Health and Value Strategies, June 15, 2022.

Comment Letter on Treasury Proposed Regulations Addressing the "Family Glitch" (with Chye-Ching Huang and Michael Kaercher), June 6, 2022.

"Proposed Regulations Fixing the 'Family Glitch' – Considerations for States," State Health and Value Strategies, May 6, 2022.

"Georgia's Plan to Exit Marketplace Will Leave More People Uninsured, Should Be Revoked" (with Tara Straw), Center on Budget and Policy Priorities, December 17, 2021.

"How Auto-Enrollment Can Achieve Near-Universal Coverage: Policy and Implementation Issues" (with Linda J. Blumberg and John Holahan), Commonwealth Fund, June 10, 2021

"The American Rescue Plan's Premium Tax Credit Expansion—State Policy Considerations" (with Dan Meuse), Brookings Institution and State Health and Value Strategies, April 19, 2021.

"Notice Template Regarding Reconciliation Relief under Section 9662 of the American Rescue Plan," State Health and Value Strategies, April 13, 2021.

"Supporting Insurance Affordability with State Marketplace Subsidies" (with Sonia Pandit), State Health and Value Strategies, March 11, 2021.

"The ACA in Maryland: A Case Study in Successful Bipartisan Innovation" (with John-Pierre Cardenas), State Health and Value Strategies, January 2021.

"COVID-19 and MLR Guidance on Risk Corridor Recoveries: State Options for Restoring Funds to Policyholders and the Public" (with Sabrina Corlette), State Health and Value Strategies, October 27, 2020.

"Georgia's latest 1332 proposal continues to violate the ACA" (with Christen Linke Young), Brookings Institution, September 1, 2020

"CMS Premium Rebate Guidance – Implications for States and Other Stakeholders," State Health and Value Strategies, August 14, 2020.

"CARES Act Unemployment Insurance Expansion and Stimulus Payments – Considerations for States," State Health and Value Strategies, April 17, 2020.

Comments submitted on HHS Notice of Benefit and Payment Parameters for 2021 (with Christen Linke Young), Brookings Institution, March 2, 2020.

"Grace Periods: A Good Start But Not Sufficient" (with Joel Ario and Sabrina Corlette), State Health and Value Strategies, Updated April 15, 2020.

"Georgia's 1332 waiver violates the ACA and cannot lawfully be approved" (with Christen Linke Young), Brookings Institution, January 23, 2020

"The Trump Administration's Final HRA Rule: Similar to the Proposed but some Notable Choices" (with Christen Linke Young and Matthew Fiedler), Brookings Institution, June 14, 2019.

"Application Template for Section 1332 Reinsurance Waiver," Updated Feb. 19, 2019, Available at www.shvs.org.

"Indexing Provision in HHS Proposed Marketplace Regulations is not just Bad Policy, but could be Vulnerable to Legal Challenge," Brookings Institution, Feb. 14, 2019.

"Evaluating the Administration's Health Reimbursement Arrangement Proposal" (with Christen Linke Young and Matthew Fiedler), Brookings Institution, Dec. 11, 2018.

"State Individual Mandates: Hows and Whys," Brookings Institution, Oct. 28, 2018.

"Model Legislation for State Individual Mandate," Updated Feb. 21, 2018, Available at www.shvs.org.

"Recommended Actions for States to Protect their Health Insurance Markets" (with Jeanne Lambrew, Aviva Aron-Dine, Sam Berger, and Matthew Fiedler), Health Affairs Blog, Jan. 22, 2018.

"Elements of a Compromise on State Innovation Waivers" (with Stuart M Butler), Brookings Institution, Sep. 19, 2017.

"Changes to State Innovation Waivers in Senate's "Skinny Bill" Still Raise Serious Concerns," Brookings Institution, Aug. 11, 2017.

"Revised Senate Health Care Bill Doesn't Fix Concerns about State Innovation Waivers," Brookings Institution, July 25, 2017.

"Changes to State Innovation Waivers in the Senate Health Bill Undermine Coverage and Open the Door to Misuse of Federal Funds," Brookings Institution, June 23, 2017.

"Want States to Have Health Reform Flexibility? The ACA Already Does That" (with Stuart M Butler), Brookings Institution, June 21, 2017.

"By Failing to Account for Regional Cost Differences, the GOP Health Care Plan Hurts Red States," Vox, Mar. 20, 2017.

"Lincoln-Kyl Estate Tax Amendment is Both Unnecessary and Unaffordable" (with Chuck Marr), Center on Budget and Policy Priorities (CBPP), Updated Apr. 10, 2009.

