|  |  |
|---|---|
| CITY OF COLUMBUS *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 26-cv-02215 |
| ROBERT F. KENNEDY JR. *et al.*, | |
| *Defendants.* | |

**DECLARATION OF FIKIRTE WAGAW, MPH**

I, Fikirte Wagaw, MPH, declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1.      I am a resident of the City of Chicago ("City" or "Chicago") in the State of Illinois. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I currently serve as the Acting Commissioner of the Chicago Department of Public Health ("CDPH"). I have held this position since May 2026. I also served as the Acting Commissioner from August 2023 to December 2023. Before becoming Acting Commissioner, I served as the First Deputy Commissioner for CDPH. In that role, I acted as the Chief Operating Officer for CDPH, conducting direct executive-level oversight of strategic planning, financial operations, facilities management, human resources, labor relationships, contracts, and cross-departmental initiatives. Previously, I served as the Director of Special Projects for the Alliance of Chicago Community Health Services, now known as "AllianceChicago," where I led strategic initiatives advancing research and public health integration for Federally Qualified Health Centers

(FQHCs) who were members of this health center controlled network. And from 1997 to 2009, I served in various roles for CDPH's Division of STD/HIV/AIDS.

3. I have a Bachelor of Arts in Psychology from the University of Michigan. I received Master of Public Health degree in Health Policy and Administration from the University of Illinois at Chicago.

4. As Acting Commissioner of CDPH, I make strategic decisions, in collaboration with the Mayor's Office and stakeholders across the City, to manage public health threats; design and deliver disease control services; and protect the food, air, and environment for 2.7 million Chicago residents.[1] I serve as a liaison and subject matter expert on all related policy matters and use of authorities and resources to promote and protect public health. I have built and currently manage an executive team of ten professionals, a budget of $335M, and approximately 600 employees, with a dedication to sustaining a strong public health workforce and capacity.

5. CDPH's overarching mission is to work with communities and partners to create an equitable, safe, resilient, and healthy Chicago. While Chicago does not operate a fully integrated health and hospital system, the Department operates seven mental health centers that provide low-barrier services to uninsured and underinsured Chicago residents, four immunization clinics, and three clinics that provide free testing and treatment for sexually transmitted infections. The City also provides certain at-home and in-field health programs, such as nursing home support for pregnant people and newborn babies and directly observed therapy for tuberculosis. Additionally, the City funds and staffs a network of Women, Infants, and Children (WIC) clinics providing nutrition counseling and supplemental food to pregnant, post-partum and breastfeeding women, their infants and children. Collectively, these clinics and services serve thousands of uninsured and

---

[1] U.S. Census Bureau QuickFacts (V2025).
https://www.census.gov/quickfacts/fact/table/chicagocityillinois/HSG010224.

underinsured City residents and support the City's safety net for health-related services. Each of these clinics faces greater demand when there is an increase in either the health needs of Chicago residents or in the number of uninsured or underinsured individuals who cannot obtain those services or other forms of health care elsewhere.

6.      I am deeply concerned with CMS's final rule titled "Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2027; and Basic Health Program" and its harmful impacts on our residents. In Chicago, nearly one in ten residents is uninsured.[2] The Rule would significantly increase barriers to coverage and the number of uninsured residents, increase health care costs for residents, and further burden the City's health care safety net. Under the guise of increased "integrity" and "affordability," the Rule would implement exactly the opposite. For example, the Rule imposes paperwork barriers on individuals enrolling in the Affordable Care Act Marketplaces by cutting off eligibility for subsidies for individuals with old tax debts, requiring audits of low-income enrollees or of enrollees for whom the IRS fails to report relevant tax data, and imposing new verification requirements for enrollees in monthly Special Enrollment Periods. This will make affordable insurance harder to obtain for many Chicago residents. The monthly Special Enrollment Periods in particular are a safeguard for people and families who experience unexpected life events.

7.      Per our Department's analysis of CMS data, 103,513 Chicagoans are enrolled in Marketplace coverage, and the overwhelming majority (approximately 90,024 residents) receive premium tax credits, or subsidies from the federal government, to make their coverage more affordable.[3] The Inflation Reduction Act of 2022 enhanced these subsidies through the end of 2025

---

[2] Chicago Health Atlas. Uninsured rate. https://chicagohealthatlas.org/indicators/UNS?tab=map.
[3] Centers for Medicare and Medicaid Services. 2026 Marketplace Open Enrollment Period Public Use Files. CMS.gov. https://www.cms.gov/data-research/statistics-trends-reports/marketplace-products/2026-marketplace-open-enrollment-period-public-use-files.

and the average tax credit among Chicagoans enrolled in Marketplace coverage is $426.[4] With the end of these subsidy enhancements after 2025 leading to higher monthly premiums, the Rule will compound the effect on Marketplace enrollees by driving younger and healthier people out of coverage and worsening the risk pool for those who remain in coverage. This alarming rise in premium costs would lead to potentially thousands of Chicago residents losing health insurance, and thus losing access to preventative services to keep them out of the hospital, primary care, mental health services, and medications, in addition to causing unnecessary and unsafe disruption to residents undergoing active treatment.

