## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| CITY OF COLUMBUS ET AL., | * |
| Plaintiffs, | * |
|  | * |
| v. | * |
|  | *  Civil No. 26-2215-BAH |
| ROBERT F. KENNEDY, JR. ET AL., | * |
| Defendants. | * |
|  | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Last year, a nearly identical set of plaintiffs brought suit against an identical set of defendants seeking to preliminarily stay and ultimately vacate certain changes to federal regulations enforcing the Patient Protection and Affordable Care Act (the "ACA," or the "Act"). This year, Plaintiffs again bring suit under the Administrative Procedure Act ("APA") seeking to prevent Defendants from implementing changes to ACA regulations. ECF 1 (complaint). These changes, some of which are materially identical to changes that Defendants unsuccessfully proposed last year, are embodied in the "Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2027; and Basic Health Program" (the "Rule"), which is set to take effect on July 20, 2026. 91 Fed. Reg. 29,256 (May 20, 2026). Plaintiffs—three cities, one county, a coalition of doctors, and an interest group representing small business owners— allege they will shoulder increased costs or see their members lose health insurance coverage if these changes are implemented. *See generally* ECF 1; ECF 17 (motion to stay).

As Plaintiffs observe, many of the Rule's provisions are already familiar to this Court. *See City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025); *City of Columbus v. Kennedy*,

Civ. No. 25-2114-BAH, --- F. Supp. 3d --- , 2026 WL 1707125 (D. Md. June 12, 2026). Plaintiffs argue, however, that Defendants seek to break new ground with several provisions designed to steer enrollees to far less generous coverage. *See* ECF 17. Defendants, the Secretary of the United States Department of Health and Human Services ("HHS") and those in his employ charged with crafting and implementing the Rule, counter that the challenged provisions are designed to help enrollees avoid inadvertently incurring unexpected costs for tax credits and benefits for which they are ineligible, among other reasons. *See* ECF 23 (opposition to the motion to stay).

Upon consideration of the parties' filings and after a robust oral argument on the motion, the Court **GRANTS** Plaintiffs' motion and enters a **STAY** enjoining certain provisions of the Rule from taking effect on July 20, 2026. The Court finds that Plaintiffs have met their burden of showing that they are likely to succeed on the merits of their challenges to certain provisions of the Rule. As to those provisions, Plaintiffs have also shown they will face irreparable harm if the challenged portions of the Rule are not enjoined. Finally, the balance of equities and the public interest weigh in favor of a stay. This memorandum opinion is offered to explain the Court's reasoning. In the interest of judicial economy, where the Court reaches the same conclusion as it did on issues presented by the motion to stay resolved in last year's related case, it repeats its prior analysis, sometimes verbatim. *Cf. Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66, 81 (D. Md. 2025). Likewise, a reader familiar with that related case will recognize much of the background expounded below. However, the Court stresses that it reaches all conclusions in this matter anew, after a thorough review of this new record and after careful consideration of the briefs filed and oral argument in this case.

## I.    BACKGROUND

In 2010, Congress enacted the ACA "to increase the number of Americans covered by health insurance and decrease the cost of health care." *NFIB v. Sebelius*, 567 U.S. 519, 538 (2012).

"Prior to the enactment of the ACA, individual health insurance markets were dysfunctional." *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 778 (D. Md. 2020) ("*City of Columbus I*").[1] The ACA "adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market." *King v. Burwell*, 576 U.S. 473, 478–79 (2015).[2] Individual market health plans are referred to as qualified health plans ("QHPs"). Individuals primarily enroll in QHPs for a given benefit year during an annual open enrollment period, or under specified special enrollment periods ("SEPs"). 42 U.S.C. § 18031(c)(6). Ultimately, the ACA "aims to achieve systemic improvements in the individual health insurance market by means of certain key reforms[.]" *City of Columbus I*, 453 F. Supp. 3d at 778.

First, the ACA's "guaranteed issue" requirement specifies that every "health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every employer and individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), subject to exceptions specified in the statute, such as limiting sign-ups to the aforementioned enrollment periods, *id.* § 300gg-1(b); *see Me. Cmty. Health Options v. United States*, 590 U.S.

---

[1] The Court frequently cites two prior opinions written by Judge Chasanow, which included the same city plaintiffs involved in this case. One opinion is from 2020 and addresses a motion to dismiss. *See City of Columbus*, 453 F. Supp. 3d at 770 ("*City of Columbus I*"). The other opinion, from the same case, addresses the parties' cross-motions for summary judgment. *See City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021) ("*City of Columbus II*"). The undersigned has also issued two decisions in the related case regarding the 2025 rule, which are also cited throughout this opinion. *See City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025) ("*City of Columbus III*") (addressing Plaintiffs' motion for a stay); *City of Columbus v. Kennedy*, Civ. No. 25-2114-BAH, --- F. Supp. 3d ---, 2026 WL 1707125 (D. Md. June 12, 2026) ("*City of Columbus IV*") (addressing the parties' cross-motions for summary judgment).

[2] "Individual health insurance is insurance that individuals purchase themselves, in contrast to, for example, joining employer-sponsored group health plans." *City of Columbus I*, 453 F. Supp. 3d at 778 (citing ECF No. 44, ¶ 32).

3

296, 301 (2020). "In other words, the Act 'ensure[s] that anyone can buy insurance.'" *Me. Cmty. Health Options*, 590 U.S. at 301 (quoting *King*, 576 U.S. at 493).

Second, the ACA's "guaranteed renewability" provision mandates that "the issuer must renew or continue in force such coverage at the option of the plan sponsor or the individual." 42 U.S.C. § 300gg-2(a). This provision, too, is subject to statutory exceptions, including an exception for persons who have failed to pay premiums owed on their policy. *Id.* § 300gg-2(b)(1); *see also id.* §§ 300gg-12, 300gg-42.

Third, the ACA requires all QHPs to cover "essential health benefits" and limits cost-sharing (in the form of deductibles and co-pays) by enrollees for these essential health benefits. 42 U.S.C. § 300gg-6(a); *id.* § 18022(a)(2). The limitation on cost-sharing is adjusted each year by a "premium adjustment percentage," which is "the percentage (if any) by which the average per capita premium for health insurance coverage in the United States for the preceding calendar year . . . exceeds such average per capita premium for 2013," the year before the ACA's reforms to the individual health insurance market went into effect. *Id.* § 18022(c)(1), (4).

Fourth, the ACA "requires the creation of an 'Exchange' in each State where people can shop for insurance, usually online." *King*, 576 U.S. at 479 (quoting 42 U.S.C. § 18031(b)(1)); *see also Me. Cmty. Health Options*, 590 U.S. at 301. The Act "gives each State the opportunity to establish its own Exchange, but provides that the Federal Government will establish the Exchange if the State does not." *King*, 576 U.S. at 479; *see also* 42 U.S.C. §§ 18031, 18041. The purpose of the Exchange is to serve as a "marketplace that allows people to compare and purchase" ACA-compliant plans.[3] *King*, 576 U.S. at 479.

---

[3] As Plaintiffs describe, "[s]ome states have elected to create Exchanges themselves (state-based Exchanges or SBEs), as is the case in Maryland and Illinois, while others have created Exchanges that operate on the federal *Healthcare.gov* platform (state based Exchanges on the federal platform,

4

Fifth, exchange plans are categorized into different "metal tiers"—bronze, silver, gold, and platinum—based on their "level of coverage." 42 U.S.C. § 18022(d) (setting the "level of coverage" for each of the plan types). For example, "silver plans," must have an actuarial value of 70%, meaning the plan is designed such that the issuer will pay around 70% of covered medical expenses, and the enrollee will pay the remaining 30% of expenses through out-of-pocket spending.[4] *Id.* Because actuarial predictions may be imprecise, the ACA specifies that the Centers for Medicare & Medicaid Services ("CMS"), an agency within HHS, may "provide for a de minimis variation . . . to account for differences in actuarial estimates." *Id.* § 18022(d)(3). In addition to the metal levels of coverage, the ACA permits insurers to offer "catastrophic plans" that do not cover any benefits, with the exception of three primary care visits and certain preventive services, until the enrollee reaches a statutory cost-sharing limitation—i.e., the out-of-pocket maximum—in a given year. *Id.* § 18022(e).

Sixth, the ACA "seeks to make insurance more affordable by giving refundable tax credits to individuals[.]" *King*, 576 U.S. at 482 (citing 26 U.S.C. § 36B). These "premium tax credits" ("PTCs") vary depending on an individual's income—individuals who earn more must pay more toward the cost of their monthly premium—but are generally pegged to the cost of the so-called "benchmark silver plan," or the second-lowest-cost silver plan offered within a market. *See, e.g.*, 26 U.S.C. § 36B(b)(3)(B)–(C). The ACA initially made these tax credits available to individuals

---

or SBE-FPs). The Exchange in other states, including Arizona, Ohio, and Wisconsin, is operated by the Centers for Medicare & Medicaid Services (CMS) (federally facilitated Exchange, or FFE)." ECF 17-1, at 12 (citing CMS, *Consumer Info. & Ins. Oversight, State Based Exchanges*, https://perma.cc/L4DF-DQYJ); *see also* ECF 23, at 11.

[4] Bronze, silver, gold, and platinum plans are designed to provide benefits that are actuarially equivalent to 60%, 70%, 80%, and 90%, respectively, of the full value of benefits under the plan. 42 U.S.C. § 18022(d)(1).

with incomes between 100% and 400% of the federal poverty level ("FPL").  26 U.S.C. § 36B(c)(1)(A).  However, during the COVID-19 pandemic, Congress—via the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 ("ARPA")—temporarily increased the generosity of the ACA's premium subsidies and expanded subsidy eligibility to enrollees with household incomes above 400% of the FPL.  The 2022 Inflation Reduction Act, Pub. L. No. 117-169, 136. Stat. 1818 ("IRA"), extended these enhanced subsides through 2025.

PTCs are claimed on an individual's tax return after the end of the year and are paid by the Internal Revenue Service ("IRS").  26 U.S.C. § 36B(h).  Rather than an enrollee paying the entire insurance premium up front and then later claiming a credit toward that amount on the taxpayer's tax return, HHS—the federal agency that largely administers the ACA—may also make an advance payment of the premium tax credit amount directly to the enrollee's insurance provider.  42 U.S.C. §§ 18081, 18082.  Such credits are known as advance premium tax credits ("APTCs").  "APTCs act as a subsidy for low-income individuals who could not afford to purchase insurance outright."  *City of Columbus II*, 523 F. Supp. 3d at 741.  CMS is responsible for determining whether individuals meet the statutory eligibility requirements for APTCs, as well as for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances."  42 U.S.C. § 18081(f)(1)(B).  The amount of the APTC owed ultimately depends on the individual's income at the end of the year.  Thus, individuals must file a federal tax return each year to "reconcile" the APTCs they received with the PTC amount they qualify for based on their actual income during the applicable tax year.  *See* 26 U.S.C. § 36B(f)(1).

"Each year, HHS promulgates rules pursuant to its rulemaking authority under the ACA and the Public Health Service Act ('PHS Act').  Such rules are the mechanisms by which HHS

6

makes ongoing adjustments to the regulations and processes surrounding ACA insurance markets." *City of Columbus II*, 523 F. Supp. 3d at 741.

## A.    The 2025 Rule

On March 19, 2025, CMS issued a Notice of Proposed Rulemaking for a proposed rule that would implement "several regulatory actions aimed at strengthening the integrity of the [ACA] eligibility and enrollment systems to reduce waste, fraud, and abuse." 90 Fed. Reg. 12,942 (Mar. 19, 2025). CMS received more than 26,000 comments on that rule. After reviewing those comments and revising certain provisions of the proposed rule, HHS issued (and publicly released) the rule on June 20, 2025, and it was published in the Federal Register on June 25. 90 Fed. Reg. 27,074. The rule was set to take effect on August 25, 2025. *Id.* at 27,075. As noted, a nearly identical set of plaintiffs brought suit under the APA, alleging that certain provisions of the rule were contrary to law and that those provisions, plus others, were arbitrary and capricious. *See City of Columbus III*, 796 F. Supp. 3d at 134. The plaintiffs there filed a motion for preliminary relief, in which they sought a stay of the August 25, 2025 effective date of the challenged provisions under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction. *Id.* at 134–35. The Court granted the plaintiffs' motion in part, staying the effective date of several provisions of the Rule. *Id.* at 135.

The Defendants appealed the Court's decision on the motion to stay to the United States Court of Appeals for the Fourth Circuit, arguing that Plaintiffs lacked standing and that the Court erred in finding that Plaintiffs demonstrated a likelihood of success on their challenges to two provisions of the rule. *See* 4th Cir. Case No. 25-2012, at ECF 28. In the interim, the parties jointly moved to proceed on the merits before the Court, and in June of 2026, the Court resolved the parties' cross-motions for summary judgment, ultimately vacating certain provisions of the 2025

7

rule and allowing one challenged provision to take effect according to its terms. *See City of Columbus IV*, 2026 WL 1707125, at *1. On June 23, 2026, the Fourth Circuit granted the parties' motion to voluntarily dismiss the appeal of the stay.[5] *See* D. Md. Civ. No. 25-2114, at ECFs 77 and 78. That same month, Plaintiffs filed this new case challenging Defendants' 2026 iteration of the rule, which was reassigned to the undersigned shortly thereafter. *See* ECF 1.

### B.    The 2026 Rule

On February 11, 2026, Defendants issued a Notice of Proposed Rulemaking for a proposed rule including "provisions to improve implementation of the Patient Protection and Affordable Care Act" with the goal of "providing quality, more affordable coverage to consumers while minimizing administrative burden and ensuring program integrity." 91 Fed. Reg. 6,292, at 6,292–93 (Feb. 11, 2026). The notice explained that the proposed changes were "also intended to enhance the role of States in these programs, provide issuers and States with additional flexibilities, reduce unnecessary regulatory burden on interested parties, and improve affordability." *Id.* at 6,293. After notice and comment on the proposed rule, the final rule was published in the Federal Register on May 20, 2026. *See* 91 Fed. Reg. 29,526. The Rule is set to take effect on July 20, 2026, *id.*, although some of its provisions will not begin until plan year 2027 or later.

As relevant to Plaintiffs' motion, the Rule implements policies concerning the requirement that recipients of APTCs file a federal tax return and reconcile those APTCs with the recipient's PTC amount, *id.* at 29,606–13, and the procedures HHS uses to verify enrollees' eligibility for APTCs, *id.* at 29,613–23. The Rule additionally makes changes to the procedures governing verification of eligibility for SEPs, *id.* at 29,631–33, cost-sharing limitations for bronze plans, *id.*

---

[5] Defendants indicated in their briefing that they were considering appealing the Court's resolution of the cross-motions for summary judgment in the related case. *See* ECF 23, at 28. Defendants filed a notice of appeal in that case on July 16, 2026.

8

at 29,690–708, and the expansion of a hardship exemption for eligibility in the enrollment of catastrophic plans, *id.* at 29,633–34. The Rule also amends standards for Exchange network adequacy, *id.* at 29,645–49, and eliminates standardized plans and discontinues non-standardized plan limits and exceptions, *id.* at 29,708, 29,720.

## C.     Procedural History

Plaintiffs are three city governments and one county government—the City of Columbus, Ohio; the Mayor and City Council of Baltimore, Maryland; the City of Chicago, Illinois; and Pima County, Arizona (the "Municipal Plaintiffs")—and two nonprofit organizations, Main Street Alliance ("MSA"), a "national network of small businesses," and Doctors for America ("DFA"), an advocacy organization consisting of "member physicians and medical trainees . . . in all 50 states." ECF 1, at 5–7. Plaintiffs seek review of agency action under the APA, claiming that six of the provisions are contrary to law (Count I), and that those same provisions plus six others are arbitrary and capricious (Count II). On June 4, 2026, Plaintiffs filed a motion for preliminary relief, in which they seek a stay of the July 20, 2026 effective date of eight of the challenged Rule provisions under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction. *See* ECF 17. Of the eight provisions Plaintiffs seek to stay, four have been previously addressed by the Court. *See id.*; *City of Columbus III*, 796 F. Supp. 3d at 158 (addressing a provision that would require pre-enrollment eligibility verification for other categories of SEPs); *id.* at 160 (addressing a failure to file and reconcile provision); *id.* at 163 (addressing data-matching and income eligibility verification provisions). Defendants filed an opposition arguing that Plaintiffs lack standing, are not likely to succeed on the merits, fail to establish irreparable harm, and that the balance of the equities and the public interest weigh against preliminary relief. *See* ECF 23. Plaintiffs filed a reply. *See* ECF 26. The Court held a hearing on the motion on July 8, 2026. *See* ECF 19; ECF

9

27. The Court also received and reviewed supplemental briefing. *See* ECF 28 (Defendants' supplement); ECF 29 (Plaintiffs' supplement). The motion is now ripe for decision.