"Promoting State Budget Accountability through Tax Expenditure Reporting" (with Nicholas Johnson and Jeremy Koulish), CBPP, Apr. 9, 2009

"High-Income Households Would Face Lower Tax Burden under Obama Budget than in Clinton Years, When Economy Performed Well" (with Chuck Marr), CBPP, Mar. 26, 2009.

"History Contradicts Claim that President's Budget Would Harm Small Business Job Creation" (with Chuck Marr), CBPP, Mar. 26, 2009.

"Limiting Itemized Deductions for Upper-Income Taxpayers Would Have Little Effect on Small Business, Charities, Housing" (with James R. Horney), CBPP, Mar. 12, 2009

"Very Few Small Business Owners Would Face Tax Increases under President's Budget" (with Chye-Ching Huang and James R. Horney), CBPP, Feb. 28, 2009

"Recovery Act Provides Much-Needed, Targeted Medicaid Assistance to States" (with Iris J. Lav, Edwin Park, and Matt Broaddus), CBPP, Feb. 13, 2009.

"Senate's Cuts to 'Fiscal Stabilization Fund' Weaken Stimulus in Economic Recovery Bill" (with Joan Huffer), CBPP, Feb. 10, 2009.

"Recovery Bill's 'Fiscal Stabilization Fund' is Important to Protecting Education and Averting State and Local Budget Cuts That Would Further Weaken the Economy" (with Joan Huffer), CBPP, Feb. 4, 2009.

"Preliminary Analysis of Medicaid Assistance for States in the Senate Economic Recovery Package" (with Matt Broaddus, Iris J. Lav, and Edwin Park), CBPP, Updated Jan. 30, 2009.

"Senate's Medicaid Assistance for States Less Targeted than in House Recovery Bill" (with Matt Broaddus, Iris J. Lav, and Edwin Park), CBPP, Updated Jan. 30, 2009.

"The Impact of State Income Taxes on Low-Income Families in 2007" (with Andrew Nicholas), CBPP, Oct. 29, 2008.

"State Earned Income Tax Credits: 2008 Legislative Update" (with Jeremy Koulish), CBPP, Updated Oct. 8, 2008.

"House Stimulus Plan Effectively Targets Fiscal Relief to States" (with Iris Lav and Edwin Park) CBPP, Sep. 26, 2008.

"Reforming Mississippi's Tax System for a Prosperous Future," Testimony to Mississippi House of Representatives Tax Study Subcommittee, Jackson, MS, Aug. 14, 2008.

"States Can Opt Out of the Costly and Ineffective 'Domestic Production Deduction' Corporate Tax Break" (with Nicholas Johnson and Katherine Lira), CBPP, July 29, 2008.

"Economic Data Can Be Used to Target State Fiscal Relief Effectively" (with Iris Lav and Elizabeth McNichol), CBPP, Updated July 9, 2008.

"Eliminating Louisiana's Income Tax Will Harm the State's Budget Outlook, Competitiveness" (with Elizabeth McNichol and Iris Lav), CBPP, Updated May 12, 2008.

"How Much Would a State Earned Income Tax Credit Cost in 2009?" (with Jeremy Koulish), CBPP, May 5, 2008.

"A Simple, Inexpensive Way for Maryland to Protect Certain Low-Income Workers from Tax Increases" (with Nicholas Johnson), CBPP, Oct. 26, 2007.

"Options for Protecting Maryland's Low- and Moderate-Income Families from Regressive Tax Increases" (with Nicholas Johnson), CBPP, Oct. 26, 2007.

"Hawaii's Income Tax on the Working Poor: A Post-Session Update," CBPP, July 18, 2007.

"The Impact of State Income Taxes on Low-Income Families in 2006," CBPP, Mar. 27, 2007.

"A State EITC Is a Cost-Effective Way to Ease Hawaii's High Income Tax Burden on the Poor," CBPP, Feb. 15, 2007.

"How Much Would a State Earned Income Tax Credit Cost in 2008?" (with Sloane Kuney and David Super), CBPP, Feb. 8, 2007.

"Together, State Minimum Wages and State Earned Income Tax Credits Make Work Pay" (with Nicholas Johnson), CBPP, Updated Nov. 20, 2006.

"The Impact of Hawaii's Income Tax on Low-Income Families: An Update" (with Nicholas Johnson), CBPP, May 4, 2006.

"A Dubious Honor for Hawaii" (with Nicholas Johnson), CBPP, Updated Apr. 17, 2006.

"The Impact of State Income Taxes on Low-Income Families in 2005" (with Nicholas Johnson), CBPP, Feb. 22, 2006.

"How Much Would a State Earned Income Tax Credit Cost?" CBPP, Feb. 1, 2006.