8. Residents who lose health coverage would likely delay essential visits – including preventative screenings, primary care appointments, and recommended treatments – until conditions worsen and emergency care and hospital services are needed. This would lead to later-stage disease detection, higher risks of complications exacerbated by untreated chronic diseases, and increased utilization of Chicago's emergency departments and hospitals – increasing uncompensated care and further straining safety net providers in our City beyond repair.

9. The higher the uninsured and underinsured rate, the more that the clinics operated by CDPH and its community-based partners will necessarily have to provide forms of low-barrier and reduced-cost care to patients. In that event, Chicago either must provide the Department and its partners with more funding, or the Department and its partners must decrease the services that they provide. Furthermore, the Department works collaboratively with the State of Illinois, Cook County, and service providers across the City to strengthen resource navigation for Chicago residents who are uninsured and underinsured. The Rule's effects will increase the burden on the

---

[4] *Id.* 2025 Marketplace Open Enrollment Period Public Use Files. 2025 OEP ZIP Code-Level Public Use File. CMS.gov. Accessed on June 1, 2026 from https://www.cms.gov/data-research/statistics-trends-reports/marketplace-products/2025-marketplace-open-enrollment-period-public-use-files.

City to coordinate essential resources and services across agencies and sectors to ensure that the hardest-to-reach communities receive care.

10. The Department also partners with all hospitals and healthcare organizations in the City through the Hospital Preparedness Program, which supports the Chicago Health System Coalition for Preparedness and Response. This program includes coordination of all thirty-four (34) acute care and specialty hospitals, 136 long term care facilities, 75 dialysis centers, all Federally Qualified Health Centers, and other organizations that provide health care services within the City.

11. This program includes safety net hospitals which, as part of their participation, demonstrate their ability to react to patient surges and complete accreditation requirements. Safety net hospitals provide healthcare for individuals regardless of their insurance status or ability to pay, and typically serve a higher proportion of uninsured, low-income, and other vulnerable individuals than do other hospitals.

12. Chicago's partnership with these hospitals includes financial support such as situational awareness communication, support for data collection and reporting, disaster exercises, clinical trainings, and providing supplies, such as personal protective equipment, mechanical ventilators, and radios. In particular, this program benefits patients during surge events, like the COVID-19 pandemic and other public health emergencies.

13. The Chicago Fire Department provides ambulance transportation services to its residents, including its uninsured and underinsured residents, and regardless of income and insurance status. Chicago generally seeks reimbursement for ambulance services from the patient or, if applicable, the patient's insurer. However, Chicago usually does not receive full reimbursement for ambulance services from its uninsured and underinsured residents. For example, based on our review of Chicago Fire Department ambulance records, in 2024, the City provided 56,556 ambulance transports to Chicago residents for whom no insurance was identified. The

5

City's net charges for these patients were $173,672,181, but the City collected just $5,647,941 – a loss of over $168 million. The Rule would only exacerbate this loss further, and other big cities and jurisdictions will also likely experience similar shortfalls.

14. In Chicago's experience, the uninsured and underinsured disproportionately rely on ambulance services for transport to the emergency department. Such individuals, for instance, are more likely to wait until their conditions become more severe and then use ambulance services to receive necessary care. A higher number of uninsured and underinsured individuals will therefore result in more ambulance transports for which Chicago does not receive reimbursement and thus must make up for the shortfall in its budget. Aside from these budgetary impacts, Chicago is harmed by the need to care for a population that is increasingly uninsured. When individuals cannot seek medical treatment, they are necessarily less healthy, less productive, and less able to participate in city life – all of which has cascading impacts throughout the City's programs and the community.

15. We are alarmed by the potential harms of this Rule on our City's residents, including our most vulnerable communities for which other forms of health coverage are out of reach. The Rule would significantly degrade access, affordability, and the integrity of Marketplace coverage for our residents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 4, 2026

Chicago, Illinois

_____
Fikirte Wagaw, MPH

6