## II.    LEGAL STANDARD

### A.    Section 705 Stay

Section 705 of the APA permits a court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of review proceedings" where "required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *Dist. of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)). A preliminary injunction is warranted when the movant demonstrates four factors: (1) that the movant is likely to succeed on the merits, (2) that the movant will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023). Where the government is a party, the balance of equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The movant must establish all four elements to prevail. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013). A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power [that is] to be granted only sparingly and in limited circumstances." *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001).

### B.    Review Under the Administrative Procedure Act

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." 5 U.S.C. § 706(2)(A). Previously, "[w]hen a challenger assert[ed] that an agency action conflicts with the language of a statute, [the reviewing court] generally appl[ied] the two-step analytical framework set forth in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)." *City of Columbus II*, 523 F. Supp. 3d at 744. *Loper Bright* overturned *Chevron* and changed this Court's role in reviewing an administrative agency's interpretation of a statute. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024). Section 706 of the APA requires courts to decide "'all relevant questions of law' arising on review of agency action." *Id.* at 392 (quoting 5 U.S.C. § 706). "A court may give weight to an agency's authoritative interpretation but ultimately must rule on matters of law." *Molina-Diaz v. Bondi*, 128 F.4th 568, 574–75 (4th Cir. 2025) (first citing *Loper Bright*, at 2262; and then citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Loper Bright*, 603 U.S. at 400–01 ("[A]gencies have no special competence in resolving statutory ambiguities. Courts do.").

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). However, the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Agency action is generally considered arbitrary or capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43.

11

## III.    ANALYSIS

### A.    Standing

Standing is an "irreducible constitutional minimum" of federal jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "The party invoking federal jurisdiction bears the burden of establishing" that it has standing. *Id.* Where a plaintiff lacks standing, "there is no case or controversy for the federal court to resolve." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). Standing "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 472 (1982). Thus, "[f]or a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting *TransUnion*, 594 U.S. at 423).

A plaintiff seeking relief in federal court must establish standing by showing: (1) that it suffered an injury in fact, which is a concrete and particularized harm that is actual or imminent, rather than hypothetical, (2) a causal connection between the injury and the challenged conduct that is fairly traceable to the defendant's actions, and (3) a non-speculative likelihood that the injury will be redressed by a decision in the plaintiff's favor. *See Lujan*, 504 U.S. at 560–6. Only one Plaintiff must have standing for the case to proceed. *See Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 681 (4th Cir. 2020); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

In *City of Columbus III*, Defendants argued that a nearly identical set of plaintiffs lacked standing to challenge the 2025 rule. *See* 796 F. Supp. 3d at 141. The Court there addressed at

length whether MSA and the municipal plaintiffs (excluding Pima County, which was not a plaintiff in that case) had Article III standing. *See id.* at 140–48. And it deferred addressing standing as to DFA given that it determined the other named plaintiffs did possess standing. *See id.* at 141 (citing *Outdoor Amusement Bus. Ass'n, Inc.*, 983 F.3d at 681). At the hearing on the present motion, Defendants emphasized that they were preserving their arguments as to standing, but suggested that such arguments did not materially differ from those advanced in the prior case. Accordingly, the Court adopts its prior reasoning and conclusions regarding the standing of the Plaintiffs in this matter as discussed in that opinion. *See id.* at 140–48. For convenience, however, the Court repeats that analysis below, and clarifies it where necessary.

Defendants argue that each of Plaintiffs' "alleged injuries rests on speculative predictions about the Rule's potential effects on a complex health insurance market and a multi-step chain of possibilities that is unlikely to materialize, much less imminently." ECF 23, at 20. Plaintiffs point out that "[t]his Court has consistently held that individuals who rely on ACA coverage and municipalities that provide safety net care—including many of the exact Plaintiffs here—suffer injury in fact, fairly traceable to agency action and sufficient for purposes of standing." ECF 26, at 4 (first citing *City of Columbus III*, 796 F. Supp. 3d at 146–47; then citing *City of Columbus II*, 523 F. Supp. 3d at 743–44; and then citing *City of Columbus I*, 453 F. Supp. 3d at 779). For the reasons stated below, the Court finds that Plaintiffs have established standing as to MSA and the Municipal Plaintiffs based on the increased premiums and uncompensated care costs that are "predictable results" of the challenged provisions of the Rule. *City of Columbus I*, 453 F. Supp. 3d at 791. The Court does not reach the question of standing for DFA because only one Plaintiff must have standing for the case to proceed. *See Outdoor Amusement Bus. Ass'n, Inc.*, 983 F.3d at

13

681. Because the Court has found that the other Plaintiffs have standing to sue, the Court defers judgment on the question of DFA's standing.

### 1. Main Street Alliance

MSA is a "national network of small businesses, with approximately 30,000 small business members throughout the United States, many of whom rely on the ACA Exchanges for health insurance." ECF 1, at 7. "[A]n association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *see also Hunt v. Wash St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) ("[A]n association has standing to bring suit on behalf of its members."). This is often called "associational" standing, which is a type of representational standing. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 n.3 (4th Cir. 2005). Here, as to MSA, Plaintiffs claim associational standing. For associational standing to exist, an organization must demonstrate that (a) "'its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Hunt*, 432 U.S. at 343).

### i. Member Standing to Sue

MSA bases its associational standing on two members who own or owned small businesses in Wisconsin and are enrolled in a qualified health plan through the ACA's individual Exchange. *See* ECF 17-7 (declaration of Brooke Legler); ECF 17-9 (declaration of Mike Ohlinger). Defendants argue that "the members do not claim that any *specific* challenged Rule provisions would impact them directly or otherwise interfere with their eligibility to remain enrolled in their current Exchange plan." ECF 23, at 21 (emphasis in original). Further, Defendants maintain that "the members' assertion that the Rule's impact on insurance markets more broadly will necessarily

14

cause their or their employees' insurance premiums to increase is wholly speculative." *Id.* Defendants conclude that "MSA has thus failed to establish that the future economic injury its members claim they will suffer as a result of the Rule is 'sufficient[ly] likel[y]' to materialize, let alone imminently so." *Id.* (quoting *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019)).

Plaintiffs respond that the Rule "jeopardizes the business plans of [ ] MSA's members." ECF 26, at 7 (citing ECF 17-9; ECF 17-11 (declaration of Shawn Phetteplace); ECF 17-7). They contend that the Rule "will raise both premiums and out-of-pocket expenses for the MSA members themselves." *Id.* at 7. For example, Mike Ohlinger explains that his family will maintain the same levels of insurance coverage even as the Rule "makes that coverage more expensive, exacerbating healthcare costs that are already 'as much as [their family's] monthly mortgage payments.'" *Id.* (quoting ECF 17-9, at 2–3 ¶¶ 7–9). Brooke Legler similarly notes that she "needs comprehensive health insurance coverage to treat her substantial medical conditions," which the Rule would increase the cost of "to unaffordable levels, threatening her health." *Id.* (citing ECF 17-7, at 2–3 ¶¶ 7–8, 11). Plaintiffs point to the declaration of Jason Levitis, who opines that the Rule "will increase premiums by 1.7 to 2.4 percent," and "those increased costs, in and of themselves, constitute irreparable injury to the members of" MSA. *Id.* at 4 (citing ECF 17-8, at 14 ¶ 34).

Defendants' objections to the MSA members' standing on the basis that "the members do not claim that any *specific* challenged Rule provisions would impact them directly or otherwise interfere with their eligibility to remain enrolled in their current Exchange plan," ECF 23, at 21, appears to be based on an incomplete reading of those declarations. Legler explains in detail her significant underlying condition, the cost of essential medication to treat that condition, and the freedom the ACA gave her to operate her small business while still maintaining affordable health

15

insurance despite her condition. *See* ECF 17-7, at 2 ¶¶ 6–8. Legler states that she "operated [her] business on narrow margins," but the new Rule "will cause [her] health insurance coverage costs to increase to a level that [she] cannot afford." *Id.* at 3 ¶ 11. "These increased costs would have made it impossible for me to continue my business, and would make it more difficult for me to re-enter this line of work," Legler attests. *Id.* Likewise, Ohlinger describes his small business, those who rely on it for quality healthcare, and the significant challenges faced by himself, his family, and his employees as a result of increased costs. ECF 17-9, at 1–3 ¶¶ 4–5, 7–10. For example, Ohlinger and members of his family "are on a NetworkHealth plan through the ACA" receiving "the bronze level of coverage." *Id.* at 2 ¶ 7. The "price hikes" he has experienced in the past year "make it even more improbable that [he and his wife] could afford to sponsor [their] employees' health insurance," and "[i]f the ACA becomes unaffordable for [their] employees, they will likely leave our business and look for alternative employment to sponsor their healthcare," which could force him to "shut down [the] company." *Id.* at 2 ¶ 7, at 3 ¶ 10.

The Court is satisfied that Ohlinger has stated with precision how the regulation change will directly impact him. An "increase in premiums constitutes economic harm and is [ ] 'a classic and paradigmatic form of injury in fact[.]'" *City of Columbus I*, 453 F. Supp. 3d at 787 (quoting *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018)). The attestations are thus sufficient to establish injury-in-fact for Article III standing purposes. Further, the Court is satisfied that this injury is sufficiently likely to materialize, given the conclusions reached by independent experts on the effects of the Rule. *See, e.g.*, ECF 17-8, at 14 ¶ 34 ("Specifically, CMS claims that, excluding its changes to special enrollment periods and the user fee, the rule will increase premiums by 1.7 to 2.4 percent. This figure is implausibly small considering the numerous burdensome administrative barriers imposed by the rule and the substantial coverage losses that

16

would result, as detailed below."). MSA's members are not required to prove they have suffered *actual* injury before filing suit. *See Adams v. Watson*, 10 F.3d 915, 921 (1st Cir. 1993) ("[I]t could hardly be thought that administrative action likely to cause harm cannot be challenged until it is too late." (quoting *Rental Hous. Ass'n of Greater Lynn v. Hills*, 548 F.2d 388, 389 (1st Cir. 1977))). Rather, Ohlinger has shown enough to establish that there is a "'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). Accordingly, at least Ohlinger has suffered a concrete injury sufficient for Article III standing.

Separately, Defendants argue that the causal chain flowing from the alleged harm is too speculative. *See* ECF 23, at 18. "For an injury to be traceable, 'there must be a causal connection between the injury and the conduct complained of by the plaintiff." *Air Evac EMS, Inc.*, 910 F.3d at 760 (quoting *Lujan*, 504 U.S. at 560). "The causation requirement precludes speculative links— that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383 (citing *Allen v. Wright*, 468 U.S. 737, 757–59 (1984)). Although a plaintiff's theory of standing may "not rest on mere speculation about the decisions of third parties[,]" it may "rel[y] instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). In short, to establish causation, a plaintiff must show "a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *All. for Hippocratic Med.*, 602 U.S. at 385. Here, Plaintiffs have clearly articulated this "predictable chain of events." *Id.*

17

According to Defendants, MSA's "members' theory of standing hinges on (1) the challenged Rule provisions causing cost increases in individual Exchanges generally and (2) an attendant (yet wholly indeterminate) increase in the monthly premiums the members pay post-subsidies, (3) which the members would categorically be unable to afford, (4) coupled with the existing costs to run or reopen their businesses, which are already costly for unexplained reasons, (5) ultimately making it impracticable for them to run their business because either (6a) the member will be unable to afford the simultaneous costs or (6b) the member's employees will leave to find an employer who can offer less costly coverage." ECF 23, at 20–21. Defendants argue that "merely describing this attenuated chain of contingencies refutes it as an adequate basis for standing." *Id.* at 21.

But Plaintiffs are not "merely describing" a possibility—the Levitis declaration outlines in great detail how the challenged provisions will "impose substantial new administrative burdens and higher costs on individuals seeking to enroll in Marketplace coverage," which will in turn "reduce enrollment and worsen risk pools, raising premiums overall and hurting providers that rely on revenue from Marketplace enrollees." ECF 17-8, at 2 ¶ 5; *see also, e.g., id.* at 21 ¶ 52 ("[T]he Final Rule projects that at most 42,000 households would lose APTC in 2027 due to [the Failure to File and Reconcile Policy or] FTR–and that assumes every state uses the stricter one-year rules. The only explanation given for this precipitous decline is that total Marketplace enrollment is expected to fall by 725,000 to 1.8 million in 2027."); *id.* at 22 ¶ 58 ("This expanded paperwork burden is expected to reduce Marketplace enrollment by about 2.3 million people . . . ."); *id.* at 29 ¶ 79 ("Removing standardized plans, preferential display, and limits on non-standardized plans will also reduce incentives for insurers to compete based on price."); *id.* at 35 ¶ 104 ("While narrower networks may decrease gross premiums for some consumers, they would be expected to

18

increase costs for consumers receiving financial assistance who want to maintain the same size network."). But Defendants fail to undermine, or even acknowledge, Levitis' conclusions. *Cf. City of Columbus I*, 453 F. Supp. 3d at 789 (finding that Plaintiffs "sufficiently alleged" a "predictable" response, including "price increases," to Defendants' actions through "independent analyses" (citation omitted)).

Finally, the Court observes its satisfaction that the relief sought here—a stay enjoining the agency from enforcing the challenged provisions—would redress Plaintiffs' injuries by "ameliorating the predictable results of Defendants' challenged actions." *City of Columbus I*, 453 F. Supp. 3d at 792. As such, at least one MSA member has established standing to sue in his own right, and therefore MSA also has associational standing to sue, so long as the organization can satisfy the second and third prongs of associational standing.

### ii.    *Interests Germane to Organization's Purpose*

As discussed, the second element of associational standing requires that the interests the organization "seeks to protect are germane to the organization's purpose." *Students for Fair Admissions, Inc.*, 600 U.S. at 199 (quotation marks and citation omitted). Shawn Phetteplace, the National Campaigns Director at MSA, indicates that MSA "seeks to amplify the voices of its small business membership by sharing their experiences with the aim of creating an economy where all small business owners have an equal opportunity to succeed." ECF 17-11, at 1 ¶ 2. According to Phetteplace, "MSA's founding was directly focused on the passage of the Affordable Care Act, and the organization has remained focused on the subsequent strengthening of the law over the past 16 years." *Id.* at 2 ¶ 6. "According to a recent survey, over 45% of MSA members access health insurance either through the marketplace or Medicaid." *Id.* ¶ 3. Defendants do not contend that the interests of Plaintiffs in protecting their members' ability to operate their businesses with

19

affordable health insurance are not germane to MSA's purpose. The Court is therefore satisfied that the interests MSA seeks to protect are "germane" to MSA's organizational purposes.

### iii.    Individual Member Participation

The third element of associational standing requires that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc.*, 600 U.S. at 199 (quotation marks and citation omitted). "'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members . . . ." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (quoting *Hunt*, 432 U.S. at 343).

Plaintiffs seek a stay under § 705 of the APA, not monetary damages. If MSA's members were to each bring suit on their own behalf, the challenged conduct would generally implicate the same facts, the same defendants, and the same arguments regarding rulemaking procedure.[6] The Court is thus satisfied that the participation of individual members is not necessary. In sum, MSA has established associational standing to sue.

### 2.    Municipal Plaintiffs

The Court now turns to standing for the Municipal Plaintiffs. As noted, to establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). A future injury must be "certainly impending." *Clapper*, 568 U.S. at 409. "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *All. for Hippocratic Med.*, 602 U.S. at 381.

---

[6] Additionally, Defendants have not asserted that individual member participation is required for the relief requested.

Plaintiffs argue that the Municipal Plaintiffs are "providers of last resort for their residents" and "are likely to suffer financial injury because the Rule will directly lead to increased costs incurred by the [municipal] Plaintiffs in the form of shouldering the expense of uncompensated care." ECF 26, at 5 (quoting *City of Columbus III*, 796 F. Supp. 3d at 147–48). "These economic injuries, which are sufficient to establish standing, cannot be remedied absent a stay." *Id.* "The municipal Plaintiffs cannot simply avoid harm by 'choosing [not] to provide services to their residents,'" according to Plaintiffs, because "[a]mong other things, municipalities have legal obligations to provide emergency ambulance and other services for their populations." *Id.* (first quoting ECF 23, at 25; then citing Ariz. Rev. Stat. Ann. §§ 36-182(A), 36-190; Md. Code Ann., Pub. Safety §§ 1-101(b), 1-304(c)(1); Ohio Rev. Code Ann. § 4765.35(A); Columbus, Ohio, City Code § 1934.01).

The Court finds that this is sufficient to show injury-in-fact, as the Municipal Plaintiffs will bear additional economic costs that come with treating people left uninsured by the implementation of the Rule. *See City of Columbus I*, 453 F. Supp. 3d at 787–88 (finding plaintiffs had standing to sue where policies shifted costs onto city governments to provide uncompensated healthcare); *see also Massachusetts v. United States Dep't of Health & Hum. Servs.*, 923 F.3d 209, 223 (1st Cir. 2019) (finding injury-in-fact where "the Commonwealth has demonstrated that there is a substantial risk of fiscal injury to itself"). To contend, as Defendants seem to do, ECF 23, at 25, that the Municipal Plaintiffs might avoid such injury by simply deciding not to offer emergency medical services residents "blinks reality," as Plaintiffs put it. ECF 26, at 5.

Defendants argue that the injury claimed by the Municipal Plaintiffs "lies at the end of a 'highly attenuated chain of possibilities.'" ECF 23, at 24 (quoting *South Carolina*, 912 F.3d at 727). Defendants suggest that "the budgetary harms they fear could materialize only if (1) the

21

Rule provisions Plaintiffs challenge cause a certain number of individuals currently enrolled in Exchange plans to disenroll or otherwise lose coverage, and (2) a portion of that recently uninsured group seeks medical care (3) in the municipal Plaintiffs' jurisdictions (4) specifically at municipality-run health care facilities (rather than privately operated ones) or through a municipality-funded emergency medical service and (5) receives services at such a rate that the municipalities (6) are required to increase the budgets for their respective public health departments to cover that increase in potentially uncompensated care." *Id.* Defendants aver that standing cannot derive from such a "lengthy chain of assumptions." *Id.* (quoting *Chambliss v. Carefirst, Inc.*, 189 F. Supp. 3d 564, 569 (D. Md. 2016)).

"A causal chain does not fail simply because it has several 'links,' provided those links are not hypothetical or tenuous." *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (internal quotation marks and citation omitted); *see also California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018) (finding standing where the interim final rules "first le[]d to women losing employer-sponsored contraceptive coverage, which [ ] then result[ed] in economic harm to the states"). In *City of Columbus I*, Judge Chasanow, in evaluating a nearly identical fact pattern involving some of the same plaintiffs, held that the plaintiffs had standing to challenge the provisions at issue in that case. 453 F. Supp. 3d at 788. There, the defendants lodged a similar argument to the one advanced here, namely that the alleged injury to the plaintiffs was founded on a "number of uncertain links in the causal chain, which are either premised on invalid assumptions or are attributable to the City Plaintiffs themselves." *Id.* Judge Chasanow noted that "this challenge does not dispute that budgetary outlays constitute injury in fact but rather focuses on traceability." *Id.* Ultimately, Judge Chasanow held that the plaintiffs "tie[d] . . . the challenged provisions of the 2019 Rule to increased costs, inaccessibility of quality coverage, and rises in the uninsured and

22

underinsured rates." *Id.* at 790–91. The holding was based on numerous "allegations outlin[ing] the predictable results of the 2019 Rule." *Id.* at 791.

Here, the Municipal Plaintiffs have likewise adequately "outline[d] the predictable results" of the challenged provisions of the Rule. *Id.* First, they have pointed to sufficient record evidence to establish that the rate of uninsured people will go up as a direct result of the implementation of the Rule, which is also a logical implication of several of the Rule's provisions. *See generally* ECF 17-8. "It is reasonably predictable (indeed, it is predicted by CMS itself) that the rule will cause insurers to push greater costs onto enrollees; will cause federal tax subsidies to decline, imposing even greater costs on enrollees; will cause some enrollees to resort to less generous coverage or drop out of the market altogether; and will force providers of last resort to incur greater uncompensated care costs." ECF 26, at 9 (citing ECF 17-8, at 7–16 ¶¶ 21–38, at 18–35 ¶¶ 46-106). Several of the challenged provisions construct new "administrative burdens" on the consumer, which "can substantially reduce enrollment and disproportionately reduce enrollment among healthier people, and thus tend to increase insurance premiums." ECF 17-8, at 7–8 ¶ 21. Other challenged provisions "reduce incentives for insurers to compete based on price." *Id.* at 29 ¶ 79. And the provisions which "expand[] the availability of lower-quality plans result[] in splitting the risk pool and increasing premiums for the higher-quality products that sicker consumers want and need." *Id.* at 30 ¶ 84.

Accordingly, the Court finds that the Municipal Plaintiffs have sufficiently shown that they are likely to suffer financial injury because the Rule will directly lead to increased costs incurred by the Municipal Plaintiffs in the form of shouldering the expense of uncompensated care. Further, the asserted imminent fiscal injury is clearly "fairly traceable" to the Defendants' actions. *Lujan*, 504 U.S. at 560–61. As to redressability, a stay preventing the challenged provisions from going

into effect would unquestionably stop the alleged fiscal injury from occurring. Therefore, the Municipal Plaintiffs have established standing.[7]

**B.    Motion to Stay**

As noted above, Plaintiffs challenge twelve provisions of the Rule as either contrary to law, arbitrary and capricious, or both. *See* ECF 1.  Of those provisions, Plaintiffs seek a § 705 stay of eight. *See* ECF 17-1, at 22 n.3 (noting that certain provisions of the Rule will be the subject of later briefing); ECF 23, at 10. Plaintiffs separate their challenges into three categories: challenges to provisions that impose barriers to coverage, challenges to provisions that increase costs for enrollees, and challenges to provisions that permit insurers to offer less comprehensive coverage. *See* ECF 17-1, at 2.

Plaintiffs' first four challenges under the "barriers [to] coverage" section seek relief from re-instituting a policy regarding failure-to-reconcile tax data, two provisions requiring heightened income verification when a person's projected annual income does not match IRS data or when tax data is unavailable, and a provision that would introduce verification requirements for SEPs. *See generally* ECF 17-1. Plaintiffs' next two challenges under the "increase[d] costs for enrollees" section seek relief from a provision that would impose a new cost-sharing scheme for bronze plans and expand the hardship exemption for purposes of catastrophic plan eligibility. *Id.*  Plaintiffs' final two challenges under the "less comprehensive coverage" section seek relief from provisions that would amend standards for Exchange network adequacy and provisions that would eliminate standardized plans and discontinue non-standardized plan limits and exceptions. *Id.*  The Court will address each challenge in turn.

---

[7] As previously described, the Court need not reach the question of standing for DFA at this time.

As an initial matter, however, the Court observes that Congress recently passed the Working Families Tax Cuts Act ("WFTCA"), also known as the "One Big Beautiful Bill," which will eventually enact as law some of the provisions challenged in this case and the prior case. *See, e.g.*, ECF 23, at 28 (citing One Big Beautiful Bill Act, Pub. L. No. 119-21 § 71303, 139 Stat. 72, 323 (2025)). Throughout their briefing on the motion to stay, Defendants argue that the One Big Beautiful Bill's "ratification" of the challenged policies "has changed the landscape" because it "strongly suggests that Congress viewed this rulemaking authority as squarely within the agency's authority all along." *Id.* at 28–29. The Court rejects this logic at the outset. To be sure, that some of the challenged provisions may soon have the express authorization of Congress means that in plan year 2028, for example, many of Plaintiffs' arguments in this and the related case will be neutralized. But that apparent inevitability is not dispositive of Plaintiffs' challenge *today*.

As the Supreme Court has repeatedly explained, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Waterman S.S. Corp. v. United States*, 381 U.S. 252, 269 (1965) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)). Even "the abortive action of [a] subsequent Congress 'would not supplant the contemporaneous intent of the Congress which enacted the . . . Act.'" *Id.* (alteration added) (quoting *Fogarty v. United States*, 340 U.S. 8, 14 (1950)). Moreover, while true that Congress's decision to amend the ACA to expressly permit some of the policies at issue is compatible with the view that "Congress viewed this rulemaking authority as squarely within the agency's authority all along," ECF 23, at 28, it is just as plausible that Congress amended the law because it believed such rulemaking authority was *not* actually within the agency's power prior to the amendment. Regardless, "CMS's rulemaking must be judged under the statute that is in force now," ECF 26, at 11, not law not yet effective.

1.    Likelihood of Success on the Merits

i.    *Failure-to-Reconcile Provision*

Last year's rule reinstated a prior Failure to File and Reconcile ("FTR") policy that required an Exchange to determine that a "tax filer" is ineligible for APTCs under the ACA if the applicant (1) received APTCs the prior year and (2) failed to comply with the statutory requirement to file a tax return and "reconcile APTC" for that year. *See* 90 Fed. Reg. at 27,113, at 27,221.  That provision amended the requirement that such a determination be made only after a tax filer fails to reconcile for two consecutive tax years. *See* 45 C.F.R. § 155.305(f)(4).  The new provision challenged here is nearly identical to the prior provision stayed and ultimately vacated by the Court, but with a few key changes. *See City of Columbus III*, 796 F. Supp. 3d at 160; *City of Columbus IV*, 2026 WL 1707125, at *20.  The new provision would require the federally facilitated Exchange and state-based exchanges on the federal platform to apply, as Plaintiffs describe it, the "one-year version" of the FTR policy for plan year 2027, while the state-based Exchange could apply either the "one-year or two-year version" of that policy. *See* ECF 17-1, at 24–25; ECF 23, at 13–14; 91 Fed. Reg. at 29,606.  In plan year 2028, the one-year version of the policy will apply to all Exchanges.  91 Fed. Reg. at 29,606.

By way of background, the IRS requires taxpayers who receive APTCs—which are typically scaled to the recipient's projected annual household income—to reconcile those advanced payments with the PTC amount they otherwise qualify for in the applicable tax year, as determined by their actual annual household income in that year. *See* 26 U.S.C. § 36B(f).  If the APTCs the taxpayer received exceed that allowable PTC amount, then the taxpayer may incur a tax liability, subject to certain income-based caps. *Id.* § 36B(f)(2).  Since 2012, HHS has prohibited an Exchange from "determin[ing] a tax filer eligible for" APTCs if the filer (1) received APTCs the prior year and (2) failed to comply with the requirement to file a federal income tax

26

return and reconcile those APTCs for that year. 45 C.F.R. § 155.305(f)(4). Taxpayers who are determined ineligible for APTCs due to their failure to reconcile can still claim on their tax returns the full amount of the PTC they are otherwise eligible for; such taxpayers just would not be able to receive that PTC amount in advance. *See id.*

In 2023, CMS amended the failure-to-reconcile regulations such that a taxpayer becomes ineligible for APTCs only after failing to file a federal income tax return and reconcile their APTCs for *two* consecutive tax years. *See* 90 Fed. Reg. at 27,113. Last year's provision reverted back to the requirement that a taxpayer be deemed ineligible for APTCs after one year of failing to reconcile, and that change would have only applied through plan year 2026. *Id.* As stated, this year's provision would, for the upcoming plan year, require the federally facilitated Exchange to apply the latter FTR policy, while the state-based Exchange could apply either the former or latter versions of the policy. *See* 91 Fed. Reg. at 29,606 (revising 45 C.F.R. § 155.305(f)(4)). The FTR policy applied to plan year 2028 will implement the law under the One Big Beautiful Bill.

In their contrary to law claim, Plaintiffs again challenge the agency's authority to "condition eligibility for a tax credit on the reconciliation of old tax debts." ECF 17-1, at 25. Like before, Plaintiffs argue that while "CMS has authority to 'determine' whether the statutory standards for APTC eligibility are met, but it does not have authority to alter those standards." *Id.* (first citing 42 U.S.C. §§ 18081(a), (f); and then citing *Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 975 (E.D. Va. 2005)). According to Plaintiffs, "[t]he statute does not contemplate the existence of a prior tax debt affecting an applicant's eligibility for APTCs in any way, and CMS's 'invocation of its general rulemaking authority . . . does not authorize it to flout separate, express provisions of the statute.'" *Id.* (quoting *City of Columbus III*, 796 F. Supp. 3d at 162–63).

27

Although the agency[8] acknowledged that the Court held its prior FTR policy to be unlawful, it offers a new statutory theory this time around. It contends that "filing a tax return is a means of verifying a condition of eligibility and not itself a condition of eligibility." 91 Fed. Reg. at 29,609. Because the "statute requires APTC to be set on the basis of the individual's household income for the most recent taxable year for which the information is available," Defendants reason that the "information reported on the tax return" for that year "establishes the starting point for verifying whether an applicant's income meets the requirements to qualify for APTC." *Id.* Where no tax return information exists, 42 U.S.C. § 18082 "requires HHS to establish alternative procedures to determine APTC." *Id.* Because that section "only references cases where a tax filer was not required to file a return," the agency suggests that the tax return itself qualifies. as a means of verifying a condition of eligibility under the statute. *Id.* Plaintiffs contend that this "theory is nonsensical." ECF 17-1, at 26. Plaintiffs argue that "the statutory mandate is precisely the opposite of the agency's reading; CMS must find eligibility on the basis of income for the most recent tax year for which information is available—meaning that it must look to other years if the previous year's return is not available, not deny eligibility altogether—and it further must adopt procedures to assess eligibility in any case where an application shows a significant change affecting eligibility, whether or not the taxpayer was required to file a return." *Id.*

Defendants appear to have abandoned their novel theory in their opposition and instead primarily rest their case on the arguments advanced in the related case. *See* ECF 23, at 28–29; ECF 26, at 10 ("CMS recognizes that this Court has already ruled on the legality of this provision, and it largely rests on the arguments it presented in last year's case."). As the Court described in

---

[8] Throughout this opinion, the Court occasionally refers to the taker of the administrative actions on review as "the agency," following the example of the parties. *See, e.g.,* ECF 17-1, at 50; ECF 23, at 29.

its prior opinions, PTCs (and thus, by extension, APTCs) are prescribed by statutory formula. *See* 26 U.S.C. § 36B(b)(2)–(3); *City of Columbus III*, 796 F. Supp. 3d at 163; *City of Columbus IV*, 2026 WL 1707125, at *21. 26 U.S.C. § 36B provides a formula for calculation of tax credits, which is determined by income and the cost of a benchmark plan offered through the Exchange. That statutory provision states:

> The premium assistance amount determined under this subsection with respect to any coverage month is the amount equal to the lesser of—
>
> (A) the monthly premiums for such month for 1 or more qualified health plans offered in the individual market within a State which cover the taxpayer, the taxpayer's spouse, or any dependent (as defined in section 152) of the taxpayer and which were enrolled in through an Exchange established by the State under 1311 of the Patient Protection and Affordable Care Act, or
>
> (B) the excess (if any) of—
>
>> (i) the adjusted monthly premium for such month for the applicable second lowest cost silver plan with respect to the taxpayer, over
>>
>> (ii) an amount equal to 1/12 of the product of the applicable percentage and the taxpayer's household income for the taxable year.

26 U.S.C. § 36B(b)(2). Relatedly, 42 U.S.C. § 18081(f) establishes a statutory formula for APTCs. That section provides that the Secretary of HHS "shall establish procedures by which the Secretary or one of such other Federal officers . . . redetermines eligibility on a periodic basis in appropriate circumstances." 42 U.S.C. § 18081(f)(1)(B).

The relatively limited grant of authority to "redetermine[] eligibility" for APTCs under "appropriate circumstances" does not encompass broad power to adjust the amount of APTCs, which are set according to a statutory formula. *Id.* The agency cannot utilize its general rulemaking authority to override explicit statutory provisions. *See NRDC v. Reilly*, 976 F.2d 36, 40 (D.C. Cir. 1992) (a "general grant of rulemaking power . . . [cannot] trump the specific provisions of the act"); *see also Air All. Hous.*, 906 F.3d at 1061 ("[I]t is well established that an

29

agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority."). "CMS is not free to re-write the statutory formula to accomplish its policy goals, irrespective of the efficacy of such a policy." *City of Columbus III*, 796 F. Supp. 3d at 163. "Thus, the agency's decision to condition APTC eligibility on reconciling tax information reads an exception into the statutory formula that is simply not there." *Id.* Because the plain text of the statute contradicts the agency's provision, Plaintiffs have shown they are likely to succeed on their claim that the failure-to-reconcile provision for plan year 2027 is contrary to law.[9]

> ii.  *Income Verification for Applicants Below 100% of the Federal Poverty Line*

Under current regulations, if an applicant's attestation regarding their projected annual household income reflects a higher household income than that reflected in income data provided by the IRS or certain other sources, an Exchange generally "must accept the applicant's attestation . . . without further verification." 45 C.F.R. § 155.320(c)(3)(iii)(A). The Rule would amend this provision to require additional income verification for enrollees who project a household income above 100% of the federal poverty line if IRS data (or lack thereof) indicates that their past income fell below that level. *See* 91 Fed. Reg. at 29,613 (revising 45 C.F.R. § 155.320(c)(3)). The applicant would then be given an opportunity to resolve the inconsistency by providing additional documentation and taking other steps to verify their household income. *See* 45 C.F.R. § 155.315(f)(1)–(4). Defendants have tried to adopt this policy twice before, and the Court has rejected that attempt both times. *See City of Columbus IV*, 2026 WL 1707125, at *26–28; *City of Columbus III*, 796 F. Supp. 3d at 166–68; *City of Columbus II*, 523 F. Supp. 3d at 761–3. Although

---

[9] Because the Court finds that Plaintiffs are likely to succeed on their argument that this provision of the Rule is contrary to law, the Court need not reach Plaintiffs' alternative argument that adopting the provision was arbitrary and capricious.

.CMS would have previously sunset this policy after one year, the Rule would now require further verification on a permanent basis. *See* 91 Fed. Reg. at 29,618.

Plaintiffs argue that "[t]he agency's third attempt to impose this policy is arbitrary for precisely the same reasons that the court vacated the same policy five years ago and stayed it last year." ECF17-1, at 28 (first citing *City of Columbus II*, 523 F. Supp. 3d at 763; and then citing *City of Columbus III*, 796 F. Supp. 3d at 168). "As before," Plaintiffs contend that "CMS improperly assumed, without evidence, that these enrollees must have been trying to defraud the Exchange." *Id.* at 29 (citations omitted). Accordingly, Plaintiffs contend that the agency "again 'improperly elevated the objective of fraud prevention, for which it had no evidence, above the ACA's primary purpose of providing health insurance.'" *Id.* (quoting *City of Columbus II*, 523 F. Supp. 3d at 762).

Defendants acknowledge that "this provision resembles policies issued in 2018 and 2025 that were vacated." ECF 23, at 30. However, they argue that the provision was found arbitrary and capricious for reasons not applicable here. "In the first case," Defendants argue that "the 2018 version was found arbitrary and capricious largely because, at the time, CMS 'failed to point to any actual or anecdotal evidence' of Exchange consumers inflating their income to obtain APTCs for which they were not otherwise eligible." *Id.* (quoting *City of Columbus II*, 523 F. Supp. 3d at 762). And Defendants contend that "the 2025 version was found arbitrary and capricious because CMS 'failed to meaningfully address the comments pointing out potential flaws in the data contained in the Paragon Report' and 'refuse[d] to engage with commenters' reasonable concerns that the data fails to support the conclusion the agency drew from that data.'" *Id.* at 30–31 (quoting *City of Columbus IV*, 2026 WL 1707125, at \*27). Now, however, Defendants argue that the agency "points to a constellation of evidence, supported by internal data metrics, new and existing

31

GAO[, or Government Accountability Office,] studies, and anecdotal accounts," to justify the new provision. *Id.* at 31.

Defendants use those three categories—internal data, GAO studies, and anecdotal evidence—to argue that the provision is not arbitrary and capricious. *See id.* at 31–32. With respect to internal data, the Rule relies on "recently identified internal data" which purportedly "found that nearly 80 percent of income [Data Matching Issues, or] ["]DMIs["] were generated for households who worked with an agent, broker, and/or web-broker in PY 2024," as well as that "for PY 2025 that enrollees who worked with an agent, broker, and/or web-broker in PY 2025 generated DMIs at a rate three times higher compared to enrollees who did not work with anyone." 91 Fed. Reg. at 29,615 (citing GAO, *Patient Protection and Affordable Care Act: Preliminary Results from Ongoing Review Suggest Fraud Risks in the Advance Premium Tax Credit Persist* (Dec. 2025), GAO-26-108742, https://perma.cc/2SXX-WTCZ)).

The agency also relied on two GAO studies, one from 2016 which was mentioned in the 2025 rule, and one published in December of 2025, after the 2025 rule was published in the Federal Register. *See id.*; ECF 23, at 31. The 2025 GAO study "identified at least 160,000 applications in P[lan] Y[ear] 2024 that likely had unauthorized changes." 91 Fed. Reg. at 29,615. It "utilized 20 fictitious applicants to identify program integrity control issues, of which 18 remained improperly enrolled as of September 2025." *Id.* "The GAO argued that, although the results cannot be generalized to the overall population, these cases highlighted vulnerabilities in verification processes that can contribute to APTC reconciliation issues," including issues related to income verification. *Id.* Finally, the Rule identifies that "the Federal Exchange has received reports that agents, brokers, and web-brokers may be using artificial intelligence [("AI")] to impersonate consumers and falsely attest to household income that could potentially qualify the

32

consumers for APTC and CSR [("Cost-sharing Reduction")] benefits they may not be eligible for," something Defendants state they "were not aware of when we finalized the 2025" rule. *Id.* at 29,614. Defendants argue that AI will enable fraud to "become easier to commit and more challenging to identify." ECF 23, at 32.

Plaintiffs argue that the new evidence does not transform a hypothetical risk of *individual* fraud into a substantiated one, such that the impact on the individual created by this provision can be rationally justified. According to Plaintiffs, the 2025 GAO study merely "found that it is possible to enroll fictitious applicants for coverage on the Exchanges," but does not suggest "*individual* enrollees have tried such a gambit, let alone that *low-income* enrollees would be more likely to do so." ECF 26, at 12 (emphasis added) (citing Ctr. on Budget & Policy Priorities ("CBPP") comment at 16 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0922). Moreover, Plaintiffs point out that "the GAO itself cautioned that its findings could not be extrapolated to make any conclusions about the behavior of enrollees" because although "fictitious enrollment could be valuable for a broker who receives commissions on a per-enrollment basis, it does nothing for the individual who would like to use a health plan to cover his or her health expenses." *Id.* at 12–13 (citing Jason Levitis et al. ("Levitis") comment at 15 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0989). As to the internal data and anecdotal evidence, Plaintiffs argue that this evidence merely proves their point: "Brokers are responsible for what remains of the problem of unauthorized enrollments. So the agency should focus on measures addressing the behavior of these entities, rather than forcing millions of low-income enrollees off coverage on the basis of nothing more than a supposition that they are falsely estimating their income for the coming year." *Id.* at 13.

33

The new justification provided by the Rule is responsive to an issue identified in this Court's previous decision on the parallel provision in the 2025 rule. The GAO study from 2016 was previously the only data relied upon by the agency, and the Court observed that such a study was insufficient evidence "to corroborate Defendants' conclusory assertion" of present program integrity concerns or abuse. *City of Columbus III*, 796 F. Supp. 3d at 159. Now, in addition to internal data and anecdotal evidence about unauthorized enrollments, Defendants offer a 2025 GAO study, which "identified at least 160,000 applications in PY 2024 that likely had unauthorized changes," which according to Defendants "further illustrates the continued problem of some agents, brokers, and web-brokers making changes without the consumer's consent to the consumer's application." 91 Fed. Reg. at 29,615. And although the study found that its results could not "be generalized to the overall population," it "utilized 20 fictitious applicants to identify program integrity control issues, of which 18 remained improperly enrolled as of September 2025." *Id.*

The Court welcomes Defendants' efforts to take a hard look at the alleged problem it seeks to solve in the context of the current healthcare landscape. However, there are facial problems with the study that the Court cannot ignore. First, it is unclear what the "unauthorized changes by agents or brokers" identified in at least 160,000 applications refers to, or how many of those changes were connected to instances of *fraudulent* income reporting or enrollment. "Changes" could be as harmless as a name, address, or date-of-birth correction, although nonetheless "unauthorized" in a technical sense. Of course, the study notes that such changes "*can* result in consumer harm, including loss of access to medications." GAO-26-108742 (overview). But the full report speaks even more equivocally, stating that "at least 160,000 applications in plan year 2024 that had *likely* unauthorized changes," "the volume of these actions indicat[ing] *potential*

34

misconduct by agents and brokers." GAO-26-108742, at 16 (emphasis added). The Rule does not explain the precise meaning of "unauthorized changes," nor does it explain how the verification it proposes would mitigate the changes identified in the study.

CMS's internal data suffers from a similar flaw. The Rule's justification includes that "recently identified internal data" reflects that "nearly 80 percent of income DMIs were generated for households who worked with an agent, broker, and/or web-broker in PY 2024," 91 Fed. Reg. at 29,615, but neither the Rule nor Defendants in briefing or at the hearing were able to explain why the Court should interpret "data matching issues" to entail ineligibility. Indeed, the regulation applicable to such inconsistencies contemplates a possible cause of the inconsistency as "typographical or other clerical errors," which might be rectified "by contacting the application filer to confirm the accuracy of the information submitted by the application filer." 45 C.F.R. § 155.315(f)(1). The thrust of both the 2025 GAO report and the "recently identified internal data" thus appears to be that agents and brokers produce errors, whether intentional or unintentional, in consumer applications at a potentially alarming rate. The agency's claims about the risk of artificial intelligence point to a similar problem. *See* 91 Fed. Reg. at 29,614 ("[T]he Federal Exchange has received reports that *agents, brokers, and web-brokers may* be using artificial intelligence to impersonate consumers and falsely attest to household income that could potentially qualify the consumers for APTC and CSR benefits they may not be eligible for . . . ." (emphasis added)). However, the Rule advances a provision focused not on the behavior of these entities but on the behavior of low-income individuals seeking to verify their income generally, whether using a broker or not. *See id.* at 29,613.

Given that "CMS again acknowledges that this policy would cause tens of thousands of enrollees to lose their coverage," ECF 17-1, at 17 (citing 91 Fed. Reg. at 29,836), the Rule should

reflect that the agency considered how this "important aspect of the problem"—i.e., the use of brokers and agents in producing income DMIs and unauthorized changes to applications—drove its solution, *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. It did not. Accordingly, the Court finds that the agency's chosen solution remains unmoored from the problem it seeks to address. "The role of courts is not to assess whether executive decisions are wise." *Am. Fed'n of Tchrs.*, 796 F. Supp. 3d at 81 (citing *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 35 (2020)). But "the agency was obligated to establish a 'rational connection between the facts found and the choice made.'" *City of Columbus III*, 796 F. Supp. 3d at 155 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Because the Court is unable to chart a throughline between the new evidence offered by the agency and its final choice, it cannot distinguish this provision from those preceding it which were found deficient under the APA. *See City of Columbus IV*, 2026 WL 1707125, at *26–28; *City of Columbus III*, 796 F. Supp. 3d at 166–68; *City of Columbus II*, 523 F. Supp. 3d at 761–63. Accordingly, the Court concludes that Plaintiffs have shown this income verification requirement is likely arbitrary and capricious.

### iii. Income Verification When Tax Data is Unavailable

Defendants again seek to rescind a regulation that requires an Exchange to accept an applicant's self-attestation of projected annual household income "without further verification" whenever (1) the Exchange requests tax return data from the IRS to verify the applicant's attested income, but (2) the IRS confirms that there is no such data available, 45 C.F.R. § 155.320(c)(5). *See* 91 Fed. Reg. at 29,619. The current regulation, which was adopted in 2023, creates an exception to the general requirement that an Exchange must verify an applicant's annual household income with certain trusted data sources, 45 C.F.R. § 155.320(c)(1)(ii), and otherwise follow an alternative verification process if tax return data for an applicant is unavailable, *id.* § 155.320(c)(3)(vi). The challenged provision would remove this exception and

36

require Exchanges to follow standard verification and data-matching procedures "if the IRS does not return any tax data" to verify a consumer's attestation of annual household income. 91 Fed. Reg. at 29,620.

Plaintiffs argue that this provision is likely arbitrary for the same reasons as the Court found last year. *See* ECF 17-1, at 30; *see also City of Columbus III*, 796 F. Supp. 3d at 169–70. Plaintiffs explain that "[i]t is relatively common for tax data to be missing for an applicant, for entirely legitimate reasons." *Id.* For example, "[a]n individual might have had a change of name, family composition, or filing status, or might not have needed to file for the year in question." *Id.* Plaintiffs argue that "[f]or many, documentation might not be readily available to substitute for tax data, which means that if these people cannot attest to their income, they will be deprived of subsidized coverage." *Id.*

In the Rule, the agency again identifies its belief that the policy it seeks to rescind "may have helped contribute to the weakening of the Exchange eligibility system." 91 Fed. Reg. at 26,619. Defendants point out that as noted earlier, new internal data suggests that "almost 80% of income data-matching issues were generated for households who worked with an agent, broker, or web-broker in Plan Year 2024." ECF 23, at 35. Defendants argue that the "provision would mitigate improper enrollments by agents, brokers, and web-brokers who do not have consumers' permission to enroll in APTCs and accordingly lack those consumers' detailed income information." *Id.*

As stated by the Court when it addressed this provision in the 2025 rule, the question "is not simply whether Defendants have presented sufficient evidence of fraudulent enrollment, but also whether there is sufficient evidence of a *nexus* between fraudulent enrollment and self-attestation to tax data such that it justifies requiring heightened income verification." *City of*

37

*Columbus III*, 796 F. Supp. 3d at 169. "Put differently, if the agency cannot point to data showing that self-attestation meaningfully contributes to increased fraud, then the agency adopted an incongruent solution to the problem." *Id.* (citing *City of Columbus II*, 523 F. Supp. 3d at 762). Defendants suggest that the new internal data provides a nexus "between enrollment control vulnerabilities, such as the one this Rule seeks to fix, and fraudulent and improper enrollments." ECF 23, at 35. Plaintiffs correctly point out that "an unscrupulous broker would have no way of knowing in advance whether the IRS would later fail to report tax data for an applicant." ECF 26, at 14. The problem identified by CMS's internal data with respect to agents and brokers does not create the logical bridge between fraudulent enrollment and *self-attestation* to tax data that the Court's prior decision identified.

Rather, the Rule's justification again repeats reasoning that the Court found conclusory in its prior decision. For example, the agency concluded that while the burden of income verification for those whom the IRS does not provide tax return data "would increase [for] some applicants, we do not anticipate this burden would deter many eligible people from enrolling as there are a multitude of documents that can verify income, and additionally, the Exchanges on the Federal platform have provided an extensive guide to verifying income with resources for households that struggle to obtain documentation." 91 Fed. Reg. at 29,622. To be sure, documents confirming income and resources to assist individuals seeking to do so may *exist*, but Defendants offer no logical basis to ground their conclusion that the new verification requirement would not deter many eligible people from enrolling. *Cf. City of Columbus III*, 796 F. Supp. 3d at 170 (finding similar reasoning conclusory). In response to comments that the provision should shift focus "to address the underlying issue of fraudulent activity by some agents and brokers," the agency stated that "[w]hile HHS is actively addressing unauthorized enrollments involving noncompliant actions by

agents, brokers, or web-brokers, we cannot ignore program integrity risks presented by consumer-submitted information. We believe it is important to institute policies that address all program integrity concerns related to all program participants, and not just agents, brokers, and web brokers." 91 Fed. Reg. at 29,622. But the agency's decision to institute the policy is premised on *broker* fraud, not the general program integrity concerns which it failed to substantiate in the 2025 rule. Such a disconnect does not reflect reasoned decision-making.[10]

The Rule also explains that Defendants seek "to continue this policy based on our statutory authority and new consideration of impacts from the WFTC[A] legislation." 91 Fed. Reg. at 29,620. Specifically, the Rule explains that "[u]nder section 71305 of the WFTC[A] legislation, repayment caps on excess APTC payments will discontinue starting in PY 2026." *Id.* "Prior to 2026 and the WFTCA legislation, there was 'a repayment cap on the maximum amount of excess APTC taxpayers with household income below 400[%] of the FPL were responsible for paying back when filing their Federal income tax for the year of coverage.'" ECF 23, at 34 (quoting 91 Fed. Reg. at 29,621). "But starting in 2026, 'tax filers whose APTC continues uninterrupted and whose actual household income is higher than their projected household income may have excess PTC and, if so, must pay back the full difference between their APTC and PTC, regardless of their income level.'" *Id.* (quoting 91 Fed. Reg. at 29,621). Defendants argue that a broker or consumers

---

[10] The Court also observes that there is internal inconsistency within the Rule on the matter of self-attestation. Namely, with respect to the newly expanded hardship exemption, CMS would permit individuals to "apply directly for the hardship exemption by completing the paper exemption request form and attesting that they cannot afford coverage because they are no longer eligible for financial assistance; income documentation is not required under this pathway." 91 Fed. Reg. at 29,636. At the hearing, the Court asked why self-attestation is permissible in that context, but not this one. Defendants' counsel argued there was no data yet to suggest that self-attestation in the hardship exemption context will lead to fraudulent enrolment. But considering the logical leaps the agency takes to connect the GAO study and its internal data to self-attestation of income here, it is unclear to the Court *why* that evidence would not counsel against the agency's adoption of a self-attestation policy in the context of catastrophic plan enrollment.

39

themselves "now could inadvertently subject themselves to significant tax liability" on account of the One Big Beautiful Bill, "which this provision seeks to mitigate as it would help ensure enrollees receive the appropriate APTCs for their income level at the outset." *Id.* In response, Plaintiffs point out that "individuals are already held harmless if they are fraudulently enrolled by a broker," ECF 26, at 14 (citing Levitis comment at 15); a point Defendants concede, *see* ECF 23, at 34 n.4. Moreover, Plaintiffs contend that the agency "does not explain why its [existing] policy is inadequate to address" the problem of enrollees facing greater tax liabilities, "particularly when the alternative is a 'front-end' solution that denies coverage to millions of people who have attempted to demonstrate to the agency their desire to keep subsidized insurance coverage and their eligibility to do so." *Id.* at 14–15.

Although the invocation of the new policy imposed by the One Big Beautiful Bill offers an additional reason to enact policies that protect enrollees from potentially increased tax liabilities, Defendants' argument on this point *assumes* they have provided evidence that self-attestation leads to those increased tax liabilities. They have not. On the contrary, as Plaintiffs note, the evidence appears to point in the opposite direction—that enrollees do not incur increased tax liabilities for the broker fraud the agency has identified because they are held harmless in such instances. *See* Levitis comment at 15 ("CMS also notes that this change prevents excess payments to those fraudulently enrolled by a broker. But in fact CMS holds people harmless who are fraudulently enrolled, including retroactively cancelling such coverage."). The agency did not meaningfully address this point in the Rule. *See* 91 Fed. Reg. at 29,619–23; ECF 23, at 34–35. Having failed to identify evidence of a nexus between tax liabilities, broker fraud, and self-attestation to tax data, the Court concludes that the solution adopted remains incongruent to the problem identified. *See City of Columbus III*, 796 F. Supp. 3d at 169; *see also City of Columbus II*, 523 F. Supp. 3d at 762

("HHS improperly elevated the objective of fraud prevention, for which it had no evidence, above the ACA's primary purpose of providing health insurance." (citing *King*, 759 F.3d at 373–374)). Given the lack of sufficient data to justify the rule, and the agency's lack of meaningful explanation for the provision, the Court finds that this provision is likely arbitrary and capricious because it was not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

### iv.    Verification for Special Enrollment Periods

The ACA requires Exchanges to offer SEPs during which qualifying individuals may enroll for coverage in between the annual open enrollment periods. 42 U.S.C. § 18031(c)(6)(C). The Rule would reimpose two additional verification requirements to Exchange enrollment via SEPs. *See* ECF 17-1, at 31; ECF 23, at 14. Under current regulations, the federally facilitated Exchange and state-based Exchanges on the federal platform are required to conduct pre-enrollment eligibility verification only for applicants seeking to enroll in an Exchange plan under the loss-of-minimum-essential-coverage ("Loss of MEC") SEP, but no such verification is required in conjunction with any other category of SEP. *See* 45 C.F.R. § 155.420(g). First, the new provision would require those Exchanges to conduct pre-enrollment eligibility verification for other categories of SEPs as well (e.g., permanent move, marriage, etc.). *See* 91 Fed. Reg. at 29,631. Second, the challenged provision would require the Exchanges[11] to conduct pre-enrollment eligibility verification "for at least 75 percent of new enrollments" through SEPs. *Id.* "If the Exchange is unable to verify such eligibility, . . . the consumer would not be eligible for enrollment . . . and any plan selection under that SEP would be canceled." *Id.* at 29,632. Though last year

---

[11] These requirements would not apply to state-based Exchanges, as under current regulations, states are given the *option* to conduct pre-enrollment eligibility verification for SEP enrollment but are not *required* to do so. *See* ECF 23, at 36 n.5.

CMS determined that, after one year, "the burden of continuing such policies will reach a point at which they outweigh any benefit," 90 Fed. at 27,151, the new provision would make these policies permanent, 91 Fed. Reg. at 29,631.

Plaintiffs emphasize that "[t]his policy will generate an estimated 293,000 verification issues to resolve in the coming year, resulting in a further barrier to coverage, through additional paperwork and administrative burdens, and costing consumers more than $7 million annually." ECF 17-1, at 32 (citing 91 Fed. Reg. at 29,814). Plaintiffs also argue that "[y]ounger and healthier people are more likely to drop coverage as a result, worsening the risk pool, as CMS itself recognized when it previously considered (and rejected) a similar policy." *Id.* (first citing 87 Fed. Reg. 27,208, 27,279 (May 6, 2022); then citing Levitis comment at 26; then citing Colo. Consumer Health Initiative ("CCHI") comment at 5 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0811; and then citing Nat'l Health Law Program ("NHLP") comment at https://www.regulations.gov/comment/CMS-2026-0496-0615). According to Plaintiffs, the agency disregarded "a well-known effect: when paperwork barriers are imposed on coverage, sicker people are more motivated to overcome those barriers, while younger and healthier people are more likely to give up." *Id.* Although CMS reached the opposite conclusion about the future of the risk pool, *see* 91 Fed. Reg. at 29,633 ("Though SEP verification could be perceived as a burdensome or unnecessary process, it will help protect the risk pool from adverse selection."), Plaintiffs argue that it has failed to "explain why it believes this to be the case, or why it repudiates its own view on risk pool effects from only four years ago." ECF 17-1, at 32.

Defendants attempt to justify this provision by asserting that "CMS identified critical enrollment control vulnerabilities for SEPs, which this provision is specifically designed to address." ECF 23, at 36. "In recent data analysis," Defendants state that "CMS discovered a

42

troubling pattern in which a disproportionate number of consumers enrolled through SEPs without verification requirements." *Id.* (citing 91 Fed. Reg. at 29,632).  Defendants describe a trend of consumers moving away from the Loss of MEC SEP "in droves" after its "verifications requirements resumed" following the COVID-19 pandemic. *Id.* Likewise, the agency observed that "other SEP types had their overall percentage of SEP enrollments increase quite substantially," which it predicted was a result of consumers shifting "so as not to have to provide verification of eligibility for the SEP." 91 Fed. Reg. at 29,632. The agency inferred from this shift that consumers were attempting to "intentionally avoid SEP verification," "driven primarily by agent and broker activity," so that individuals can enroll via "SEPs they are not eligible for." *Id.*

Plaintiffs take issue with Defendants' "attempt to justify this policy by pointing to shifting patterns in SEP enrollments." *Id.* Plaintiffs acknowledge that "[w]hen stricter verification requirements were imposed for the SEP for persons who lose other coverage, for example, this resulted in an increase in enrollments under other SEPs." *Id.* (citing 91 Fed. Reg. at 29,632). But "CMS intuits from these trends that fraud must be widespread among SEP enrollees." *Id.* Plaintiffs argue this conclusion does not follow because "many individuals may be eligible for multiple SEPs, and it is only natural to assume that, given a choice, they would choose the process with less burdensome red tape." *Id.* at 32–33 (first citing Levitis comment at 25; and then citing NHLP comment at 26). So "even if the agency's inference were correct," Plaintiffs maintain that "this would not indicate that fraud is widespread; it would simply indicate that individuals who are eligible under multiple pathways choose the option that poses the least administrative burden." *Id.* Finally, Plaintiffs contend that "CMS should have considered why the [federally facilitated Exchange] might be different, such as the ability of enhanced direct enrollment entities to apply on behalf of enrollees," a reasonable alternative action to the policy it selected. ECF 17-1, at 33

(citing CBPP comment at 23). Rather than consider such an alternative, Plaintiffs assert that the agency "failed even to acknowledge the extent of the burden that it was placing on individuals seeking coverage," which Plaintiffs contend would be "about 2.2 million people . . . cut off from access to coverage." ECF 26, at 16.

Generally, "an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Here, it appears that the agency "entirely failed to consider an important aspect of the problem," *id.*—i.e., that the shifts in behavior resulting from the introduction of new verification methods for SEPs reflects a natural response to a new barrier to entry into those programs, rather than fraud or ineligibility. Although the agency stated that it "believe[d] there is a high likelihood action is being taken to intentionally avoid SEP verification," and further that it "believe[d] this trend is being driven primarily by agent and broker activity as 86 percent of SEP enrollments are through agents and brokers," this reasoning is conclusory and unsupported by evidence. Defendants cannot merely state a belief to avoid engaging with data. There is no data to back up the claim and reasoning that the *cause* of the shift Defendants observed was related to the problem they seek to mitigate, "fraudulent enrollments and ineligible individuals gaining access to coverage." 91 Fed. Reg. at 29,632.

Moreover, Plaintiffs point out that "[u]sing CMS's own numbers, 52% of all SEP enrollments, or 357,500 individuals, would have been enrolled in other SEPs before the policy change," while "[a]fter the change, 73% of all SEP enrollments, or 256,850 individuals, would

have been enrolled in other SEPs." ECF 26, at 16. "So," they note, "the agency's own data reveals that there has not been an influx of fraudsters shifting from one enrollment opportunity to another." *Id.* "Rather, SEP enrollments have declined across the board, albeit more quickly for the one type of SEP that newly required verification, as one would expect" when more work is required of the consumer to enroll via that method. *Id.* Plaintiffs further argue, and the Court agrees, that "it is only natural to assume that, given a choice, [enrollees] would choose the process with less burdensome red tape." ECF 17-1, at 32–33 (Levitis comment at 25; NHLP comment at 26). Given that this obvious alternative explanation was raised by several commenters, the agency should have addressed it. Instead, the agency only stated that "the SEPV requirement adds a minor administrative burden to the enrollment process; however, we are unable to determine whether this burden contributes to consumers foregoing coverage through the Exchange." 91 Fed. Reg. at 29,633. Such "nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020).

Finally, the Court observes that the agency's discussion of the burden imposed by these new verification requirements is dissonant with its prior position sunsetting this policy. Though last year CMS determined that, after one year, "the burden of continuing such policies will reach a point at which they outweigh any benefit," 90 Fed. Reg. at 27,151, the new provision nonetheless makes these policies permanent, 91 Fed. Reg. at 29,631. As to this change in position, the Court can discern no particular reasoning except that general justification CMS provides for the provision itself. *See id.* at 29,632 ("For the reasons provided above, we reproposed without a sunset at §155.420(g), the provision to remove the restriction for Exchanges on the Federal platform to only conduct SEPV for Loss of MEC, and the provision to require Exchanges on the Federal platform

to conduct SEPV for at least 75 percent of new enrollments."). "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Because the Court identifies no such reasoned explanation here, it concludes that Plaintiffs have shown the SEP verification provision was likely arbitrary and capricious.

### v.   *Cost-Sharing Limitation for Bronze Plans*

For each metal-level plan, the ACA sets an annual limitation on cost-sharing, or the maximum amount that an insured consumer may be required to spend on covered medical expenses each year through deductibles, copayments, and co-insurance. *See* 42 U.S.C. § 18022(c)(1), (3). For plan year 2027, the statutory cost-sharing limitations for metal-level plans generally are $12,000 for an individual and $24,000 for a family. *See* 91 Fed. Reg. at 29,691; ECF 17-1, at 34. Accordingly, an insurer must set the maximum out-of-pocket ("MOOP") cost that an enrollee could incur annually under a bronze plan at or below those amounts. The relevant provision of the Rule, however, would allow insurers to offer individual market bronze plans with MOOPs up to 130% of the statutory limitation ($15,600 for an individual or $31,200 for a family) so long as the insurer offers at least *one* bronze plan that complies with the statutory limitation. *See* 91 Fed. Reg. at 29,697. The policy applicable to bronze plans would take effect in plan year 2027, and a similar policy for catastrophic plans (not implicated by the present motion) will take effect in 2028. *See id.*

Plaintiffs argue that "this policy is explicitly contrary to 42 U.S.C. § 18022(c) and exceeds the agency's statutory authority to regulate under that provision." ECF 17-1, at 33. Plaintiffs

argue that "under section 18022(c), the annual cost-sharing under an individual market bronze plan cannot lawfully exceed the statutory cap, which is set annually and which CMS calculates to be $12,000 for self-only coverage or $24,000 for a family for 2027." *Id.* at 33–34 (citing 91 Fed. Reg. at 29,691–92 & tbl. 9). But as Plaintiffs point out, "the new rule allows an insurer to offer bronze plans with MOOPs that exceed those very limits by 30%, as long as the insurer also offers at least one bronze plan that complies with the statutory limits." *Id.* at 34 (citing 91 Fed. Reg. at 29,697, 29,699). Defendants argue that, contrary to Plaintiffs' arguments, the provision "harmonizes two competing ACA mandates in a manner that best effectuates congressional intent." ECF 23, at 38. According to Defendants, a problem "arises from competing ACA requirements on insurers to adhere to the cost-sharing limits described in 42 U.S.C. § 18022(c) and to meet the actuarial value (AV) levels of plans established by 42 U.S.C. § 18022(d))." *Id.*

The Court starts with the text, as it must. Section 18022 of Title 42 governs essential health benefits. Related to those benefits, subsection (c) sets out requirements relating to cost-sharing, or the portion of healthcare costs paid by the enrollee out of pocket, usually in the form of deductibles, copayments, or co-insurance.[12] *See* 42 U.S.C. § 18022(c). Section 18022(c) limits the annual cost sharing incurred under a health plan to a maximum annual limitation (i.e., the maximum out-of-pocket cost, or MOOP), which is calculated using a provided formula. *See id.* As described before, the next subsection, § 18022(d), categorizes exchange plans into different "metal tiers"—bronze, silver, gold, and platinum—based on their "level of coverage." 42 U.S.C. § 18022(d). Under that subsection, "bronze plans" must have an actuarial value ("AV") of 60%, meaning the plan is designed such that the issuer will pay around 60% of covered medical

_____

[12] Cost-sharing "does not include premiums, balance billing amounts for non-network providers, or spending for non-covered services." 42 U.S.C. § 18022(c)(3)(B).

expenses, while the enrollee pays the remaining 40% of expenses through the forms of out-of-pocket spending. *Id.* § 18022(d)(1)(A). The statute also contains provisions specific to determining actuarial value, although no specific formula is provided. *See id.* § 18022(d)(2).

Defendants state that AV is generally calculated using the "CMS AV Calculator, which comprises three interrelated components that have changed at different speeds: worsening health in the standard population increases [essential health benefits, or] ["]EHB["] costs, which push the AV up, while increases to the MOOP limit pushes the AV down—but not enough to offset the other two components." ECF 23, at 38 (first citing 91 Fed. Reg. at 29,693–96; and then citing 42 U.S.C. § 18022(d)(2)(A)). The Rule asserts that "CMS has assessed that the structural mismatch between how AV is calculated and the cost sharing formula set out in § 18022(c)(1) will *eventually* make compliant bronze plans 'mathematically impossible' to design." *Id.* at 38–39 (emphasis added) (citing 91 Fed. Reg. 29,691). Indeed, the agency believes that "bronze plans are barely still viable in 2027." 91 Fed. Reg. at 29,698.

As an initial matter, Plaintiffs take issue with the agency's concern about the viability of bronze plans. *See* ECF 17-1, at 34 ("[T]here is no serious danger that insurers will be unable to design bronze plans in the foreseeable future." (citing Matthew Fiedler comment at 3 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-1027)). The Court observes that "even on the agency's own telling, it remains possible today to design bronze plans that comply with the ACA's limitations." ECF 17-1, at 34. One need look no further than the Rule itself, which "requires that insurers offering bronze plans on the individual market design at least one bronze plan that complies with the statutory limitations." *Id.* (citing 91 Fed. Reg. at 29,697). But the Court does not need to decide who is right or wrong with respect to the viability of bronze plans as the ACA is unequivocal in describing their requirements. The statute states that bronze

48

plans "*shall* provide a level of coverage that is designed to provide benefits that are actuarially equivalent to 60 percent of the full actuarial value of the benefits provided under the plan." 42 U.S.C. § 18022(d)(1)(A) (emphasis added). In sum, if a bronze plan exists, it must provide the statutorily prescribed level of coverage, regardless of the efficacy of such a policy. *Cf. City of Columbus III*, 796 F. Supp. 3d at 163 ("CMS is not free to re-write the statutory formula to accomplish its policy goals, irrespective of the efficacy of such a policy."). The Court thus concludes that Plaintiffs have shown this provision is likely contrary to law.[13]

### vi. *Expansion of Catastrophic Plan Eligibility*

As discussed above, catastrophic plans, unlike metal-level plans, do not cover most benefits until after an enrollee has reached the statutory limit on out-of-pocket spending. *See* 42 U.S.C. § 18022(e). Because of the consequently high out-of-pocket costs of catastrophic plans, premiums are generally lower for catastrophic plans relative to metal-level plans, but PTCs cannot be used to purchase them. *See* ECF 17-1, at 19. The ACA limits catastrophic plan enrollment to individuals under 30 years old or those who are certified as exempt from the individual mandate by reason of either § 5000A(e)(1) relating to individuals without affordable coverage or § 5000A(e)(5) relating to individuals with hardships. *See* 42 U.S.C. § 18022(e)(2); 26 U.S.C. § 5000A(e)(1), (e)(5). Although § 5000A(e)(5) does not define "hardship," CMS has defined a qualifying hardship to encompass a variety of financial and domestic circumstances, such as "an unexpected natural or human-caused event." *See* 45 C.F.R. § 155.605(d)(1).

In September of 2025, CMS promulgated guidance that expanded the hardship exemption such that many more people would be eligible to enroll in catastrophic coverage. *See* CMS,

---

[13] Because the Court finds that Plaintiffs are likely to succeed on their argument that this provision of the Rule is contrary to law, the Court need not reach Plaintiffs' alternative argument that adopting the provision was arbitrary and capricious.

*Guidance on Hardship Exemptions for Individuals Ineligible for Advance Payment of the Premium Tax Credit or Cost-Sharing Reductions* (Sept. 4, 2025), https://perma.cc/9QMD-RJH2 ("Guidance on Hardship Exemptions"). The relevant provision of the Rule would codify and build on this guidance, "expand[ing] hardship exemption eligibility to consumers ineligible for APTC or CSRs due to projected household income in all States." 91 Fed. Reg. at 29,634. Specifically, the provision would "codify the expansion of hardship exemption eligibility to individuals who are ineligible for APTC or CSR due to projected household income below 100 percent or above 250 percent of the" federal poverty line. *Id.* at 29,633.

This "broad nationwide hardship exemption," *id.* at 29,634, will thus allow individuals over the age of 30 to obtain an exemption to enroll in catastrophic coverage based solely on income. The Rule describes two pathways that individuals may take to qualify for the newly expanded exemption. *See id.* at 29,636. First, "individuals who apply for coverage through the Exchange and attest to a projected household income above 400 percent of the FPL—rendering them ineligible for APTC—will have the hardship exemption automatically adjudicated based on the income information provided in their coverage application." *Id.* Second, "individuals may apply directly for the hardship exemption by completing the paper exemption request form and attesting that they cannot afford coverage because they are no longer eligible for financial assistance; income documentation is not required under this pathway." *Id.*; *see also* ECF 17-1, at 39 n.12.

Plaintiffs argue that this provision is contrary to § 18022(e)(1), which Plaintiffs read as limiting eligibility for catastrophic plans to narrow, mutually exclusive categories. *See* ECF 17-1, at 38–39. Defendants counter that the relevant "statutory provisions grant broad authority to CMS to determine the nature and scope of qualifying hardships; they also provide a distinct and

50

independent pathway from the affordability exemption in 26 U.S.C. § 5000A(e)(1)." ECF 23, at 43. Resolution of this dispute requires a deeper dive into statutory interpretation.

As discussed, § 18022(d) establishes levels of coverage under the ACA. *See* 42 U.S.C. § 18022(d). Section 18022(e) governs an additional form of coverage—catastrophic plans. *See* 42 U.S.C. § 18022(e). Generally, a catastrophic plan is "[a] health plan not providing a bronze, silver, gold, or platinum level of coverage" that will nevertheless "be treated as meeting the requirements of subsection (d) with respect to any plan year if":

> (A) the only individuals who are eligible to enroll in the plan are individuals described in paragraph (2); and
>
> (B) the plan provides—
>
>> (i) except as provided in clause (ii), the essential health benefits determined under subsection (b), except that the plan provides no benefits for any plan year until the individual has incurred cost-sharing expenses in an amount equal to the annual limitation in effect under subsection (c)(1) for the plan year (except as provided for in section 2713); and
>>
>> (ii) coverage for at least three primary care visits.

*Id.* § 18022(e)(1). Paragraph (2) describes the individuals eligible for enrollment in a catastrophic plan. *Id.* § 18022(e)(2). The statute defines such an individual as someone who:

> (A) has not attained the age of 30 before the beginning of the plan year; or
>
> (B) has a certification in effect for any plan year under this title 1 that the individual is exempt from the requirement under section 5000A of title 26 by reason of—
>
>> (i) section 5000A(e)(1) of such title (relating to individuals without affordable coverage); or
>>
>> (ii) section 5000A(e)(5) of such title (relating to individuals with hardships).

*Id.* If a health insurance issuer offers a catastrophic plan, "the issuer may only offer the plan in the individual market." *Id.* § 18022(e)(3).

26 U.S.C. § 5000A(e) describes the identified exemptions at greater length. Section 5000A(e)(1) states the first exemption listed in § 18022(e)(2)(B) applies to "[a]ny applicable individual[14] for any month if the applicable individual's required contribution (determined on an annual basis) for coverage for the month exceeds 8 percent of such individual's household income for the taxable year described in section 1412(b)(1)(B) of the Patient Protection and Affordable Care Act." *Id.* § 5000A(e)(1)(A). The provision defines "required contribution" as either "the portion of the annual premium which would be paid by the individual" in the case of an individual eligible to purchase minimum essential coverage through an employer-sponsored plan, or "the annual premium for the lowest cost bronze plan available in the individual market through the Exchange in the State in the rating area in which the individual resides . . . reduced by the amount of the credit allowable under section 36B for the taxable year." *Id.* § 5000A(e)(1)(B)(i)–(ii).

On the other hand, § 5000A(e)(5) provides for the hardship exemption. But it states only the following with respect to those who may fall under the exemption:

> Any applicable individual who for any month is determined by the Secretary of Health and Human Services under section 1311(d)(4)(H) to have suffered a hardship with respect to the capability to obtain coverage under a qualified health plan.

*Id.* § 5000A(e)(5). The section referenced in that provision, codified at 42 U.S.C. § 18031(d)(4)(H), provides that an Exchange shall grant a certification attesting that "an individual is exempt from the individual requirement or from the penalty imposed by such section because":

> (i) there is no affordable qualified health plan available through the Exchange, or the individual's employer, covering the individual; or

---

14 Section 5000A(d)(1) defines an "applicable individual" as "an individual other than an individual described in paragraph (2), (3), or (4)"—namely, individuals with certain religious exemptions, those not lawfully present in the United States, and incarcerated individuals. *See* 26 U.S.C. § 5000A(d)(1)–(4).

(ii) the individual meets the requirements for *any other such exemption* from the individual responsibility requirement or penalty;

42 U.S.C. § 18031(d)(4)(H) (emphasis added).

"To start," Plaintiffs argue that "the hardship exemption is a distinct provision from the income-based affordability exemption." ECF 17-1, at 40. Plaintiffs contend that "[i]t is more circumscribed, speaking to individual circumstances, such as 'an unexpected natural or human-caused event' causing 'a significant, unexpected increase in essential expenses,' or 'other circumstances that prevented [the individual] from obtaining coverage under a qualified health plan,' as determined by the Exchange." *Id.* (quoting 45 C.F.R. § 155.605(d)(1)). According to Plaintiffs, a "broad, categorical, income based, and automatic 'hardship' exemption is therefore wholly incompatible with section 50001(e)(5)," because it would swallow up the distinct exemption in (e)(1). *Id.* Defendants argue instead that "[t]he hardship provision grants CMS the authority to define the circumstances that constitute a qualifying hardship," and the provision at issue "reflects the exercise of the CMS's broad discretion." ECF 23, at 43–44.

In large part, the parties' dispute turns on the meaning of the word "hardship," as it is used in § 18022(e)(2)(B)(ii) and § 5000A(e)(5), and whether it can refer only to an income-based status. "In interpreting statutory language, words are generally given their common and ordinary meaning." *Nat'l Coal. For Students With Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 288 (4th Cir. 1998) (quoting *Alexander S. v. Boyd*, 113 F.3d 1373, 1383 (4th Cir. 1997)); *see also Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 85 (2018) (noting that when a word "is not defined in the statute," courts should "give the term its ordinary meaning" (quoting *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012))). "Hardship" as used in the sections at issue is not defined by the ACA, so the Court considers what a common and ordinary meaning of that term might be. "To glean a word's ordinary meaning, courts often look to dictionaries for

illumination and guidance." *United States v. George*, 946 F.3d 643, 646 (4th Cir. 2020) (citing *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454 (2012)).

Plaintiffs offer one source for defining hardship. *See* ECF 17-1, at 40. They point out that Black's Law Dictionary defines "hardship" in relevant part as "[p]rivation; suffering or adversity." *Hardship*, Black's Law Dictionary (12th ed. 2024); *see also Hardship*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/hardship (last accessed July 14, 2026). Plaintiffs argue that "any amount greater than 250% of the federal poverty level—even as much as, say, 3,000% or more—could scarcely be described as a 'hardship'" under such a definition. *See* ECF 17-1, at 40. The Court observes generally that income alone, divorced from context, does not appear capable of meeting any ordinary definition of "hardship." Identifying that an individual makes $30,000 a year, for example, says nothing about hardship unless that amount is contextualized against the backdrop of that individual's needs and the society and economy in which they exist. However, to characterize Defendants' expansion of the hardship exemption as entirely divorced from context here would be disingenuous. Furthermore, the Court is loath to conclude that a plain language reading of the word "hardship" is exclusive of any particular income amount, for the reason articulated above—external circumstances might quickly transform a median income into one accompanied by significant "hardship."

Defendants offer little help in guiding the Court's interpretation of "hardship," stating simply that the agency has "broad discretion" to determine what "hardship" means. *See* ECF 23, at 42. But "the statutory language itself does not afford 'broad discretion' to HHS to determine when such a hardship exists." *In re Juntoff*, 636 B.R. 868, 880 & n.12 (B.A.P. 6th Cir. 2022), *aff'd*, 76 F.4th 480 (6th Cir. 2023). Moreover, even if Defendants enjoy some measure of discretion, surely "hardship" must have some meaning capable of guiding or limiting that

54

discretion, and the Court must give effect to the meaning of the words in the statute. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 657 (4th Cir. 2019) ("We assume that Congress chooses its words carefully . . . ."); *Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("[C]ourts 'must give effect, if possible, to every clause and word of a statute.'" (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000))).

However, the Court is not only limited to text to ascertain legislative intent. "'Just as Congress' choice of words is presumed to be deliberate' and deserving of judicial respect, 'so too are its structural choices.'" *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018) (alteration omitted) (quoting *Univ. of Tex. Southwestern Medical Ctr. v. Nassar*, 570 U.S. 338, 353 (2013)). The hardship exemption at issue here sits within what the United States Court of Appeals for the Eleventh Circuit has referred to as a "significant *exception* to the 'essential health benefits package' requirement." *Fla. ex rel. Atty. Gen. v. U.S. Dep't of Health & Hum. Servs.*, 648 F.3d 1235, 1254 (11th Cir. 2011) (emphasis added), *aff'd in part and rev'd in part on other grounds sub nom. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012). This Court agrees that there is good reason to think about the catastrophic plan provision of § 18022 as an exception—it is a limited instance in which a plan under the Act need not offer an "essential health benefits package" as defined in § 18022 but nevertheless may still meet the requirements of a "qualified health plan." *See* 42 U.S.C. § 18022(a), (d)(4), (e)(1). "[E]xceptions from a general policy which a law embodies should be strictly construed." *United States v. Kanasco, Ltd.*, 123 F.3d 209, 212 (4th Cir. 1997) (quoting *Spokane & Inland Empire R.R. v. United States*, 241 U.S. 344, 350 (1916)); *see also Comm'r of Internal Revenue v. Clark*, 489 U.S. 726, 739 (1989) ("In construing provisions . . . in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision."). Moreover, as the D.C.

55

Circuit has observed, "Congress has included limited, specific exemptions from Section 5000A, and, absent reason to conclude otherwise, exemptions are to be construed narrowly." *Sissel v. U.S. Dep't of Health & Hum. Servs.*, 760 F.3d 1, 5–6 (D.C. Cir. 2014) (citing *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)).

In addition to the broad structure of the sections at issue, the Court considers the structure of the relevant subsections as well—specifically, § 18022(e)(2). Three categories of individuals are eligible for enrollment in a catastrophic plan. *See* 42 U.S.C. § 18022(e)(2). In addition to permitting those below the age of 30 before the beginning of the plan year to enroll, §18022(e)(2) also allows enrollment by an individual with "a certification in effect for any plan year under this title that the individual is exempt from the requirement under section 5000A of title 26 by reason of . . . section 5000A(e)(1) of such title (relating to individuals without affordable coverage); *or* . . . section 5000A(e)(5) of such title (relating to individuals with hardships)." *Id.* § 18022(e)(2)(B) (emphasis added). There is no doubt that under the new provision, the hardship exemption will sweep broadly into the territory of the other exemption relating expressly to "individuals without affordable coverage." *Id.* Although the Court cannot say that the exemption would be rendered *superfluous* under the challenged provision, it appears contrary to foundational principles of statutory interpretation that Congress would use the word "hardship" to capture an income-based need alone, when an exemption already exists for that very purpose. *See United States v. Cuong Gia Le*, 206 F. Supp. 3d 1134, 1141 (E.D. Va. 2016) ("Importantly, where provisions of the same statute use different terms, it is presumed 'that the enacting legislature meant those terms to have at least slightly different meanings.'" (quoting Caleb Nelson, *Statutory Interpretation* 88 (2011))).

With that analysis in mind, the Court concludes that a "hardship" as that term is used in § 18022(e)(2)(B)(ii) and § 5000A(e)(5) cannot be defined solely on the basis of an individual's

income. Yet, by expanding the "hardship exemption eligibility to individuals who are ineligible for APTC or CSR due to projected household income below 100 percent or above 250 percent of the FPL," 91 Fed. Reg. at 29,634, Defendants have done just that. Moreover, given that "the final rule places no upper limit on the income that can qualify an individual for the purported exemption," it appears inevitable that even if such an approach were consistent with the text and structure of the provision, the challenged Rule would nonetheless "sweep[] in consumers who suffer no income hardship" in actuality. ECF 26, at 19. Accordingly, the Court concludes that Defendants' provision expanding the eligibility for catastrophic plan enrollment via the hardship exemption is likely contrary to law.[15]

### vii.    Change of Standards for Network Adequacy

CMS's current adequacy network standards ensure enrollees can access care from a sufficient number and type of providers "without unreasonable delay." 45 C.F.R. § 156.230(a)(1)(ii); *id.* § 155.1050(a)(1) ("A federally facilitated Exchange must ensure that the provider network of each QHP meets the standards specified in § 156.230 of this subtitle."). These standards include time and distance thresholds. *See id.* § 156.230(a)(2)(i). The regulations also ensure access to "essential community providers" that serve primarily low-income individuals and other underserved populations. *Id.* §§ 156.230(a)(1)(i), 156.235. Collectively, these standards set a "[f]ederal floor," 89 Fed. Reg. 26,218, 26,333 (Apr. 15, 2024), for network adequacy standards that apply to qualified health plans offered through the federally facilitated Exchange ("FFE"), which reviews and determines whether plans meet these minimum federal standards. Under current regulations, State-based Exchanges ("SBEs"), including state-based Exchanges on the

---

[15] Because the Court finds that Plaintiffs are likely to succeed on their argument that this provision of the Rule is contrary to law, the Court need not reach Plaintiffs' alternative argument that adopting the provision was arbitrary and capricious.

federal platform ("SBE-FPs"), must "[e]stablish and impose network adequacy time and distance standards for [qualified health plans] that are at least as stringent as standards for [qualified health plans]. participating on the Federally-facilitated Exchanges under § 156.230(a)(2)(i)(A)," 45 C.F.R. § 155.1050(a)(2)(i)(A), subject to limited exceptions.

Under the relevant provision of the Rule, the agency would now "defer reviews of network adequacy to FFE States, including States performing plan management, provided the State elects to conduct such reviews, and demonstrates sufficient authority and the technical capacity to conduct network adequacy reviews by satisfying the applicable criteria to be considered to have an Effective Provider Access Review Program." 91 Fed. Reg. at 29,727. HHS, however, "would continue to conduct network adequacy reviews using standards described at § 156.230(a)(2) through (a)(4) for QHP issuers that use a provider network in FFE States that do not elect to conduct their own provider access reviews, or that HHS has determined do not satisfy applicable criteria." *Id.* The provision would also allow FFE states to conduct their own essential community. provider ("ECP") certification reviews when "the State is determined by HHS to have an Effective ECP Review Program." *Id.* at 29,747. The Rule also removes the quantitative time and distance requirements for in-network treatment and treatment access from plans offered on SBEs and SBE-FPs and permits SBEs and SBE-FPs to establish their own standards, if certain conditions are met. *Id.* at 29,645. However, CMS will continue to conduct the aforementioned reviews for states that do not conduct reviews themselves.

Plaintiffs argue that these changes are arbitrary and capricious, and that they mirror network adequacy provisions in the 2018 rule that this Court ultimately vacated as arbitrary. ECF 17-1, at 21 (citing *City of Columbus II*, 523 F. Supp. 3d at 751). Specifically, Plaintiffs argue that "CMS fails to reasonably explain its about-face from its prior rulemakings on the need for

58

meaningful network adequacy standards." *Id.* at 47. According to Plaintiffs, the justification the agency provided "depends on its belief 'that restoring authority to the States will enable them to proactively adapt their Exchange standards to meet their market's needs, as they will be better able to take into consideration the needs of their enrollee population.'" *Id.* (quoting 91 Fed. Reg. at 29,655). But Plaintiffs argue that "CMS offers no meaningful support for this conclusion." *Id.* Rather, Plaintiffs assert that the agency "simply appeals to its 'expert judgment,' without 'point[ing] . . . to any data of the sort it would have considered if it had considered [the issue] in any meaningful way.'" *Id.* (quoting *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 499 (D.C. Cir. 1988)). Moreover, Plaintiffs contend that Defendants failed to respond to numerous commenters who "noted that removing the FFE network adequacy standards as the minimum requirements for SBEs and SBE-FPs risks states *lowering* adequacy standards, at the particular expense of rural communities and consumer access to mental health, substance use disorders, and other specialty care." *Id.* (emphasis in original) (citing Levitis comment at 60; NHLP comment at 34; Families USA comment at 6 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0945; Am. Acad. of Family Physicians comment at 13–14 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0634).

Defendants counter that CMS's "policy of deferring review of network adequacy to states, when certain conditions are met, is not a new one," pointing to, for example, a 2017 rule which "deferred review to states that possessed sufficient authority to enforce network adequacy standards." ECF 23, at 48 (citing 82 Fed. Reg. at 18,346–47). And although Defendants acknowledge that the 2018 rule enacting a similar policy was ultimately vacated by this Court, Defendants contend it was on bases specific to that rule—i.e., that "the agency did not sufficiently respond to public comments." *Id.* (citing *City of Columbus II*, 523 F. Supp. at 750). In response

to Plaintiffs' claims that the Rule lacks justification, Defendants contend that "CMS explained that it conducted reviews of QHP issuer provider network adequacy and analyzed the data submitted by insurers from Plan Year 2023 to 2026," along with obtaining information through "discussions with states, insurers and other stakeholders." *Id.* at 49. Defendants also argue that their response to commentors was sufficient, by "explain[ing] how the Rule's framework, which allows but does not require state review, provides consumer protections and backstops that would mitigate commenters' concerns." *Id.* at 50. "Finally, contrary to Plaintiffs' assertions," Defendants argue that "CMS addressed commenter concerns regarding removal of the FFE network adequacy standards as the minimum requirements for SBEs and SBE FPs" by explaining that "states will be better positioned to proactively adapt their Exchange standards to meet specific market needs." *Id.* at 51 (citing 91 Fed. Reg. at 29,647–48).

The Court ultimately agrees with Plaintiffs that commenters "challenged a fundamental premise of the agency's decision to entrust network adequacy standards to the states"—namely, that removing the network adequacy standards as minimum requirements "risks states *lowering* adequacy standards, at the particular expense of rural communities and consumer access to mental health, substance use disorders, and other specialty care." ECF 17-1, at 47 (collecting comments) (emphasis in original). As it did before, however, the justification provided in the Rule largely "dismissed such concerns" in a "vague and conclusory" manner. *City of Columbus II*, 523 F. Supp. 3d at 751. For example, the agency noted in response to concerns about removing such requirements that "restoring authority to the States will enable them to proactively adapt their Exchange standards to meet their market's needs, as they will be better able to take into consideration the needs of their enrollee population related to factors such as provider supply

shortages and topography." 91 Fed. Reg. at 29,647. However, that response fails to explain *why* or even *if* States are better positioned to do so.

Although there is some inherent logic in the idea that States might be better aware of local features that could inform time and distance standards, *see* ECF 23, at 49, current regulations "already allow insurers to submit narrative explanations to justify deviations from the time-and-distance standards that would otherwise apply for plans on the federally-facilitated Exchange, and these explanations could cite any geographic constraints," ECF 26, at 21 (citing 45 C.F.R. § 156.230(a)(2)). Specifically, "[i]f a plan applying for QHP certification to be offered through a Federally-facilitated Exchanges does not satisfy the network adequacy standards described . . . , the issuer must include it as part of its QHP application a justification describing how the plan's provider network provides an adequate level of service for enrollees and how the plan's provider network will be strengthened and brought closer to compliance . . . ." 45 C.F.R. § 156.230(a)(2)(ii). As Plaintiffs point out, "[t]he agency specifically provided for this option in response to concerns raised by commenters that geographic barriers may make compliance with a time-and-distance standard difficult in some cases." ECF 26, at 21 (citing 87 Fed. Reg. 27,208, 27,327 (May 6, 2022)). CMS fails to explain why this existing safety valve did not address the issue in particular locations where geographic barriers existed, let alone why it would now be necessary to permit states to do away with the time-and-distance standards across the board.

The agency contends that it responded to these concerns by permitting states to depart from the uniform federal standards only if CMS first certifies them to conduct their own network adequacy or essential community provider reviews, if those states demonstrate to CMS's satisfaction that they have sufficient authority and technical capacity. *See* ECF 23, at 50 (citing 91 Fed. Reg. at 29,727–40). "For instance, under the Effective Provider Access Review Program,

a state must show sufficient legal authority (i.e., having standards in statute/regulations); technical capacity; measurable, enforceable standards consistent with certain federal standards (e.g., *id.* § 156.230(a)(1)(ii) and (iii)); and processes for compliance monitoring, data collection, and public reporting." *Id.* Moreover, CMS "will continue to collect and analyze various forms of network adequacy data, including time and distance and appointment wait time data, and make it available in a standardized format to effective program states, to assist them in their network adequacy analysis." *Id.* at 50–51 (citing 91 Fed. Reg. at 29,732).

The issue commenters pointed out, however, is that by both rescinding federal standards and assigning review to the states without continued federal oversight beyond the initial certification stage, a likely result is "implementation of provider access reviews with 'relaxed' time and distance standards or removal of time and distance standards altogether." 91 Fed. Reg. at 29,733. "Commenters were concerned that this may result in negative impacts in rural areas, such as longer wait times, reduced access to specialty care, including mental health and substance use disorder services, or the removal of certain specialties from their standards entirely; and generally narrower networks compared to those in FFE States where we will continue to conduct provider access reviews." *Id.* The agency responded that "while an FFE State with an Effective Provider Access Review Program *could choose* to implement standards that differ from the Federal review standards and hypothetically opt to remove a specialty type (for example, pulmonology) from the provider specialty list their FFE State reviews for time and distance, that in no way prevents QHP issuers from continuing to contract with that provider type in an effort to better serve their enrollees." *Id.* (emphasis added). But the agency cannot dismiss such an outcome as a mere possibility when commenters point out empirical evidence showing that "state enforcement to network adequacy provisions in private insurance plans has been 'severely underwhelming,'

with most state insurance regulators reporting an average of one to zero enforcement actions related to network adequacy annually," NHLP comment at 33–34 (citing Abigail Burman, *Laying Ghost Networks to Rest: Combatting Deceptive Health Plan Provider Directories*, 40 Yale L. & Pol'y Rev. 78, 122 (2021)), and "that insurers will race to the bottom and offer inadequate networks when they are permitted to do so," ECF 17-1, at 48–49 (citing Am. Acad. of Family Physicians comment at 13–14). "The agency's failure to consider or respond meaningfully to the significant points raised is not indicative of reasoned decision-making." *City of Columbus II*, 523 F. Supp. 3d at 752. Accordingly, the Court concludes Plaintiffs have shown that the challenged provisions changing standards for network adequacy are likely arbitrary and capricious.

### viii. Elimination of Standardized Plans and Discontinuation of Non-Standardized Plan Limits and Exceptions

Standardized plans were first introduced by CMS in plan year 2017 in an effort "to simplify the consumer shopping experience and to allow consumers to more easily compare plans across issuers." 81 Fed. Reg. 12,204, 12,205 (Mar. 8, 2016); *see also* 45 C.F.R. § 155.20. Standardized plans offer a standard cost-sharing structure specified by CMS that intends to make it easier for consumers to compare plans, including fixed deductibles, fixed annual limits on cost-sharing, and fixed copayments or coinsurance for specified benefits. *See* 81 Fed. Reg. at 12,289–93. A standardized plan is defined as "a QHP offered for sale through an individual market Exchange that" generally "[h]as a standardized cost-sharing structure specified by HHS in rulemaking[.]" 45 C.F.R. § 155.20. Under current regulations, issuers participating in the FFE must offer at least one standardized plan option at every product network type, at every metal level (except the non-expanded bronze metal level), and throughout every service area that offers a non-standardized QHP option. *See id.* § 156.201(b). Issuers that offer "multiple standardized plan options within the same product network type, metal level, and service area" must ensure the plans meaningfully

differ from one another. *Id.* § 156.201(c). Current regulations also impose limits on the number of "non-standardized" plans that issuers may offer on the FFE. *See id.* § 156.202(b).

The relevant provision of the Rule would discontinue the requirement that insurers offer standardized options. 91 Fed. Reg. at 29,708 ("[W]e proposed to exercise our authority . . . to discontinue the full suite of standardized plan option policies effective beginning in PY 2027."). Under the Rule, insurers may continue to offer standardized plans, with modified cost-sharing levels, but will not be required to do so. *Id.* at 29,720. Further, any such offerings would not be specifically identified as "standardized" on Exchange websites. *Id.* Defendants also seek to remove the limitations on the number of non-standardized plans that insurers may offer. *Id.* at 29,720.

Plaintiffs contend that this Court vacated a materially identical policy in the 2018 rule for reasons endemic to the provision at issue. *See* ECF 17-1, at 21 (citing *City of Columbus II*, 523 F. Supp. 3d at 754–55). Following that decision, in 2022, CMS reintroduced standardized plan options, again with the stated goal of enhancing consumer experience, increasing consumer understanding, simplifying plan selection process, and combating discriminatory benefit designs. *See* 91 Fed. Reg. at 29,709. Plaintiffs argue that the effects of this provision, again seeking to discontinue standardized plan options, "will make it harder for consumers to meaningfully compare plan options," resulting in "confused consumers" who are "more likely to select plans that do not provide adequate coverage, or to drop out of the enrollment process altogether." ECF 17-1, at 22.

In the final Rule, the agency explains that "since these requirements were introduced in PY 2023, we no longer believe that the benefits of requiring issuers to offer these plans outweighs the burden of requiring them doing so—especially since employing this strategy has failed to achieve

our originally articulated objectives." 91 Fed. Reg. at 29,713. Plaintiffs argue, however, that the agency fails to provide a reasoned basis for that conclusion. *See* ECF 17-1, at 50–51. "Instead," Plaintiffs contend that "CMS concludes that plan standardization has been ineffective because 'each issuer on average tended to offer a higher number of plans after the imposition of the requirement to offer standardized plan options than the year before this requirement was made effective.'" *Id.* (quoting 91 Fed. Reg. at 29,722). Plaintiffs counter that "this increase occurred only in the first year that standardized plans were required, and the proliferation of plans was instead addressed in a separate provision limiting the number of non-standardized offerings." *Id.* at 51 (citing Partnership to Protect Coverage comment at 13 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0762). Plaintiffs also take issue with CMS's reliance on "'the comparatively low uptake' in standardized plan options despite differential display features," pointing out that according to the agency's own data, "more than eight million enrollees chose standardized plans last year." *Id.* (first quoting 91 Fed. Reg. at 29,715; and then citing Families USA comment at 2 (Mar. 13, 2026), https://www.regulations.gov/comment/CMS-2026-0496-0945).

Defendants argue that after over "over four years of additional experience implementing" standardized plan options, the agency is "equipped with new information to evaluate and 'weigh[] both the advantages and disadvantages of requiring FFE and SBE–FP QHP issuers to offer standardized plan options.'" ECF 23, at 52–53 (quoting 91 Fed. Reg. at 29,711). But after reviewing the agency's reasoning, the Court finds that CMS concluded in a conclusory fashion that the disadvantages accompanying standardized plan options outweighed the advantages. While the agency was "not required to refute the factual underpinnings of its prior policy with new factual data, it must provide a reasoned explanation for discounting the importance of the facts that it had

65

previously relied upon." *City of Columbus II,* 523 F. Supp. 3d at 755. That did not occur here. CMS did not "suggest that market conditions have changed in any material way" or identify how the goals of "consumer experience, increasing consumer understanding, and combatting discriminatory benefit designs" failed to materialize through offering standardized plans. ECF 17-1, at 50–51.

Rather, the agency asserts "4 plan years of experience (PY 2023 through PY 2026) administering these standardized and non-standardized plan option policies," but without meaningful explanation of why that "experience" drove its new conclusion. 91 Fed. Reg. at 29,711. The agency primarily relies on the observation that the past policy "led to an increase in the total number of QHPs that issuers offer." *Id.* First, the agency effectively "misreads its own data," or at least fails to reckon with data to the contrary: "the average number of bronze plan offerings has dropped by 27% since 2022, and the average number of silver plan offerings has dropped by 20% over the same period." ECF 26, at 23 (citing CBPP comment at 31). Second, the agency acknowledges that "most of this increase in plan offerings [was] comprised of standardized plan options" from plan year 2022 to plan year 2023, the time period the agency's data focuses on. 91 Fed. Reg. at 29,711 (noting that the "weighted average number of total plans available per enrollee in PY 2022 was 108, as compared to 114 in PY 2023). But such a result is not necessarily inconsistent with the original rationale for the policy—the introduction of standardized plans was intended to allow consumers "to *focus* their decision making" by offering a standardized baseline. 80 Fed. Reg. 75,488, 75,542 (Dec. 2, 2015) (emphasis added); *see also* 87 Fed. Reg. 27,208, 27,316 (May 6, 2022). Moreover, unintended proliferation effects were addressed by the parallel policy limiting the number of non-standardized offerings, which the agency also now seeks to repeal. *See* ECF 17-1, at 51–52 (first citing Partnership to Protect Coverage comment at 13 (Mar. 13, 2026),

https://www.regulations.gov/comment/CMS-2026-0496-0762; and then citing Levitis comment at 37). Although CMS acknowledges that the limitation has succeeded in reducing proliferation, it dismisses that success as "a marginal net reduction" in a conclusory fashion. 91 Fed. Reg. at 29,725.

Though the Rule asserts that there was a "comparatively low uptake" in standardized plan options to further justify the about-face in policy, that conclusion is internally inconsistent, as the agency acknowledges in the same breath that a "significant number of consumers" have still chosen standardized plans. 91 Fed. Reg. at 29,717; *see also* ECF 26, at 24 ("But [the agency] concedes that nearly 8 million individuals enrolled in standardized plans last year . . . ."). Moreover, while true that "active selection of and enrollment in standardized plan options would be substantially lower without differential displaying these plans on *HealthCare.gov*," *id.*, such a statement fails to provide a reasoned basis on which to *depart* from the policy of differentiation. And although the agency offers alternatives to "simplifying the plan selection process," such as "making enhancements to plan display, choice architecture, decision- support tools, and other forms of consumer assistance on *HealthCare.gov*," the agency did not actually *adopt* any of those solutions when it decided to remove standardized plans and the associated limitations on non-standardized plan offerings. 91 Fed. Reg. at 29,717; *see* ECF 26, at 24.

Mere mention of such viable alternatives is not enough. "An agency is 'required to consider responsible alternatives to its chosen policy *and* to give a reasoned explanation for its rejection of such alternatives.'" *Globalstar, Inc. v. F.C.C.*, 564 F.3d 476, 488 (D.C. Cir. 2009) (emphasis added) (internal quotation marks omitted) (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008)). Moreover, because the new policy with respect to standardized plans and limits on non-standardized plans "rests upon factual findings that contradict

those which underlay its prior policy," CMS needed to "provide a more detailed justification than what would suffice for a new policy created on a blank slate" and thus must offer more than the mere invocation of "experience" implementing the prior policy to provide a satisfactory explanation under the APA. *See Fox Television Stations, Inc.*, 556 U.S. at 515. For all those reasons, the Court concludes that Plaintiffs have shown that the provisions eliminating standards plans and discontinuing non-standardized plan limits and exceptions are likely arbitrary and capricious.

### 2.    Prejudice and Public Interest

The final two factors—balance of the equities and weighing the public interest—"merge," as here, "when the Government is the opposing party." *Nken*, 556 U.S. at 435. The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," with "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)). Logically, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). On the other hand, there is a substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994); *see also HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 686 (D. Md. 2020) (same), *aff'd*, 985 F.3d 309 (4th Cir. 2021). The Court is also mindful that the Fourth Circuit recently cautioned against collapsing "the first *Winter* factor—likelihood of success on the merits—with the merged balance of equities and public interest factor." *USA Farm Lab, Inc. v. Micone*, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025). As such, "[l]ikelihood of success on the merits alone does not suffice." *Am. Fed. of State, Cnty.*

*and Municipal Employees, AFL-CIO et al., v. Social Security Administration et al.*, 778 F. Supp. 3d 685, 779 (D. Md. 2025).

There is a strong public interest in Americans maintaining affordable healthcare coverage. Indeed, that was the primary purpose of enacting the ACA. *See NFIB*, 567 U.S. at 538 (explaining that the purpose of the ACA is "to increase the number of Americans covered by health insurance and decrease the cost of health care"). Moreover, causing an estimated 1.2 to 2 million people to drop coverage, CMS's own number, *see* 91 Fed. Reg. at 29,854, will drive up costs for the insured and lead to a significant decrease in the quality of care for the newly uninsured, which is unquestionably not in the public interest. As articulated in the Rule itself and by Defendants throughout this litigation thus far, it is of course the case that many of the Rule's general aims are worthy goals also reflecting the public interest. One such example is reducing fraud by brokers and agents, thereby reducing the burden of subsidy expenditures on taxpayers. However, the Court is not convinced that the concerns articulated by the Rule outweigh the damage that will flow from its enactment. And though the agency no doubt posits laudable goals it wishes to achieve through the enactment of the Rule, "that does not mean that the government can flout the law to do so." *Am. Fed. of State, Cnty. & Mun. Emps., AFL-CIO*, 778 F. Supp. 3d at 779.

At the hearing, Defendants raised for the first time in this litigation the concern that some consumers and the agency would be harmed by the imposition of a stay because of measures taken to implement the Rule prior to its effective date. The Court provided the parties with the opportunity for supplemental briefing on the matter. *See* ECF 28 (Defendants' supplement); ECF 29 (Plaintiffs' supplement). Specifically, the parties address two issues in the supplemental briefing: "(1) The potential effect of the preliminary relief sought on individuals who have already

69

enrolled in catastrophic coverage for 2026; and (2) the practical obstacles to directing CMS to develop a standardized plan for Plan Year 2027 at this juncture." ECF 28, at 2.

As to the former, Defendants assert that on "September 4, 2025, CMS advised insurers and the public of a forthcoming expansion of catastrophic coverage eligibility." *Id.* at 3 (citing *Guidance on Hardship Exemptions for Individuals Ineligible for Advance Payment of the Premium Tax Credit or Cost-sharing Reductions Due to Income, and Streamlining Exemption Pathways to Coverage*, Ctrs. For Medicare & Medicaid Servs. (Sep. 4, 2025), https://perma.cc/NLQ8-TVT2). That guidance explained that "[s]tarting November 1, 2025, when the open enrollment period for plan year 2026 begins, CMS will begin streamlining the process to allow consumers to apply for a hardship exemption through the [Federal Exchange] for a catastrophic plan based on being ineligible for APTC or CSRs[.]" *Id.* (alterations in original) (citation omitted). CMS's communication "prompted some insurers to offer catastrophic coverage to the expanded eligibility pool ahead of the 2027 Payment Notice, and some consumers elected to enroll in that coverage for Plan Year 2026." *Id.* "As of July 8, 2026, 20,025 consumers who were ineligible for APTCs, and thus eligible for catastrophic coverage under the revised hardship exemption, enrolled in a catastrophic plan between November 1, 2025, and January 15, 2026 in the Federal Exchange." *Id.* (citing ECF 28-1, at 7 ¶ 25). However, CMS has only approved approximately 630 applications, a number which is "inclusive of *every* hardship request, not just those due to ineligibility for APTCs" or who would qualify for the exemption only by virtue of the expanded definition established in the Rule. *Id.* at 4 (emphasis added).

Defendants argue that some portion of these 630 approved applications are likely to be invalidated should the Court issue a stay, and further that "CMS would be required to engage in significant coordination with insurers to remove consumers from their catastrophic coverage

plans" and to "properly re-enroll this population into other coverage." *Id.* Seeming to contradict the decision to expand the exemption itself, Defendants argue that "catastrophic coverage is intended to be a backstop to total uninsurance," so "many of these consumers may not have the means to obtain coverage under another more expensive plan." *Id.* Defendants also point out that some of these consumers "may have already made financial planning decisions based on their enrollment in catastrophic coverage." *Id.*

Of the 630 individuals whose applications have been approved by CMS for catastrophic coverage, it is not clear to the Court how many of those applicants would actually be impacted by a stay. Nor does it appear to the Court to be overly burdensome for CMS to re-enroll the portion of individuals affected through, for example, a SEP, as Plaintiffs suggested at the hearing. Indeed, Plaintiffs point out in supplemental briefing that a regulation already exists permitting "a special enrollment period in 'other exceptional circumstances as the Exchange may provide.'" ECF 29, at 5 (quoting 45 C.F.R. § 155.420(d)(9)). Moreover, Plaintiffs suggest that "[a] stay need not affect individuals who are currently enrolled in catastrophic coverage," because "CMS may exercise its enforcement discretion to declare, for current enrollees, that it would not enforce the relevant provisions of the ACA or the Public Health Service Act against insurers for any actions taken in good faith reliance on the guidance before the date of any order from this Court." *Id.* at 4. Indeed, Plaintiffs identify exercises of the agency's discretion under similar circumstances in the past. *See id.* (noting that "[i]n 2019, a federal district court vacated a Department of Labor rule" and "[i]n response to the district court's order, CMS, together with the Department of Labor, announced that both agencies would exercise their enforcement discretion to ensure that enrollees in the unlawful plans could remain in that coverage for the remainder of the plan year" (citing U.S. Dep't of Labor, *News Release, U.S. Department of Labor Statement Relating to the U.S. District Court Ruling in*

71

*State of New York v. United States Department of Labor* (Apr. 29, 2019), https://perma.cc/JM77-E26A)).  The Court concludes that the proposed strategies offered by Plaintiffs are sufficient to avoid or substantially mitigate the inequities theorized by Defendants.

Second, Defendants argue that it is impracticable for the agency to design standardized plan options for plan year 2027 if the provision removing such plans is stayed.  *See id.* at 5–6.  Defendants contend that CMS cannot use a template plan from a previous year because "[s]everal standardized plan option designs that were finalized in the 2026 Payment Notice are no longer compliant with CMS's revised 2027 AV requirements when run through the 2027 AV Calculator."  *Id.* at 6.  To create such plans "would be no small task," Defendants aver, as CMS would typically "issue standardized plan designs in notice-and-comment rulemaking," which would be "extremely difficult, if not impossible, to complete . . . before Open Enrollment begins on November 1, 2026."  *Id.*  And although an interim final rule presents a possible bypass, Defendants argue that "rule would still take time to draft, clear, and become effective—likely significantly past the August 12, 2026, deadline for issuers to finalize their 2027 QHP data."  *Id.*  Further, Defendants describe the involved process for insurers to "submit their plan options for review and approval" after "CMS published its standardized designed."  *Id.* at 7.  Defendants suggest that a stay, requiring that process to be conducted on an expedited basis, "could lead some insurers to simply withdraw from the market for this year."  *Id.*

Also problematic for Defendants is the "operational difficulties relating to the differential display of standardized plan options on *HealthCare.gov*," which Defendants suggest would require revision and resubmission of several plans by insurers, along with revisions for "CMS-authorized. brokers and private entities who operate websites separate from the *Healthcare.gov* platform."  *Id.* at 7–8.  Defendants also argue that "if this Court required CMS to reinstate the non-standardized

plan option limit, insurers would need to discontinue at least 12-to-21 percent of plans, upsetting their market segmentation strategies and depriving consumers of additional, innovative plans." *Id.* at 8 (citing ECF 28-1, at 6–7 ¶ 23). Finally, Defendants note that if the Court "were to order a stay of the Rule's changes to standardized and non-standardized plan requirements, insurers would be required to submit these materials for chronic and high-cost condition plans to be available." *Id.* at 8–9. As a practical matter, Defendants contend that these issues "would likely reduce the number of affordable plans available to consumers." *Id.* at 9.

Plaintiffs advance a variety of counterarguments. *See* ECF 29, at 5–10. Perhaps most compellingly, Plaintiffs contend that the difficulties the agency may now face in complying with a stay of this provision is "a problem of the agency's own devising." ECF 29, at 6. According to Plaintiffs, "[o]rdinarily, CMS announces its policies for the Exchanges through annual rulemakings, which are typically completed before insurers are required to submit their plan designs to state regulators." *Id.* (citing Cong. Res. Serv., *Health Insurance Exchanges and Qualified Health Plans: Overview and Policy Updates* 57–58 (May 6, 2025), https://perma.cc/TN72-L7XX). Plaintiffs observe that "[t]his year, however, CMS issued a proposed rule in February (including a proposal to rescind the standardized plan rules), while the annual rate-setting cycle had already begun, and issued its final rule in May, while that cycle was well underway." *Id.* (internal reference omitted). In light of the notice-and-comment process, the previous litigation, and the fact that this Rule contained several materially identical provisions to that of the rule at issue in the related case, the Court finds persuasive the argument that "the agency should have prepared for the possibility that commenters would persuade it to retain the standardized plan rules, or at least to delay their rescission . . . ." *Id.*; *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir.

2002) (noting that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself").

Plaintiffs suggest that complying with the Court's stay of the relevant provision would not be as hard as Defendants claim. Regardless, the Court has no doubt, given Defendants' representations, that a stay of the provisions related to standardized plans will result in additional work for the agency in the coming months. However, Plaintiffs offer a declaration from Jeffrey Grant, the founder and president of Schedule F Healthcare Strategies who "spent nearly thirty years as a career employee at [CMS], including almost fifteen in senior roles at the Center on Consumer Information and Insurance Oversight (CCIIO), which oversees Affordable Care Act (ACA) policy and runs the federal Marketplace." ECF 29-1, at 1 ¶ 2. Grant offers three examples where "CMS, issuers, and states were able to offer guidance, adapt timelines, and adjust plan pricing ahead of the open enrollment period . . . with far less time ahead of the open enrollment period than stakeholders have now to respond to any ruling from this Court." ECF 29-1, at 6 ¶¶ 16–17; *e.g.*, *id.* at 4–5 ¶¶ 11–13 (describing a change in federal policy that "came after that year's deadline of September 27 for issuers to finalize their Marketplace plan offerings for 2018," but which involved "issuers, CMS, and states work[ing] together to quickly revise filings and update premiums in response to the announcement," making "the necessary changes by late October," before "open enrollment began on November 1, 2017"). In light of those examples, the Court cannot conclude that Defendants' asserted inequity disrupts the balance of the equities. Accordingly, the Court is satisfied that the balance of equities and the public interest favor the issuance of a stay with respect to both the standardized plan and hardship exemption provisions.

## C. Security

The APA has no bond requirement. *See* 5 U.S.C. § 705; *see also Seafreeze Shoreside, Inc. v. U.S. Dept. of Interior*, 2023 WL 3660689, at *3 (D. Mass. May 25, 2023) ("Unlike a preliminary

injunction, a stay under 5 U.S.C. § 705 does not expressly require the movant post a bond.");

*Coalition for Humane Immigrant Rights v. Noem*, No. 25-cv-872, 2025 WL 2192986, at *38

(D.D.C. Aug. 1, 2025) (declining to require a bond because "Plaintiffs here seek a stay under APA

section 705, which is neither a preliminary injunction nor a temporary restraining order").  Because

the Court is issuing a stay under § 705, not a preliminary injunction, the Court declines to require

a bond, as it similarly declined to do in the related case.  *See City of Columbus III*, 796 F. Supp.

3d at 176–77.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a stay under 5 U.S.C. § 705 or, in the

alternative, for a preliminary injunction, ECF 17, construed as a motion for a stay under 5 U.S.C.

§ 705, is **GRANTED**.  A separate implementing order will issue.


Dated: July 16, 2026                                    /s/
                                              Brendan A. Hurson
                                              United States District Judge